UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION


UNITED STATES OF AMERICA,

      PLAINTIFF,          CASE NO.  CR-11-846-EJD

  VS.                 SAN JOSE, CALIFORNIA

ASHVIN DESAI,           SEPTEMBER 20, 2013

     DEFENDANT.       VOLUME 9

                   PAGES 1395 - 1584


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE EDWARD J. DAVILA
UNITED STATES DISTRICT JUDGE


A-P-P-E-A-R-A-N-C-E-S


FOR THE PLAINTIFF:   U.S. DEPARTMENT OF JUSTICE
                    BY:  MELISSA S. SISKIND
                        ROBERT KENNEDY
                    601 D STREET, NW, ROOM 7806
                    WASHINGTON, D.C. 20579


FOR THE DEFENDANT:   MARTIN A. SCHAINBAUM APLC
                    BY:  MARTIN A. SCHAINBAUM
                       ANDREW ALLEN
                    351 CALIFORNIA STREET, NO. 800
                    SAN FRANCISCO, CALIFORNIA 94104

   (APPEARANCES CONTINUED ON THE NEXT PAGE.)

  OFFICIAL COURT REPORTER:   IRENE L. RODRIGUEZ, CSR, CRR
                          CERTIFICATE NUMBER 8074


   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY,
TRANSCRIPT PRODUCED WITH COMPUTER.

1

    A P P E A R A N C E S: (CONT'D)

2


3    ALSO PRESENT:            U.S. TAX DIVISION
                              BY:  SCHYLON L. LANE, PARALEGAL

4                          601 D STREET, NW
                          ROOM 7115

5                          WASHINGTON, D.C. 20004

6


7                          LAFFER & GOTTLIEB
                          BY:  MARTIN G. LAFFER, CPA

8                          9454 WILSHIRE BOULEVARD
                          SUITE 920

9                          BEVERLY HILLS, CALIFORNIA 90212

10                       DEPARTMENT OF THE TREASURY
                          INTERNAL REVENUE SERVICE

11                       BY:  MICHAEL HELGESEN, AGENT
                          1200 FIRST STREET NORTHEAST

12                       SUITE 4200
                        WASHINGTON, D.C. 20002

13

14

15

16

17

18

19

20

21

22

23

24

25

1

INDEX OF PROCEEDINGS

2

3     FOR THE GOVERNMENT:

4     **JAMES OERTEL**

          DIRECT EXAM BY MS. SISKIND              P. 1413
5         (RESUMED)
          CROSS-EXAM BY MR. SCHAINBAUM            P. 1438
6         REDIRECT EXAM BY MS. SISKIND            P. 1527
          RECROSS EXAM BY MR. SCHAINBAUM          P. 1538

7

8     FOR THE DEFENDANT:

9     **ANKIL LALU**

          DIRECT EXAM BY MR. SCHAINBAUM           P. 1554
10        CROSS-EXAM BY MR. KENNEDY               P. 1557

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                                 INDEX OF EXHIBITS

3                                          IDENT.          EVIDENCE

4     GOVERNMENT'S:

5     163 – 169                                              1414
      143 – 153                                              1415
6

7     DEFENDANT'S:

8     GG-1                                                   1455
      GG-2                                                   1460
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1      SAN JOSE, CALIFORNIA                    SEPTEMBER 20, 2013

 2                      P R O C E E D I N G S

 3          (JURY OUT AT 10:32 A.M.)

 4               THE COURT:  ALL RIGHT.  LET'S JUST GO ON THE RECORD

 5      IN THE DESAI MATTER.  ALL COUNSEL AND THE DEFENDANT ARE

 6      PRESENT.  THE JURY IS NOT PRESENT.  THE WITNESS IS NOT PRESENT.

 7          AND WE'RE HAVING A DISCUSSION OUTSIDE OF THE PRESENCE OF

 8      THE JURY FOR A COUPLE OF ISSUES.  THE FIRST IS THE REDACTION OF

 9      THE EXHIBITS THAT WE DISCUSSED YESTERDAY.  I THINK THOSE

10      WERE --

11               MS. SISKIND:  -- 143 TO 153, YOUR HONOR.

12               THE COURT:  THANK YOU.

13               MS. SISKIND:  WE MADE THE REDACTIONS LAST NIGHT, AND

14      THERE WAS ONE MISTAKE I JUST CAUGHT.  THERE IS ONE LINE OF TEXT

15      THAT DID NOT GET CAPTURED IN THE REDACTION.  MS. LANE IS MAKING

16      THAT RIGHT NOW.  AND OTHERWISE THE REDACTIONS ARE MADE.

17          WE GAVE COPIES TO THE DEFENSE THIS MORNING TO REVIEW TO

18      SEE IF IT'S SATISFACTORY TO THEM.

19               THE COURT:  LET ME ASK THE DEFENSE, YOU HAVE REVIEW

20      THE REDACTED VERSION?

21               MR. SCHAINBAUM:  I HAVE GENERALLY REVIEWED IT.  I

22      RESERVE THE RIGHT, AS SPECIFIC DOCUMENTS ARE BEING INTRODUCED,

23      TO SEE IF THEY CONFORM TO WHAT WE AGREED UPON YESTERDAY.

24          SO I CAN'T REPRESENT TO THE COURT THAT I HAVE LOOKED AT

25      EVERY PARTICULAR DOCUMENT ON EVERY PAGE, BUT I HAVE GENERALLY
```

1    LOOKED AT THE DOCUMENTS, AND I'LL TAKE THE GOVERNMENT'S

2    REPRESENTATION THAT THERE WAS ONLY ONE ERROR.

3        BUT OUT OF AN ABUNDANCE OF CAUTION, I RESERVE THE RIGHT,

4    SHOULD ANY PARTICULAR DOCUMENT NOT CONFORM TO WHAT THIS COURT

5    HAS STATED YESTERDAY AND WHAT WE UNDERSTOOD TO BE THE

6    REDACTION, I WILL EITHER CALL FOR A SIDE-BAR OR JUMP UP.

7        THE COURT:  ALL RIGHT.

8        MR. SCHAINBAUM:  AND I'LL SAY "OBJECTION" AND A

9    SIDE-BAR.

10        MS. SISKIND:  AND THERE MAY BE MORE THAT WE MISSED.

11    THAT WAS THE ONE THAT I CAUGHT THIS MORNING.

12        MR. SCHAINBAUM:  YES.

13        THE COURT:  AND SO ALL PARTIES HAVE THE REDACTIONS.

14    THE WITNESS BINDER CONTAINS THEM NOW.

15        MS. SISKIND:  AND THE COURT HAS THEM AS WELL.

16        THE COURT:  THANK YOU VERY MUCH.

17        LET'S MOVE TO THE NEXT ISSUE, WHICH IS THE LIMITING

18    INSTRUCTION THAT I INDICATED I THINK WOULD BE APPROPRIATE FOR

19    THE COURT TO PROVIDE TO THE JURY UPON RECEIPT OF THIS

20    INFORMATION.

21        AND DO YOU HAVE A SUGGESTED --

22        MS. SISKIND:  WE DO, YOUR HONOR.  WE GAVE A COPY --

23    MAY I COME AROUND?

24        THE COURT:  YES.  THANK YOU.  THANK YOU.  DO YOU

25    HAVE A COPY OF THIS, MR. SCHAINBAUM?

1           MR. SCHAINBAUM:  I DON'T --

2           MS. SISKIND:  OH, I THOUGHT YOU WERE HANDED ONE.

3    I'M SORRY.  TOO MANY PAPERS.  AND WE PATTERN THIS OFF OF THE

4    INSTRUCTIONS, I BELIEVE, EVIDENCE OFFERED FOR A LIMITED

5    PURPOSE.

6           THE COURT:  I THINK THAT'S 2.11.

7           MR. SCHAINBAUM:  RIGHT.

8           THE COURT:  YES, 2.11.  IT'S THE NINTH CIRCUIT

9    INSTRUCTION 2.11.

10        (PAUSE IN PROCEEDINGS.)

11          THE COURT:  MR. SCHAINBAUM, DO YOU CARE TO COMMENT

12   ON THE PROPOSED 2.11?

13          MR. SCHAINBAUM:  WOULD YOU GIVE ME A MINUTE OR TWO,

14   YOUR HONOR?

15          THE COURT:  OF COURSE.

16          MR. SCHAINBAUM:  THANK YOU, YOUR HONOR.

17        (PAUSE IN PROCEEDINGS.)

18          MR. SCHAINBAUM:  YOUR HONOR, I'M GOING TO CONSULT

19   WITH THE DEFENDANT?

20          THE COURT:  OF COURSE, YES.

21          MR. SCHAINBAUM:  OKAY.

22        (PAUSE IN PROCEEDINGS.)

23          MR. SCHAINBAUM:  OKAY, YOUR HONOR, I'M INITIALLY

24   READY.

25          THE COURT:  YES, SIR.

```
 1              MR. SCHAINBAUM:  I HAVE IN HAND WHAT THE GOVERNMENT

 2     PREPARED AS A LIMITING INSTRUCTION, AND I HAVE SOME

 3     MODIFICATIONS AND THEY'RE AS FOLLOWS:

 4          THE FIRST SENTENCE IS AS THE GOVERNMENT HAS PROPOSED IT,

 5     "YOU'RE ABOUT TO HEAR EVIDENCE AND TESTIMONY REGARDING AUDITS

 6     THAT THE I.R.S. CONDUCTED OF THE DEFENDANT FOR THE YEARS 2003

 7     THROUGH 2008."

 8          TO BE ACCURATE, I MODIFIED THE SENTENCE BY ADDING THE

 9     WORDS BETWEEN "REGARDING" AND "AUDITS" THE FOLLOWING:  "I.R.S.

10     NOTICES REGARDING ONLY CORRESPONDENCE CIVIL AUDITS."

11          SO IT WOULD READ:  "YOU'RE ABOUT TO HEAR EVIDENCE AND

12     TESTIMONY REGARDING I.R.S. NOTICES REGARDING ONLY

13     CORRESPONDENCE CIVIL AUDITS THAT THE I.R.S. CONDUCTED OF THE

14     DEFENDANT FOR THE YEARS 2003 THROUGH 2008."

15          IN THE SECOND SENTENCE PARAGRAPH IT READS:  "I INSTRUCT

16     YOU THAT THIS EVIDENCE IS ADMITTED ONLY FOR THE LIMITED PURPOSE

17     OF PROVIDING EVIDENCE OF WHETHER THE DEFENDANT ACTED WILLFULLY

18     WHEN HE FILED THE TAX RETURNS ALLEGED IN THE INDICTMENT, AND,

19     THEREFORE, YOU MUST CONSIDER IT FOR ONLY THAT LIMITED PURPOSE

20     AND NOT FOR ANY OTHER PURPOSE."

21          I MODIFIED THAT SENTENCE BY THE FOLLOWING BETWEEN THE

22     WORDS "WHETHER" AND THE WORD "THE."

23              THE COURT:  THE SECOND LINE?

24              MR. SCHAINBAUM:  THE SECOND LINE, YOUR HONOR.  IT'S

25     THE SECOND LINE OF THE SECOND SENTENCE PARAGRAPH.
```

1        I PUT BETWEEN THE WORD "WHETHER" AND "THE" "WHETHER OR NOT

2    THE DEFENDANT ACTED WILLFULLY."

3        AND FURTHER ON THAT SAME LINE WHERE IT SAYS, "FILED THE,"

4    I INSERTED "2007, 2008, AND 2009 TAX RETURNS ALLEGED IN THE

5    INDICTMENT."

6        ACCORDINGLY THE MODIFIED SENTENCE WOULD READ:  "I INSTRUCT

7    YOU THAT THIS EVIDENCE IS ADMITTED ONLY FOR THE LIMITED PURPOSE

8    OF PROVIDING EVIDENCE OF WHETHER OR NOT THE DEFENDANT ACTED

9    WILLFULLY WHEN HE FILED THE 2007, 2008, AND 2009 TAX RETURNS

10   ALLEGED IN THE INDICTMENT, AND, THEREFORE, YOU MUST CONSIDER IT

11   ONLY FOR THAT LIMITED PURPOSE AND NOT FOR ANY OTHER PURPOSE."

12          THE COURT:  OKAY.  LET'S START WITH THIS LAST

13   PARAGRAPH.  ANY OBJECTION?

14          MS. SISKIND:  NOT TO THE SECOND PARAGRAPH CHANGES.

15          THE COURT:  ALL RIGHT.  SO I'LL READ THE SECOND

16   PARAGRAPH AS YOU AMENDED, MR. SCHAINBAUM.

17          MR. SCHAINBAUM:  THANK YOU.

18          THE COURT:  YOU'RE WELCOME.  LET'S GO TO THE FIRST

19   PARAGRAPH AGAIN.  IT SEEMS YOUR AMENDMENT ADDS LANGUAGE BETWEEN

20   THE WORDS "REGARDING" AND "AUDITS" IN THE FIRST LINE?

21          MR. SCHAINBAUM:  CORRECT.

22          THE COURT:  MS. SISKIND?

23          MS. SISKIND:  I THINK THE PROPOSED CHANGES BY

24   MR. SCHAINBAUM ARE A LITTLE WORDY AND CONFUSING.  I DON'T HAVE

25   AN OBJECTION TO PUTTING SOME ADDITIONAL WORDS IN THERE THAT

```
 1        MODIFIES THE WORD "AUDIT" TO ADD A LITTLE MORE DETAIL, BUT I

 2        THINK THE PARTICULAR DETAIL PROPOSED MAKES IT A LITTLE

 3        CONFUSING.

 4                  THE COURT:  THESE ARE CORRESPONDENCE AUDITS; IS THAT

 5        CORRECT.

 6                  MS. SISKIND:  I THINK WE CAN PUT THAT IN, FOR

 7        EXAMPLE.  THAT'S CORRECT.

 8                  MR. SCHAINBAUM:  IT'S THE LOWEST FORM --

 9                  THE COURT:  YOU'LL BE ABLE TO INTRODUCE LANGUAGE ON

10        THAT.  I'M TRYING TO GET THE LANGUAGE.  IF WE INSERT

11        "CORRESPONDENCE AUDITS."

12                  MS. SISKIND:  AND I THINK THAT WOULD BE CONSISTENT

13        WITH THE WITNESS'S TESTIMONY THAT THAT'S WHAT THESE THINGS ARE.

14                  MR. SCHAINBAUM:  I THINK I WOULD DO THAT IF YOU ALSO

15        ADD THE W.

16            ORD "CIVIL," "CORRESPONDENCE CIVIL AUDITS."

17                  MS. SISKIND:  I DON'T THINK THAT IS WHAT THE WITNESS

18        CALLED THEM.  HE CALLED THEM CORRESPONDENCE AUDITS.  SO I THINK

19        CORRESPONDENCE CIVIL AUDITS WOULD NOT BE AN APPROPRIATE WAY OF

20        REFERRING TO THEM.  AT LEAST THERE'S BEEN NO EVIDENCE THAT

21        THAT'S WHAT THEY'RE CALLED.

22                  THE COURT:  THAT SUGGESTS AND INFERS, DOESN'T IT,

23        THAT THERE'S A CRIMINAL AUDIT.  AND THERE'S NO EVIDENCE OF A

24        CRIMINAL AUDIT THAT HAS BEEN IMPOSED HERE, IF THERE IS SUCH A

25        THING.
```

1          MR. SCHAINBAUM:  WELL, IT LEAVES -- IT WILL BE

2     CONFUSION BECAUSE IN THE SECOND PARAGRAPH YOU'RE TALKING ABOUT

3     FOR THE LIMITED PURPOSE OF WHETHER OR NOT HE WILLFULLY FILED

4     2007, '08, AND '09 TAX RETURNS.

5          SO THIS IS WHAT IT IS, IT'S A CIVIL CORRESPONDENCE AUDIT.

6     THERE'S NO CRIMINAL ASPECT TO IT, AND I'M NOT WEDDED TO THIS

7     PARTICULAR LANGUAGE.

8          I'M JUST WEDDED TO THE POINT THAT IT SHOULD BE POINTED OUT

9     THAT IT IS A CIVIL CORRESPONDENCE NOTICE -- OR A CIVIL NOTICE

10    OF A CORRESPONDENCE AUDIT.

11         IF YOU WANT TO PUT CIVIL NOTICE OF A CORRESPONDENCE

12    NOTICE -- AUDIT, THAT'S FINE.

13         MS. SISKIND:  YOUR HONOR, IF WE JUST SAY

14    CORRESPONDENCE AUDIT, AND THEN MR. SCHAINBAUM CAN ELICIT ON THE

15    CROSS-EXAMINATION OF THE WITNESS THAT A CORRESPONDENCE AUDIT IS

16    A CIVIL PROCEEDING.

17         MR. SCHAINBAUM:  BUT I THINK IF YOU'RE GOING TO GIVE

18    A LIMITING INSTRUCTION AND YOU'RE GOING TO USE THE TERMINOLOGY

19    WILLFULLY IN THE SECOND PARAGRAPH, YOU NEED TO BALANCE IT WITH

20    AN ACCURATE DESCRIPTION OF WHAT THE CORRESPONDENCE AUDIT IS.

21         THE COURT:  ALL RIGHT.  THANK YOU.  I WILL AMEND THE

22    FIRST LINE.

23         AND, MR. SCHAINBAUM, I'M GOING TO AMEND IT WITH JUST THE

24    WORD "CORRESPONDENCE," AND I'M GOING TO RELY ON YOU IN YOUR

25    EXAMINATION TO ELICIT WHATEVER YOU'D LIKE ADDITIONALLY AS TO

 1      WHAT THESE ARE.  I'LL CERTAINLY GIVE YOU THE OPPORTUNITY TO DO

 2      THAT.

 3           SO THE FIRST LINE WILL BE "YOU ARE ABOUT TO HEAR EVIDENCE

 4      AND TESTIMONY REGARDING CORRESPONDENCE AUDITS THAT THE I.R.S.

 5      CONDUCTED OF THE DEFENDANT FOR THE YEARS 2003 THROUGH 2008."

 6           THE SECOND PARAGRAPH WOULD READ:  "I INSTRUCT YOU THAT

 7      THIS EVIDENCE IS ADMITTED ONLY FOR THE LIMITED PURPOSE OF

 8      PROVIDING EVIDENCE OF WHETHER OR NOT THE DEFENDANT ACTED

 9      WILLFULLY WHEN HE FILED THE 2007, 2008, AND 2009 TAX RETURNS

10      ALLEGED IN THE INDICTMENT, AND, THEREFORE, YOU MUST CONSIDER IT

11      ONLY FOR THAT LIMITED PURPOSE AND NOT FOR ANY OTHER PURPOSE."

12           THAT'S WHAT I'LL READ TO THE JURY WHEN THESE 143 THROUGH

13      153 ARE INTRODUCED.

14              MR. SCHAINBAUM:  RIGHT.  WELL, I'LL OBJECT BECAUSE

15      REALLY WHAT WE'RE LOOKING AT IS NOTICES OF A CORRESPONDENCE

16      CIVIL AUDIT AND YOU HAVE LIMITED IT TO CORRESPONDENCE AND NOT

17      PUT IN THE WORD "NOTICE."

18           SO THERE IS A DISTINCTION, I BELIEVE, AND A DISTORTION IN

19      THERE, AND I WILL OBJECT TO THE LANGUAGE UNLESS IT'S MODIFIED

20      TO INDICATE EXACTLY WHAT IT IS.

21              THE COURT:  I'M LOOKING AT 143 NOW, EXHIBIT 143 IN

22      THE BINDER.  AND I'M LOOKING FOR A TITLE OF THE DOCUMENT.  IF

23      COUNSEL CAN HELP ME?

24              MS. SISKIND:  143, THE TITLE OF THE DOCUMENT IS A

25      CP 2000.  THAT'S WHAT THIS THING IS CALLED.  AND IT'S IN THE

```
 1      BOTTOM RIGHT AND ALSO ON THE TOP RIGHT OF THE NOTICE.

 2          AND MR. OERTEL TESTIFIED THAT ALL OF THE NOTICES, WHICH

 3      THEY HAVE SLIGHTLY DIFFERENT NUMBERS ON ALL OF THEM, THAT ALL

 4      OF THE NOTICES IN 143 THROUGH 153 ARE THE TYPES OF NOTICES THAT

 5      WOULD BE ISSUED AS PART OF A CORRESPONDENCE AUDIT.

 6              THE COURT:  WILL MR. OERTEL TESTIFY AS TO WHAT

 7      CP 2000 MEANS.

 8              MS. SISKIND:  I BELIEVE HE'LL TESTIFY THAT IT'S A

 9      NOTICE ISSUED BY THE I.R.S. AS PART OF AN AUDIT.  I DON'T KNOW

10      EXACTLY WHAT WORDS HE'S GOING TO USE.

11              THE COURT:  DO WE KNOW WHETHER THAT CP HAS SOME KIND

12      OF CONNOTATION AS TO CIVIL PROCEDURE 2000 OR SOMETHING LIKE

13      THAT?  DOES IT INCLUDE THE WORD "CIVIL" DO WE KNOW?

14              MS. SISKIND:  I DON'T KNOW THE ANSWER TO THAT.

15              MR. SCHAINBAUM:  WELL, THAT'S WHAT CP REPRESENTS,

16      AND THERE'S NOWHERE THAT IT SAYS THIS IS AN AUDIT.  IT SAYS

17      THIS IS A NOTICE, IT'S AN INQUIRY.

18              THE COURT:  WELL, BUT I THINK, AND YOU COUNSEL

19      AGREE, THAT THIS WAS A LETTER AUDIT?

20              MR. SCHAINBAUM:  CORRESPONDENCE.

21              MS. SISKIND:  CORRESPONDENCE.

22              THE COURT:  CORRESPONDENCE AUDIT IS WHAT THE

23      EVIDENCE SHOWS.

24              MR. SCHAINBAUM:  BUT THE WAY IT'S SET UP, IT'S NOT

25      REALLY AN AUDIT BECAUSE THEY'RE JUST ASKING QUESTIONS OR
```

1    MAKING -- OR PROVIDING INFORMATION, FOR EXAMPLE, THOSE GRIDS

2    PROVIDED INFORMATION AS TO INTEREST AND THERE WAS OTHER GRIDS

3    THAT WERE ELIMINATED.

4           THE COURT:  SO LET ME JUST ASK YOU, I THOUGHT THERE

5    WAS AGREEMENT THAT THESE WERE CONSIDERED AUDITS OF A CERTAIN

6    TYPE BY COUNSEL YESTERDAY.  AND THAT'S WHAT THESE ARE.

7           MR. SCHAINBAUM:  WELL, I'M LOOKING AT THESE CLOSER

8    AND I'M LOOKING AT -- AND ACTUALLY, THE COURT --

9           THE COURT:  LET'S DO THIS, WHY DON'T WE BRING THE

10   WITNESS IN AND ASK HIM TO DEFINE WHAT THIS IS AND WHAT THE CP

11   IS AND MAYBE THAT WILL BE HELPFUL.

12          MR. SCHAINBAUM:  OKAY.

13          MS. SISKIND:  SURE.

14          THE COURT:  OUTSIDE OF THE PRESENCE OF THE JURY, OF

15   COURSE.

16          MS. SISKIND:  WHAT IF WE JUST SAY INSTEAD OF

17   "CORRESPONDENCE AUDIT" WE SAY "YOU ARE ABOUT TO HEAR TESTIMONY

18   REGARDING NOTICES THAT THE DEFENDANT RECEIVED FROM THE I.R.S.

19   REGARDING TAX YEARS 2003 TO 2008."  JUST LEAVE IT VERY GENERIC

20   AT THE WORD "NOTICES"?

21          MR. SCHAINBAUM:  RIGHT.  BUT I STILL WOULD LIKE TO

22   HEAR WHAT THE WITNESS SAYS.

23          THE COURT:  WELL, I ASKED YOU TO COME IN HERE JUST

24   FOR THIS DEFINITION PURPOSE.  IF YOU AGREE WITH THIS, WE WON'T

25   NEED THIS TESTIMONY.

```
 1              MR. SCHAINBAUM:  IT WOULD BE HELPFUL TO ME TO GET MY

 2     AGREEMENT.

 3              THE COURT:  SO RIGHT NOW IT'S SUGGESTED "NOTICE

 4     AUDITS"?

 5              MS. SISKIND:  NO, JUST THE WORD --

 6              MR. SCHAINBAUM:  NOTICES.

 7              THE COURT:  NOTICES.  SO IT READS "REGARDING NOTICES

 8     THAT THE I.R.S."

 9              MS. SISKIND:  "THAT THE DEFENDANT RECEIVED FROM THE

10     I.R.S. REGARDING THE YEARS 2003 THROUGH 2008."

11              MR. SCHAINBAUM:  I WOULD SUGGEST REGARDING CIVIL

12     NOTICES THAT THE I.R.S. ISSUED TO THE DEFENDANT FOR THE YEARS

13     2003 THROUGH 2008.

14              MS. SISKIND:  YOUR HONOR, THAT GETS BACK TO THE

15     DEFENSE CAN ELICIT THE CIVIL NATURE OF THESE IN ANOTHER MATTER.

16              THE COURT:  I UNDERSTAND.  SO LET'S -- MR. OERTEL IS

17     ON THE WITNESS STAND NOW.

18         (GOVERNMENT'S WITNESS, JAMES OERTEL, PREVIOUSLY SWORN.)

19              THE COURT:  MS. SISKIND, DID YOU WANT TO ASK

20     QUESTIONS REGARDING THE DESIGNATION CP 2000?

21              MS. SISKIND:  SURE.

22     Q.   DO YOU WANT TO TURN TO 143, PLEASE, MR. OERTEL?

23     A.   OKAY.  YES, IT'S ALREADY OPEN.

24     Q.   AND DO YOU KNOW WHAT THE CP AND CP 2000 STANDS FOR?

25     A.   COMPLIANCE PROGRAM.
```

```
 1              THE COURT:  MR. OERTEL, WHAT IS 143 TITLED?  I SEE

 2      THE FIRST PAGE, AND WE ALL SEE THAT.  WHAT IS THIS DOCUMENT

 3      TITLED?

 4              THE WITNESS:  THIS WOULD BE A CP 2000 NOTICE.  IT

 5      DOESN'T ACTUALLY HAVE A TITLE ON IT.  IT'S -- I WOULD CALL IT A

 6      CP 2000 NOTICE OR LETTER.

 7              THE COURT:  NOTICE?

 8              THE WITNESS:  OR LETTER.

 9              THE COURT:  OR LETTER?

10              THE WITNESS:  YEAH, BECAUSE YOU DO IT IN LETTER

11      FORM, AND IT IS A NOTICE.  SO IT'S BOTH THINGS.

12              THE COURT:  ANY FURTHER QUESTIONS, MS. SISKIND?

13         MR. SCHAINBAUM, ANY QUESTIONS ON THIS TOPIC?

14              MR. SCHAINBAUM:  NO.

15              THE COURT:  THANK YOU, SIR.  YOU CAN -- I'M GOING TO

16      ASK YOU TO GO BACK OUTSIDE.

17              THE WITNESS:  OKAY.

18              THE COURT:  WE'LL CALL YOU IN, IN JUST A MOMENT.

19              THE WITNESS:  OKAY.

20              THE COURT:  YOU'VE BEEN VERY HELPFUL.  THANK YOU.

21         ALL RIGHT.  THE RECORD SHOULD REFLECT THAT MR. OERTEL HAS

22      LEFT THE COURTROOM.

23         MS. SISKIND.

24              MS. SISKIND:  THE CP, AS HE TESTIFIED, DOES NOT

25      STAND FOR -- THE "C" IS NOT FOR CIVIL.  SO WE WOULD SUGGEST
```

```
1    THAT EITHER THE SENTENCE BE AS THE COURT PROPOSED IT JUST

2    ADDING THE WORD "CORRESPONDENCE" OR THE SENTENCE STRUCTURE

3    CHANGE AND REFER GENERALLY TO NOTICES.

4         EITHER OF THOSE WOULD BE AGREEABLE TO THE GOVERNMENT.

5              MR. SCHAINBAUM:  I WOULD ADOPT WHAT MR. OERTEL SAID

6    THAT IT'S A COMPLIANCE PROGRAM NOTICE OR LETTER.  PUT THAT

7    IN --

8              THE COURT:  I DON'T THINK HE SAID THAT.

9              MR. SCHAINBAUM:  WHAT?

10             THE COURT:  I DON'T THINK HE SAID THAT.

11             MR. SCHAINBAUM:  HE SAID COMPLIANCE PROGRAM, THAT IS

12   WHAT CP STANDS FOR.

13             THE COURT:  HE DID SAY THAT.

14             MR. SCHAINBAUM:  SO THAT'S WHAT THE NOTICE IS.

15             THE COURT:  HE DIDN'T SAY THAT.

16             MR. SCHAINBAUM:  SO WHAT IS THAT?

17             THE COURT:  HE SAID THAT IT'S -- HE SAID IT WOULD BE

18   A CP 2000 NOTICE.  IT DOESN'T HAVE A TITLE ON IT.  I WOULD CALL

19   IT A CP 2000 NOTICE OR LETTER.  THAT'S WHAT HE SAID.

20             MR. SCHAINBAUM:  AND THAT'S WHAT I WOULD GO WITH.

21             MS. SISKIND:  AND FOR THE RECORD, YOUR HONOR,

22   THEY'RE NOT ALL CP 2000.  SO IF WE'RE GOING TO USE THAT IN THE

23   INSTRUCTION THEN THE COURT WOULD HAVE TO LIST OUT EVERY TYPE OF

24   NOTICE AND THERE ARE OTHER TYPES.

25             MR. SCHAINBAUM:  YOUR HONOR, I BELIEVE THAT ALL OF
```

```
 1     THOSE NOTICES ARE DERIVATIONS.  SOME ARE CP 2500, SOME ARE

 2     CP 2501.  SO THEY'RE ALL COMPLIANCE --

 3               THE COURT:  LET ME ASK YOU THIS --

 4               MR. SCHAINBAUM:  -- NOTICES OR LETTERS.

 5               THE COURT:  SO I'M INCLINED TO READ:  "YOU ARE ABOUT

 6     TO HEAR EVIDENCE OR TESTIMONY REGARDING LETTER NOTICES THAT THE

 7     I.R.S. CONDUCTED OF THE DEFENDANT."

 8               MS. SISKIND:  OR "SENT TO THE DEFENDANT"?

 9               THE COURT:  "SENT TO THE DEFENDANT."

10               MR. SCHAINBAUM:  SENT TO THE DEFENDANT.

11               MS. SISKIND:  "FOR THE YEARS 2003 THROUGH 2008"?

12               THE COURT:  YES, I WILL COMPLETE THAT.

13          SO THE SENTENCE WILL READ:  "YOU ARE ABOUT TO HEAR

14     EVIDENCE AND TESTIMONY REGARDING LETTER NOTICES THAT THE I.R.S.

15     SENT TO THE DEFENDANT FOR THE YEARS 2003 THROUGH 2008."

16          THAT'S WHAT I'LL READ.  ANY OBJECTION, MR. SCHAINBAUM?

17               MR. SCHAINBAUM:  I WOULD PREFER HAVING THE WORD

18     "COMPLIANCE" AS THE WITNESS TESTIFIED, BUT I WILL ACCEPT THE

19     COURT'S INTERPRETATION FOR THIS LIMITING INSTRUCTION, ALTHOUGH

20     I OBJECT TO THE WHOLE LIMITING INSTRUCTION ITSELF AS A

21     CONTINUING OBJECTION THAT NEITHER THE DOCUMENTS NOR THE

22     LIMITING INSTRUCTION SHOULD BE GIVEN.

23               THE COURT:  ALL RIGHT.  SO NOTED.  THANK YOU.

24               MR. SCHAINBAUM:  YOU'RE WELCOME.

25               THE COURT:  AND SHOULD WE CALL OUR JURY AND WITNESS
```

```
 1        IN THEN?

 2                    MS. SISKIND:  YES, PLEASE.

 3                    THE COURT:  LET'S DO THAT.

 4               (JURY IN AT 10:57 A.M.)

 5                    THE COURT:  PLEASE BE SEATED.  THANK YOU VERY MUCH.

 6        ALL RIGHT.  THE RECORD SHOULD REFLECT THAT WE ARE BACK ON THE

 7        RECORD IN THE DESAI MATTER.  ALL COUNSEL AND THE DEFENDANT ARE

 8        PRESENT.  OUR JURY AND ALTERNATES ARE PRESENT.

 9               MR. OERTEL IS BACK ON THE STAND.  SIR, I'LL REMIND YOU

10        YOU'RE STILL UNDER OATH.

11                    THE WITNESS:  OKAY.

12                    DIRECT EXAMINATION (RESUMED)

13        BY MS. SISKIND:

14        Q.  MR. OERTEL BEING WHEN WE LEFT YESTERDAY, WE WERE TALKING

15        ABOUT CORRESPONDENCE AUDITS.  DO YOU RECALL THAT?

16        A.  YES.

17        Q.  AND CAN YOU REMIND THE JURY WHAT A CORRESPONDENCE AUDIT

18        IS?

19        A.  THAT'S WHERE THE I.R.S. BASICALLY BY MAIL TELLS YOU THAT

20        THERE'S SOME KIND OF DISCREPANCY OR SOMETHING BETWEEN WHAT THE

21        COMPUTER HAS RECEIVED ABOUT YOUR INCOME AND WHAT YOUR TAX

22        RETURN SHOWS AS YOUR INCOME.

23        Q.  WAS MR. DESAI THE SUBJECT OF I.R.S. CORRESPONDENCE AUDITS

24        FOR THE YEARS 2003 THROUGH 2008?

25        A.  YES.
```

1    Q.  AND HAVE YOU REVIEWED RECORDS RELATING TO THOSE

2    CORRESPONDENCE AUDITS?

3    A.  YES.

4    Q.  ARE YOU FAMILIAR WITH SOMETHING CALLED AN I.R.S. ACCOUNT

5    TRANSCRIPT OR A TRANSCRIPT OF ACCOUNT?

6    A.  YES.

7    Q.  AND CAN YOU TURN TO WHAT HAS BEEN MARKED FOR

8    IDENTIFICATION AS GOVERNMENT'S EXHIBITS 163 THROUGH 169.

9    A.  OKAY.

10   Q.  AND JUST TAKE A MOMENT AND FLIP THROUGH THOSE, IF YOU

11   WOULD.

12   A.  OKAY.

13   Q.  DO 163 THROUGH 169 CONTAIN ACCOUNT TRANSCRIPTS FOR ASHVIN

14   AND NILA DESAI FOR THE YEARS 2003 THROUGH 2009?

15   A.  THAT'S CORRECT.

16       MS. SISKIND:  YOUR HONOR, THE GOVERNMENT MOVES FOR

17   THE ADMISSION OF 163 THROUGH 169.

18       MR. SCHAINBAUM:  NO OBJECTION.

19       THE COURT:  THEY'RE RECEIVED WITHOUT OBJECTION.

20      (GOVERNMENT'S EXHIBITS 163-169 WERE RECEIVED IN EVIDENCE.)

21   BY MS. SISKIND:

22   Q.  AND IF YOU COULD TAKE A LOOK AT GOVERNMENT'S EXHIBITS 143

23   THROUGH 153.  ARE THESE DOCUMENTS THAT YOU REVIEWED BEFORE YOUR

24   TESTIMONY HERE TODAY?

25   A.  YES.

DIRECT OERTEL

```
 1    Q.   AND DO 143 THROUGH 153 CONTAIN NOTICES AND LETTERS THAT

 2    WERE ISSUED BY THE I.R.S. TO THE DEFENDANT AS PART OF

 3    CORRESPONDENCE AUDITS FOR THE YEARS 2003 THROUGH 2008?

 4    A.   YES.

 5             MS. SISKIND:  THE GOVERNMENT MOVES FOR THE ADMISSION

 6    OF 143 THROUGH 153.

 7             THE COURT:  ANY OBJECTION?

 8             MR. SCHAINBAUM:  NO OBJECTION.

 9             THE COURT:  THEY'RE RECEIVED WITHOUT OBJECTION.

10        (GOVERNMENT'S EXHIBIT 143-153 WERE RECEIVED IN EVIDENCE.)

11             THE COURT:  ARE YOU GOING TO ELICIT TESTIMONY ON

12    THESE ITEMS NOW?

13             MS. SISKIND:  YES, YOUR HONOR.

14             THE COURT:  LADIES AND GENTLEMEN, I WANT TO GIVE YOU

15    AN INSTRUCTION NOW REGARDING THIS EVIDENCE.  YOU ARE ABOUT TO

16    HEAR EVIDENCE AND TESTIMONY REGARDING LETTER NOTICES THAT THE

17    I.R.S. SENT TO THE DEFENDANT FOR THE YEARS 2003 THROUGH 2008.

18        I INSTRUCT YOU THAT THIS EVIDENCE IS ADMITTED ONLY FOR

19    THE LIMITED PURPOSE OF PROVIDING EVIDENCE OF WHETHER OR NOT THE

20    DEFENDANT ACTED WILLFULLY WHEN HE FILED THE 2007, 2008, AND

21    2009 TAX RETURNS ALLEGED IN THE INDICTMENT, AND, THEREFORE, YOU

22    MUST CONSIDER IT ONLY FOR THAT LIMITED PURPOSE AND NOT FOR ANY

23    OTHER PURPOSE.  THANK YOU.

24        MS. SISKIND.

25    BY MS. SISKIND:
```

1    Q.   IF WE COULD START -- AS SOON AS YOU HAVE YOUR WATER.

2    A.   SORRY.

3              MS. SISKIND:  MS. LANE, IF YOU COULD PULL UP 143,

4    PLEASE.

5              THE WITNESS:  OKAY.  I HAVE 143 UP.

6    BY MS. SISKIND:

7    Q.   OKAY.  WHAT IS EXHIBIT 143?

8    A.   THIS WOULD BE CALLED -- OH, EXCUSE ME.  THIS WOULD BE

9    CALLED A CP 2000 NOTICE LETTER.

10   Q.   AND JUST WHAT TAXPAYER OR TAXPAYERS DOES THIS NOTICE

11   PERTAIN TO?

12   A.   ASHVIN AND NILA DESAI.

13   Q.   AND DOES IT RELATE TO A PARTICULAR TAX YEAR?

14   A.   2003.

15   Q.   AND WHAT IS THE DATE OF THIS NOTICE?

16   A.   MARCH 28, 2005.

17   Q.   AND IS A CP 2000 THE TYPE OF NOTICE THAT WOULD BE ISSUED

18   AS PART OF A CORRESPONDENCE AUDIT?

19   A.   YES.

20   Q.   AND CAN YOU READ WHAT IT SAYS UNDER "NUMBER 1.  WHY ARE

21   YOU GETTING THIS NOTICE?"

22   A.   "THE INCOME AND PAYMENT INFORMATION (E.G. INCOME TAX

23   WITHHELD, WAGES, MISCELLANEOUS INCOME, INTEREST, ET CETERA)

24   THAT WE HAVE ON FILE DOES NOT MATCH ENTRIES ON YOUR 2003 FORM

25   1040.  IF THIS INFORMATION IS CORRECT, YOU WILL OWE $10,266."

1    Q.   AND UNDER NUMBER 2 CAN YOU READ WHAT THE NOTICE SAYS ABOUT

2    "WHAT STEPS YOU SHOULD TAKE?"

3    A.   "FOLLOWING THESE STEPS CAN HELP YOU UNDERSTAND THIS

4    NOTICE.

5         "1.   REVIEW YOUR 2003 TAX RETURN.

6         "2.   COMPARE YOUR RETURN TO THE INFORMATION IN THE

7    EXPLANATION SECTION -- PAGE 5.

8         "3.   DECIDE IF THE INFORMATION IN THE EXPLANATION SECTION

9    IS CORRECT.

10        "4.   CHECK THE ANSWERS TO FREQUENTLY ASKED QUESTIONS --

11   PAGE 2.

12        "5.   COMPLETE AND RETURN THE RESPONSE FORM IN THE ENCLOSED

13   ENVELOPE -- PAGE 3.

14        "6.   COMPLETE AND RETURN THE INSTALLMENT AGREEMENT REQUEST

15   (ENCLOSED) IF YOU NEED TO SET UP A PAYMENT PLAN.

16        "7."  WHICH IS THE LAST ONE, "REVIEW YOUR RIGHTS IN THE

17   EXAMINATION PROCESS BOOKLET."

18   Q.   IF YOU TURN TO THE NEXT PAGE, DO YOU SEE A SECTION "HOW

19   CAN I PREVENT AN ERROR IN THE FUTURE?"

20   A.   YES.

21   Q.   AND CAN YOU READ WHAT NUMBER 1 SAYS?

22   A.   "NUMBER 1.  "INCLUDE ALL," "ALL" IS UNDERLINED, "INCLUDE

23   ALL INCOME YOU'VE RECEIVED DURING THE YEAR ON YOUR TAX RETURN."

24   Q.   NOW, DOES THIS NOTICE CONTAIN A LIST OF ITEMS THAT THE

25   I.R.S. IS SAYING THAT DO NOT MATCH -- THAT THERE ARE A

1    DISCREPANCY BETWEEN THEIR RECORDS AND THE TAX RETURN?

2    A.   YES.

3    Q.   AND DOES THAT LIST START ON PAGE 5?

4    A.   PAGE 5.

5    Q.   CAN YOU READ WHAT IT SAYS UNDER "1.  INFORMATION REPORTED

6    TO THE I.R.S. THAT DIFFERS FROM THE AMOUNT SHOWN ON THE TAX

7    RETURN"?

8    A.   WHICH PART WOULD YOU LIKE ME TO READ?

9    Q.   JUST THE FIRST PARAGRAPH, PLEASE?

10   A.   "THIS SECTION TELLS YOU SPECIFICALLY WHAT INCOME

11   INFORMATION THE I.R.S. HAS RECEIVED ABOUT YOU FROM OTHERS,

12   (INCLUDING YOUR EMPLOYERS, BANKS, MORTGAGE HOLDERS, ET CETERA.)

13   THE INFORMATION LISTED BELOW DOES NOT MATCH THE INFORMATION

14   THAT YOU LISTED ON YOUR TAX RETURN.  USE THIS TABLE TO COMPARE

15   THE DATA I.R.S. HAS RECEIVED FROM OTHERS TO THE INFORMATION YOU

16   LISTED ON YOUR TAX RETURN TO UNDERSTAND WHERE THE DISCREPANCY

17   OR DIFFERENCE OCCURRED."

18   Q.   AND THEN DO YOU SEE A CHART THAT -- OR TABLE THAT STARTS

19   BELOW?

20   A.   YES.

21   Q.   AND WHAT IS -- WHAT ARE THESE THINGS THAT ARE LISTED AS

22   ITEMS IN THIS TABLE?

23   A.   ON THIS PAGE THERE IS THREE ITEMS OF INTEREST.

24   Q.   AND WHY ARE THEY INCLUDED IN THIS TABLE?

25   A.   WELL, IT SAYS INTEREST, AND THEN IT SAYS THE BANK.  IT

```
 1     GIVES THE ACCOUNT INFORMATION, AND THEN IT SAYS AMOUNT REPORTED

 2     TO THE I.R.S. BY OTHERS, AND IT GIVES AN AMOUNT.

 3          AND THEN IT COMPARES WHAT IS ON THE RETURN, AND THEN IT

 4     SHOWS THE DIFFERENCE.

 5     Q.   SO LOOKING AT ITEM NUMBER 1, HOW MUCH INTEREST DID BANK OF

 6     AMERICA REPORT TO THE I.R.S. FOR THIS ACCOUNT ON A 1099?

 7     A.   FOR THIS BANK OF AMERICA ACCOUNT IT'S $2,051.

 8     Q.   AND HOW MUCH WAS REPORTED ON THE DEFENDANT'S TAX RETURN?

 9     A.   NONE.

10     Q.   HOW MANY ITEMS OF INTEREST INCOME ARE ON THIS PAGE?

11     A.   THREE.

12     Q.   AND ARE THERE MORE ON THE NEXT PAGE?

13     A.   THERE'S FIVE MORE ON THE NEXT PAGE.

14     Q.   ANY ON THE PAGE AFTER THAT?

15     A.   FIVE MORE.

16     Q.   AND ON THE EIGHTH PAGE?

17     A.   ONE MORE INTEREST ONE.

18     Q.   AND WHAT IS THE TOTAL AMOUNT OF INTEREST INCOME THAT

19     ACCORDING TO THIS NOTICE WAS REPORTED TO THE I.R.S. BY OTHERS?

20     A.   $22,529.

21     Q.   AND HOW MUCH WAS INCLUDED ON THE TAX RETURN?

22     A.   22,975.

23     Q.   AND SO WHAT IS THE DIFFERENCE BETWEEN THE TWO?

24     A.   $553.

25     Q.   AND, NOW, WHEN A TAXPAYER GETS A NOTICE LIKE THIS AS PART
```

```
 1     OF A CORRESPONDENCE AUDIT, ARE THEY GIVEN A CHANCE TO RESPOND?

 2     A.   YES.

 3     Q.   IF YOU COULD GO TO EXHIBIT 144.

 4     A.   OKAY.

 5     Q.   AND IS THIS ANOTHER NOTICE THAT ASHVIN AND NILA DESAI

 6     RECEIVED FROM THE I.R.S. REGARDING THEIR 2003 TAXES?

 7     A.   YES.

 8     Q.   AND WHAT IS THE DATE OF THIS NOTICE?

 9     A.   JUNE 13TH, 2005.

10     Q.   AND WHAT DOES IT SAY UNDER "WHY ARE YOU GETTING THIS

11     NOTICE?"

12     A.   "WE RECEIVED YOUR RESPONSE TO OUR PREVIOUS NOTICE DATED

13     3-28-2005.  WE USED THE INFORMATION YOU PROVIDED TO REFIGURE

14     OUR ORIGINAL PROPOSAL.  AS A RESULT, THE PROPOSED EXCHANGES TO

15     YOUR TAX ARE LISTED BELOW."  AND THEN THERE'S A CHART.

16     Q.   IF YOU COULD FLIP ALL OF THE WAY TO THE LAST PAGE OF THIS

17     EXHIBIT?

18     A.   OKAY.

19     Q.   IN THE CHART AT THE TOP OF THE PAGE DO YOU SEE THE SAME

20     REFERENCE TO INTEREST INCOME FROM THE PREVIOUS NOTICE?

21     A.   YES.

22     Q.   AND THE SAME AMOUNTS?

23     A.   LET'S SEE.  WELL, THERE'S STILL A $553 DIFFERENCE.

24     Q.   AND SO ARE THE AMOUNTS THE SAME?

25     A.   YES.
```

1     Q.   NOW, IF YOU COULD TURN TO -- WELL, ACTUALLY, LET ME ASK

2     YOU THIS, AT THE BOTTOM CHART DO YOU SEE TOTAL AMOUNT YOU OWE?

3     A.   YES.

4     Q.   AND HOW MUCH IS THE I.R.S. SAYING THAT THE DESAIS OWE AS

5     PART OF THIS AUDIT?

6     A.   $5,269.

7     Q.   NOW, IF YOU GO -- IF YOU FLIP TO EXHIBIT 163.

8     A.   OKAY.

9     Q.   IS THIS THE ACCOUNT TRANSCRIPT FOR THE DESAIS FOR 2003?

10    A.   YES, IT IS.

11    Q.   AND ON THIS DOCUMENT IS THERE A REFERENCE TO THE FACT THAT

12    AN AUDIT OCCURRED FOR THAT YEAR?

13    A.   LET'S SEE.  WELL, THERE IS ADDITIONAL TAX ASSESSED.

14    Q.   AND IS THAT ON THE SECOND PAGE?

15    A.   YES, IT IS.

16    Q.   AND WHAT IS THE CODE FOR THAT?

17    A.   THAT'S A 290 POSTING.

18    Q.   TAKING A LOOK AT THIS TRANSCRIPT, CAN YOU TELL WHETHER THE

19    DEFENDANT -- WHETHER THE DESAIS PAID THE AMOUNT THAT THE I.R.S.

20    SAID THAT THEY OWED FOR THAT AUDIT?

21    A.   YES.  THERE WAS A 640 POSTING.  A 640 POSTING IS WHEN THE

22    TAXPAYER GETS A PAYMENT AND THEY PAID $5,269.

23    Q.   AND WHAT IS THE DATE OF THIS TRANSCRIPT?  WHAT DATE IS IT

24    CURRENT AS OF?

25    A.   THE DATE AT THE BOTTOM IS 9-19-2003.

DIRECT OERTEL

1    Q.   AND 2003?

2    A.   I'M SORRY.  2013.

3    Q.   WAS THAT YESTERDAY?

4    A.   YES.

5    Q.   WHAT IS THE DESAIS' BALANCE FOR THE 2003 TAX YEAR AS OF

6    YESTERDAY?

7    A.   ZERO.

8    Q.   THOSE TWO CORRESPONDENCE AUDITS NOTICES THAT YOU LOOKED AT

9    IN EXHIBITS 143 AND 144, WAS THERE ANY MENTION OF THEM OF

10   INTEREST INCOME FROM HSBC INDIA?

11   A.   NO, NOT THAT I SAW.  NO.

12   Q.   AND AS FAR AS YOU CAN TELL FROM THESE DOCUMENTS, DID THE

13   CORRESPONDENCE AUDIT HAVE ANYTHING TO DO WITH INTEREST INCOME

14   FROM HSBC INDIA?

15   A.   NO.

16   Q.   IF YOU COULD GO TO EXHIBIT 145.

17   A.   OKAY.

18   Q.   IS THIS A NOTICE THAT THE I.R.S. ISSUED TO THE DESAIS FOR

19   THE 2004 TAX YEAR?

20   A.   YES.

21   Q.   AND, AGAIN, IS IT A CP 2000?

22   A.   THAT'S RIGHT.

23   Q.   AND WHAT IS THE DATE OF THIS NOTICE?

24   A.   OCTOBER 30, 2006.

25   Q.   AND, AGAIN, WHAT WAS THE PURPOSE OF THIS NOTICE?

```
 1     A.   THEY'RE SAYING THAT THERE'S INCOME THAT DOESN'T SHOW UP ON

 2     THE DEFENDANT'S TAX RETURN.

 3     Q.   AND IF YOU LOOK AT THE SECOND PAGE, ONCE AGAIN, COULD YOU

 4     READ UNDER WHAT IS UNDER "HOW CAN I PREVENT AN ERROR IN THE

 5     FUTURE?"

 6     A.   "NUMBER 1.  "INCLUDE ALL," AGAIN, "ALL" IS UNDERLINED,

 7     "INCOME YOU'VE RECEIVED DURING THE YEAR ON YOUR TAX RETURN."

 8     Q.   DOES THIS NOTICE FOR THE 2004 TAX YEAR ALSO INCLUDE

 9     SPECIFIC ITEM OR ITEMS OF INCOME THAT THE I.R.S. SAYS WERE LEFT

10     OFF OF TAX RETURN?

11     A.   YES.

12     Q.   AND IS THAT ON PAGE 6 OF 15?

13     A.   YES.

14     Q.   AND WHAT IS THAT ITEM IN THIS CASE?

15     A.   ON PAGE 6 IT'S INTEREST FROM A CITIBANK ACCOUNT.

16     Q.   AND HOW MUCH INCOME?

17     A.   $63,391.

18     Q.   AND IS THAT WHAT CITIBANK REPORTED TO THE I.R.S. ON A FORM

19     1099?

20     A.   YES, THEY DID.

21     Q.   AND HOW MUCH OF THAT WAS REPORTED ON THE DEFENDANT'S TAX

22     RETURN?

23     A.   63 -- OH, ACTUALLY NONE WAS REPORTED.  SO THE DIFFERENCE

24     IS 63,391.

25     Q.   AND IF YOU TURN TO PAGE 14 OF 15?
```

DIRECT OERTEL

```
1    A.   I'M SORRY.  WHICH PAGE?

2    Q.   14 OF 15.  IT SAYS IN THE TOP RIGHT CORNER.

3    A.   YES.

4    Q.   AND IS THERE A TOTAL AMOUNT IN THE BOTTOM CHART THAT THE

5    I.R.S. SAYS THAT THE DESAIS OWE AS A RESULT OF THE 2004

6    CORRESPONDENCE AUDIT?

7    A.   YES, IT SAYS $22,513.

8    Q.   AND IF YOU GO TO EXHIBIT 164.

9    A.   OKAY.

10   Q.   IS THIS THE TRANSCRIPT OF ACCOUNT FOR THE DESAIS FOR 2004?

11   A.   YES.  IT IS DATED YESTERDAY.

12   Q.   AND ACCORDING TO THE ACCOUNT BALANCE INFORMATION, HAVE THE

13   DESAIS PAID EVERYTHING THAT THE I.R.S. REQUIRED OF THEM FOR

14   2004 BASED ON THAT AUDIT?

15   A.   WELL, BASED ON THE AUDIT, YES.

16   Q.   AND DID THAT AUDIT HAVE ANYTHING TO DO WITH INTEREST

17   INCOME FROM HSBC INDIA?

18   A.   NO.

19   Q.   IF YOU COULD GO TO EXHIBIT 146, PLEASE.

20   A.   OKAY.

21   Q.   IS THIS ANOTHER NOTICE ISSUED TO THE DESAIS AS PART OF A

22   CORRESPONDENCE AUDITS?

23   A.   YES.

24   Q.   AND FOR WHAT TAX YEAR?

25   A.   2005 AND IT'S DATED MAY 29TH, 2007.
```

DIRECT OERTEL

```
 1    Q.   AND DID THIS NOTICE HAVE THE SAME NOTICE AS THE PREVIOUS

 2    NOTICES THAT WE LOOKED AT?

 3    A.   YES.

 4    Q.   AND IF YOU START AT PAGE 5 -- DO YOU SEE A CHART THAT

 5    LISTS OUT ITEMS OF INCOME THAT THE I.R.S. SAYS WAS MISSING FROM

 6    THE DEFENDANT'S I.R.S. TAX RETURN?

 7    A.   YES, THIS IS JUST A -- YEAH, THERE ARE TWO LISTS ON PAGE

 8    5.

 9    Q.   AND WHAT TYPES OF INCOME?

10    A.   INTEREST.

11    Q.   AND WHAT BANKS ARE THEY FROM?

12    A.   WELL, ONE IS FROM CITIBANK GLOBAL, AND THE OTHER IS FROM

13    CITIBANK SINGAPORE.

14    Q.   AND IF YOU FLIP TWO MORE PAGES FORWARD ONTO PAGE 7, DO YOU

15    SEE MORE ITEMS OF INTEREST INCOME THAT THE I.R.S. IS SAYING

16    WERE OMITTED FROM THE DEFENDANT'S 2005 TAX RETURN?

17    A.   YES.  THERE'S TWO MORE ITEMS OF INTEREST BOTH FROM

18    CITIGROUP.

19    Q.   IF YOU COULD TURN TO EXHIBIT 147.

20    A.   OKAY.

21    Q.   IS THIS ANOTHER NOTICE THAT THE I.R.S. ISSUED TO THE

22    DESAIS AS PART OF THE 2005 CORRESPONDENCE AUDITS?

23    A.   YES.

24    Q.   AND WHAT IS THE DATE OF THIS NOTICE?

25    A.   SEPTEMBER 17, 2007.
```

DIRECT OERTEL

```
1    Q.   AND LOOKING THROUGH THE PAGES OF THIS NOTICE, FOR EXAMPLE,

2    ON PAGE 6, ARE THERE MORE REFERENCES TO INTEREST INCOME?

3    A.   YES, THERE ARE.

4    Q.   HOW ABOUT ON PAGE 8 OF 18?

5    A.   YES.

6    Q.   MORE REFERENCES TO INTEREST INCOME THERE?

7    A.   THAT'S CORRECT.

8    Q.   AND IF YOU GO TO PAGE 17 OF 18, DO YOU SEE THE SECTION

9    CHANGES TO YOUR INCOME AND DEDUCTIONS?

10   A.   YES.

11   Q.   AND WHAT WAS THE -- ACCORDING TO THIS NOTICE, WHAT WAS THE

12   TOTAL AMOUNT OF INTEREST INCOME AS SHOWN ON THE DEFENDANT'S

13   2005 TAX RETURN?

14   A.   $51,655.

15   Q.   AND HOW MUCH INTEREST INCOME WAS REPORTED TO THE I.R.S.?

16   A.   $139,541.

17   Q.   FOR A DIFFERENCE OF HOW MUCH?

18   A.   $87,886.

19   Q.   DOES THIS PAGE ALSO TELL THE DESAIS HOW MUCH THE I.R.S.

20   HAS DETERMINED THAT THEY OWE AS A RESULT OF THIS AUDIT?

21   A.   YEAH, $65,020.

22   Q.   AND IF YOU FLIP TO EXHIBIT 165, IS THIS -- I'LL LET YOU

23   GET THERE.

24   A.   OKAY.

25   Q.   IS THIS AN ACCOUNT TRANSCRIPT FOR THE DEFENDANT AND HIS
```

```
 1    WIFE FOR THE YEAR 2005?

 2    A.   YES.

 3    Q.   AND AS OF YESTERDAY'S DATE WHAT IS THEIR ACCOUNT BALANCE?

 4    A.   IT'S ZERO.

 5    Q.   AND WHAT DOES THAT MEAN IN TERMS OF WHETHER THEY PAID WHAT

 6    THE I.R.S. SAID THAT THEY OWED FROM THIS AUDIT?

 7    A.   IT SHOWS THAT THEY PAID IT.

 8    Q.   AND DID THAT AUDIT OF THEIR 2005 TAXES HAVE ANYTHING TO DO

 9    WITH INTEREST INCOME FROM HSBC INDIA?

10    A.   NO, MA'AM.

11    Q.   IF YOU CAN GO TO EXHIBIT 148?

12    A.   GOT IT.

13    Q.   IS THIS NOTICE THAT WOULD HAVE BEEN ISSUED TO THE DESAIS

14    AS PART OF AN AUDIT OF THEIR 2006 TAXES?

15    A.   YES, AND IT'S DATED MARCH 17TH, 2008.

16    Q.   LOOKING AT PAGE 5, DOES THIS NOTICE CONTAIN A LIST OF

17    INTEREST INCOME ITEMS THAT THE I.R.S. SAYS ARE MISSING FROM THE

18    TAX RETURN?

19    A.   YES.

20    Q.   AND ARE THERE TWO OF THEM LISTED ON PAGE 5?

21    A.   YES.  ON PAGE 5 THERE'S A 1099 FROM CITIBANK AND THEN

22    ANOTHER 1099 FROM PAN PACIFIC.

23    Q.   AND IS THERE ONE MORE 1099 FROM CITIBANK REFERENCED ON THE

24    NEXT PAGE?

25    A.   YES.
```

DIRECT OERTEL

1    Q.   IF YOU COULD GO TO EXHIBIT 149, PLEASE.

2    A.   OKAY.

3    Q.   AND IS THIS ANOTHER NOTICE THAT WOULD HAVE GONE OUT TO THE

4    DESAIS AS PART OF THE 2006 AUDIT?

5    A.   YES, DATED JUNE 2, 2008.

6    Q.   AND DOES THIS DOCUMENT ALSO CONTAIN REFERENCES TO INTEREST

7    INCOME THAT WAS NOT REPORTED ON THE DESAIS' 2006 TAX RETURN?

8    A.   YES.

9    Q.   IF YOU GO TO THE VERY LAST PAGE OF THIS EXHIBIT, HOW MUCH

10   INTEREST INCOME WAS REPORTED ON THE DESAIS'S 2006 RETURN?

11   A.   SHOWN ON THE RETURN 60,338.

12   Q.   AND HOW MUCH WAS ACTUALLY REPORTED TO THE I.R.S.?

13   A.   THE I.R.S. WAS -- GOT REPORTED $233,386.

14   Q.   SO HOW MUCH WAS MISSING FROM THE DEFENDANT'S TAX RETURN

15   ACCORDING TO THIS AUDIT?

16   A.   FROM INTEREST IT IS $173,048.

17   Q.   AND DID THE DESAIS OWE MONEY TO THE I.R.S. FOLLOWING THIS

18   AUDIT?

19   A.   $64,933.

20   Q.   AND IF YOU FLIP TO GOVERNMENT'S EXHIBIT 166?

21   A.   OKAY.

22   Q.   IS THIS THE ACCOUNT TRANSCRIPT FOR 2006 FOR THE DESAIS?

23   A.   YES, MA'AM.

24   Q.   AND WHAT IS THEIR ACCOUNT BALANCE AS OF YESTERDAY?

25   A.   AS OF YESTERDAY?  ZERO.

DIRECT OERTEL

```
1    Q.   DID THE AUDIT THAT RESULTED IN THE DESAIS OWING MORE MONEY

2    FOR 2006, HAVE ANYTHING TO DO WITH UNREPORTED INTEREST INCOME

3    FROM HSBC INDIA?

4    A.   NO, MA'AM.

5    Q.   IF YOU COULD GO TO EXHIBIT 150, PLEASE.

6    A.   OKAY.

7    Q.   IS THIS A NOTICE THAT IS PART OF A CORRESPONDENCE AUDIT

8    FOR 2007?

9    A.   YES, DATED FEBRUARY 2, 2009.

10   Q.   AND FOCUSSING ON PAGE 5, DOES THE NOTICE REFERENCE SOME

11   ITEMS OF INTEREST INCOME THAT WERE, ACCORDING TO THE I.R.S.,

12   LEFT OFF OF THE DEFENDANT'S 2007 TAX RETURN?

13   A.   YES.

14   Q.   AND IF YOU GO TO PAGE 7 OF 14, ARE THERE TWO MORE ITEMS OF

15   INTEREST INCOME LISTED THERE?

16   A.   YES.

17   Q.   IF YOU CAN GO TO GOVERNMENT'S EXHIBIT 151, PLEASE.

18   A.   OKAY.

19   Q.   IS THIS ANOTHER NOTICE AS PART OF THE 2007 AUDIT?

20   A.   YES.  THIS ONE IS DATED APRIL 13TH, 2009.

21   Q.   AND, AGAIN, FLIPPING THROUGH THIS, ARE THERE MORE

22   REFERENCES TO UNREPORTED INTEREST INCOME?

23   A.   TWO THERE, TWO THERE.  YES.

24   Q.   AND IF YOU GO TO PAGE 17 OF 18, PLEASE.

25   A.   OKAY.
```

1    Q.   HOW MUCH INTEREST WAS SHOWN ON THE DEFENDANT'S 2007

2    REPORT?

3    A.   20,125.

4    Q.   AND AS PART OF THIS AUDIT, HOW MUCH IS THE I.R.S. TELLING

5    THE DESAIS THAT WERE MISSING FROM THEIR RETURN?

6    A.   IT SHOWS A DIFFERENCE OF $51,639.

7    Q.   AND DID THE DESAIS OWE ADDITIONAL MONEY TO THE I.R.S. AS A

8    RESULT OF -- WELL, AS A RESULT OF THIS AUDIT?

9    A.   YES.

10   Q.   AND IF YOU COULD GO TO PAGE -- EXHIBIT 152.

11   A.   OKAY.

12   Q.   IS THIS YET ANOTHER NOTICE FROM THE I.R.S. REPORTING 2007?

13   A.   YES, DATED NOVEMBER 30, 2009.

14   Q.   AND DOES IT ALSO REFERENCE INTEREST INCOME THAT WAS NOT

15   REPORTED TO THE I.R.S. ON THE DESAIS'S RETURN FOR 2007?

16   A.   YES, IT DOES.

17   Q.   AND IF YOU COULD GO TO EXHIBIT 1667.

18   A.   OKAY.  THAT'S A TRANSCRIPT FOR 2007.

19   Q.   AND ACCORDING TO THAT TRANSCRIPT, WHAT IS -- AS OF

20   YESTERDAY, DO THE DESAIS OWE MONEY TO THE I.R.S. FOR 2 --

21   A.   NO, THEY DON'T OWE ANYTHING.

22   Q.   FOR 2007?

23   A.   FOR 2007.

24   Q.   DID THE CORRESPONDENCE AUDITS THAT WE JUST LOOKED AT FOR

25   2007, HAVE ANYTHING TO DO WITH INTEREST INCOME FOR HSBC INDIA?

1    A.   NO, MA'AM.

2    Q.   AND THE LAST NOTICE I WANT YOU TO LOOK AT IS GOVERNMENT'S

3    EXHIBIT 153.

4    A.   OKAY.

5    Q.   IS THIS A NOTICE ISSUED TO THE DESAIS REGARDING THEIR 2008

6    TAXES?

7    A.   YES, DATED SEPTEMBER 7, 2010.

8    Q.   AND DOES IT ALSO INCLUDE ITEMS OF INTEREST INCOME THAT THE

9    I.R.S. SAYS WERE MISSING FROM THEIR RETURN?

10   A.   YES.

11   Q.   IF YOU GO TO PAGE 13 OF 15, PLEASE.

12   A.   OKAY.

13   Q.   WHAT IS THE TOTAL AMOUNT OF INTEREST INCOME THAT THE

14   I.R.S. SAYS WAS MISSING FROM THE DESAIS' 2008 TAX RETURN?

15   A.   $10,000.

16   Q.   AND DID THEY OWE ADDITIONAL MONEY AS A RESULT OF THIS

17   AUDIT?

18   A.   $6,776.

19   Q.   AND IF YOU LOOK AT EXHIBIT 168.

20   A.   THAT'S THEIR 2008 TRANSCRIPT.

21   Q.   AND DID THEY PAY THAT MONEY THAT THE I.R.S. SAID THAT THEY

22   OWED?  IF YOU LOOK AT THE SECOND PAGE.

23   A.   YES, THEY PAID IT.

24   Q.   AND IS THEIR ACCOUNT BALANCE ZERO AS OF YESTERDAY?

25   A.   YES.

1    Q.   AND -- BUT DID THEIR CORRESPONDENCE OF THEIR 2008 RETURN

2    HAVE ANYTHING TO DO WITH HSBC INDIA?

3    A.   NO.

4    Q.   AND TO YOUR KNOWLEDGE HAVE THE DESAIS EVER BEEN AUDITED BY

5    THE I.R.S. WITH RESPECT TO INTEREST INCOME FOR HSBC INDIA?

6    A.   NO.

7    Q.   DID YOU ASSIST IN THE PREPARATION OF A TIMELINE THAT PUTS

8    THESE NOTICES IN CONTEXT WITH OTHER EVENTS THAT HAVE OCCURRED

9    IN THIS CASE?

10   A.   YES, MA'AM.

11   Q.   AND IF YOU COULD TURN TO EXHIBIT 157, PLEASE.

12            MR. SCHAINBAUM:  COULD WE HAVE A SIDE-BAR?

13            THE COURT:  YES.

14        (SIDE-BAR CONFERENCE ON THE RECORD.)

15            THE COURT:  WE'RE AT SIDE-BAR WITH COUNSEL.

16            MR. SCHAINBAUM:  THIS EXHIBIT IS A DISTORTION, AND

17   IT'S ALSO INACCURATE IN ITS DESCRIPTION OF A TIMELINE, BUT I

18   THINK IT'S HIGHLY PREJUDICIAL IF IT GOES TO THE JURY.

19        THE BEST EVIDENCE ARE THE EXHIBITS THEMSELVES INSTEAD OF

20   SORT OF ACCUMULATING THEM IN THIS KIND OF A FASHION.

21            THE COURT:  LET ME ASK MS. SISKIND IF SHE'S SEEKING

22   INTRODUCTION OF THIS DOCUMENT?

23            MS. SISKIND:  NO, YOUR HONOR.

24            MR. SCHAINBAUM:  OKAY.  SO EVEN DISPLAYING THIS KIND

25   OF A DOCUMENT, THE BEST EVIDENCE IS THE EXHIBITS THEMSELVES AND

1    NOT THIS WHAT IS CALLED A "SUMMARY" HEADED UP TIMELINE BECAUSE

2    IT COMINGLES DATES OF ACTIVITIES WITH HIGHLIGHTING WHEN

3    MR. DESAI ALLEGEDLY ACTIVATES THE HSBC INDIA ACCOUNT.  IT MAKES

4    NO REFERENCE TO REPRESENTATIVE OFFICE.  SO I THINK THE WHOLE

5    DOCUMENT IS A DISTORTION.

6             THE COURT:  MS. SISKIND.

7             MS. SISKIND:  YOUR HONOR, HE'S A SUMMARY WITNESS.

8    THIS IS SUMMARIZING DIFFERENT EXHIBITS THAT ARE NOW IN EVIDENCE

9    AND PUTTING THEM INTO CHRONOLOGICAL ORDER.

10            THE COURT:  OKAY.

11            MR. SCHAINBAUM:  THAT'S REALLY NOT A DESCRIPTION OF

12   WHAT THIS EXHIBIT IS.  SURE THERE'S CHRONOLOGICAL DATES HERE,

13   BUT THEY'RE IN SUCH A MANNER AND SUCH A FORMAT THAT CREATE A

14   DISTORTION.

15            THE COURT:  OKAY. ALL RIGHT.  THANK YOU.  I'M GOING

16   TO ALLOW THE WITNESS TO USE THIS TO TESTIFY.  I WON'T ALLOW

17   THIS OR PERMIT IT TO BE ADMITTED.  I'VE BEEN TOLD IT'S NOT

18   GOING TO BE SOUGHT FOR ADMISSION.

19        THE WITNESS CAN USE THIS, AND IT CAN BE DISPLAYED TO THE

20   JURY WHILE THE WITNESS TESTIFIES TO EXPLAIN HIS INVESTIGATION.

21        DO WE HAVE THE MOST ACCURATE COPY?

22            MS. SISKIND:  NO.  THEY DO.  IT SEEMS THAT YOU

23   DON'T.

24            THE COURT:  ALL RIGHT.

25            MS. SISKIND:  I THOUGHT MS. LANE PUT IT IN YOUR

```
 1     BINDERS THIS MORNING.

 2             THE COURT:  OKAY.  IF YOU HAVE AN EXTRA COPY, I

 3     WOULD APPRECIATE IT.

 4             MS. SISKIND:  BUT THEY HAVE THE MOST --

 5             MR. SCHAINBAUM:  MR. ALLEN JUST POINTS OUT NONE OF

 6     THIS REPORTED INTEREST INCOME.  THIS IS WITH RESPECT TO INCOME

 7     THAT WAS AT THE MOST UNDERREPORTED.  THERE'S BEEN A DESCRIPTION

 8     OF UNREPORTED, AND WHICH I THINK IS AN ULTIMATE FACT FOR THE

 9     JURY.  TO PUT THIS IN HERE JUST EMPHASIZES IN A DISTORTED

10     MANNER AND PREJUDICES THE DEFENDANT.

11         IT'S NOT FAIR.  IF YOU WANT TO PUT DOWN A LETTER FROM THE

12     I.R.S. REGARDING INTEREST INCOME AND IN THIS SUMMARY, THAT'S

13     ONE THING, BUT EVEN THAT WOULD BE AN OBJECTION BY ME --

14     OBJECTIONABLE, I MEAN.

15             MS. SISKIND:  YOUR HONOR, THE WITNESS TESTIFIED THAT

16     THE NOTICES ENUMERATED ITEMS OF INCOME THAT WERE NOT REPORTED

17     ON THE DEFENDANT'S TAX RETURN AND NOT REPORTED BEING THE SAME

18     THING AS UNREPORTED.

19             THE COURT:  SO I SEE THE CHART HAS THE WORDS

20     UNREPORTED INTEREST INCOME.

21             MS. SISKIND:  AND WE MADE THAT CHANGE AFTER THE

22     REDACTIONS LAST NIGHT BECAUSE THAT IS THE ONLY TYPE OF INCOME

23     THAT THE JURY SEES ON THEM.  SO --

24             THE COURT:  I WANT TO NOTE YOUR OBJECTIONS, AND I'LL

25     PERMIT THE GOVERNMENT TO USE THAT FOR THAT PURPOSE.
```

```
 1              MS. SISKIND:  DOES YOUR HONOR NEED MY COPY?  THE
 2    ONLY CHANGE IS TO ADD --
 3              THE COURT:  NO, THAT'S FINE.  THANK YOU, COUNSEL.
 4         (END OF DISCUSSION AT SIDE-BAR.)
 5              THE COURT:  AS TO 157, MR. SCHAINBAUM, YOU HAVE AN
 6    OBJECTION TO THIS.  I'LL NOTE YOUR OBJECTION, SIR, AND I'LL
 7    PERMIT -- I'LL OVERRULE THE OBJECTION.
 8              MR. SCHAINBAUM:  THANK YOU.
 9              THE COURT:  YOU'RE WELCOME.  THE GOVERNMENT IS
10    PERMITTED TO EXAMINE ON THIS EXHIBIT.
11    BY MS. SISKIND:
12    Q.   MR. OERTEL, MY QUESTION BEFORE MR. SCHAINBAUM OBJECTED WAS
13    WHETHER YOU ASSISTED IN THE PREPARATION OF A TIMELINE THAT PUTS
14    THESE AUDIT NOTICES IN CONTEXT WITH OTHER EVENTS IN THIS CASE?
15    A.   THAT'S CORRECT.
16    Q.   AND IS THAT TIMELINE CONTAINED IN GOVERNMENT'S
17    EXHIBIT 157?
18    A.   YES, MA'AM.
19              MS. SISKIND:  YOUR HONOR, MAY I DISPLAY IT FOR
20    DEMONSTRATIVE PURPOSES?
21              THE COURT:  YES.
22    BY MS. SISKIND:
23    Q.   WHAT APPEARS ON THE RIGHT-HAND SIDE OF THIS TIMELINE?
24    A.   THESE ARE THE LETTERS FROM THE -- ON THE RIGHT SIDE IT'S
25    THE LETTERS FROM THE I.R.S. ABOUT UNREPORTED INTEREST INCOME.
```

```
 1    Q.   AND ARE THOSE THE LETTERS IN EXHIBITS 143 THROUGH 153?

 2    A.   YES, MA'AM.

 3    Q.   AND ON THE LEFT-HAND SIDE ARE THERE REFERENCES TO THE

 4    DATES OF OTHER EXHIBITS THAT WE HAVE SEEN DURING THIS TRIAL?

 5    A.   YES, MA'AM.

 6    Q.   AND SO STARTING AT THE TOP, WHAT HAPPENED ON MARCH 28TH,

 7    2005?

 8    A.   THERE'S A LETTER FROM THE I.R.S. REGARDING UNREPORTED

 9    INTEREST INCOME FOR 2003.

10    Q.   AND THEN WHAT HAPPENED A LITTLE UNDER THREE MONTHS LATER

11    ON JUNE 13TH, 2005?

12    A.   THERE'S A LETTER FROM THE I.R.S. REGARDING UNREPORTED

13    INTEREST INCOME FOR 2003.

14    Q.   AND AFTER THE I.R.S. SENT OUT THESE TWO NOTICES IN

15    EXHIBITS 143 AND 144, WHAT HAPPENED ON JULY 17TH, 2006?

16    A.   DESAI REACTIVATED HIS HSBC INDIA ACCOUNT AND IT ENDS IN

17    3679.

18    Q.   AND IS THAT THE TRANSACTION THAT IS REFERENCED IN

19    EXHIBIT 28?

20    A.   YES, MA'AM.

21    Q.   AND ABOUT THREE MONTHS LATER WAS THERE ANOTHER NOTICE?

22    A.   YEAH, THERE WAS A LETTER FROM THE I.R.S. REGARDING

23    UNREPORTED INTEREST INCOME FOR 2004.

24    Q.   AND THAT WAS ON OCTOBER 30TH, 2006?

25    A.   YES, MA'AM.
```

DIRECT OERTEL

```
1    Q.   AND WHAT HAPPENED ON MAY 29TH, 2007?

2    A.   THERE'S A LETTER FROM THE I.R.S. REGARDING UNREPORTED

3    INTEREST INCOME FOR 2007.

4    Q.   AND SEPTEMBER 17TH, 2007?

5    A.   A LETTER FROM I.R.S. REGARDING UNREPORTED INTEREST INCOME

6    FOR 2005.

7    Q.   AND HOW ABOUT ON MARCH 17TH, 2008?

8    A.   A LETTER FROM I.R.S. REGARDING UNREPORTED INTEREST INCOME

9    FOR 2006.

10   Q.   AND A LITTLE LESS THAN A MONTH LATER ON APRIL 12TH, 2008,

11   WHAT HAPPENED?

12   A.   DESAI SIGNED HIS 2007 FORM 1040.

13   Q.   AND IS THAT EXHIBIT 1?

14   A.   YES, MA'AM.

15   Q.   WHAT HAPPENED ON JUNE 2ND, 2008?

16   A.   THERE'S A LETTER FROM THE I.R.S. REGARDING UNREPORTED

17   INTEREST INCOME FOR 2006.

18   Q.   AND HOW ABOUT ON FEBRUARY 2ND, 2009?

19   A.   A LETTER FROM THE I.R.S. REGARDING UNREPORTED INTEREST

20   INCOME FOR 2007.

21   Q.   AND HOW ABOUT APRIL 13TH, 2009?

22   A.   LETTER FROM THE I.R.S. REGARDING UNREPORTED INTEREST

23   INCOME FOR 2007.

24   Q.   AND WHAT HAPPENED TWO DAYS LETTER?

25   A.   DESAI SIGNED HIS 2008 FORM 1040.
```

```
1    Q.   AND THAT WAS THE FORM 1040 THAT OMITTED INTEREST INCOME

2    FROM HSBC INDIA?

3    A.   YES, MA'AM.

4    Q.   AND WHAT HAPPENED ON NOVEMBER 30TH, 2009?

5    A.   LETTER FROM THE I.R.S. REGARDING UNREPORTED INTEREST

6    INCOME FOR 2007.

7    Q.   AND WHAT HAPPENED ON APRIL 5TH, 2010?

8    A.   DESAI SIGNED HIS 2009 FORM 1040, WHICH IS EXHIBIT 3.

9    Q.   AND IS THAT THE ONE THAT ACCORDING TO YOUR TESTIMONY WAS

10   MISSING INTEREST INCOME FROM HSBC INDIA?

11   A.   THAT'S RIGHT.

12   Q.   AND, FINALLY, WHAT HAPPENED ON SEPTEMBER 7TH, 2010?

13   A.   A LETTER FROM THE I.R.S. REGARDING UNREPORTED INTEREST

14   INCOME FOR 2008.

15           MS. SISKIND:  NO FURTHER QUESTIONS, YOUR HONOR.

16           THE COURT:  CROSS-EXAMINATION?

17                      CROSS-EXAMINATION

18   BY MR. SCHAINBAUM:

19   Q.   GOOD MORNING, MR. OERTEL.

20   A.   GOOD MORNING.

21   Q.   MY NAME IS MARTIN A. SCHAINBAUM, AND YOU PROBABLY ALREADY

22   KNOW THAT SINCE BEING IN THE COURTROOM SINCE THE BEGINNING OF

23   TRIAL?

24   A.   CORRECT.

25   Q.   NOW, AS I UNDERSTAND IT, YOU HAVE BEEN AN INTERNAL REVENUE
```

CROSS OERTEL

1    AGENT FOR HOW MANY YEARS?

2    A.    TWENTY-SEVEN YEARS.

3    Q.    AND AS I UNDERSTAND IT, IN THAT PERIOD OF TIME YOU HAVE

4    CONDUCTED FIELD AUDITS?

5    A.    THAT'S RIGHT.

6    Q.    AND DO YOU WANT TO EXPLAIN WHAT A FIELD AUDIT IS?

7    A.    A FIELD AUDIT IS WHERE THE AGENT CAN GO OUT TO THE

8    TAXPAYER'S PLACE OF BUSINESS OR TO THEIR REPRESENTATIVE OFFICE,

9    REPRESENTATIVE BEING USUALLY AN ATTORNEY OR ACCOUNTANT, AND

10   LOOK AT THE RECORDS THERE, AS WELL AS CONDUCT THE INTERVIEW

11   THERE.

12   Q.    AND DURING THOSE 27 YEARS, HAVE YOU BECOME FAMILIAR WITH

13   SOMETHING CALLED THE INTERNAL REVENUE MANUAL?

14   A.    YES.

15   Q.    AND COULD YOU TELL THE LADIES AND GENTLEMEN OF THE JURY

16   WHAT THAT IS?

17   A.    THE INTERNAL REVENUE MANUAL IS A SET OF PROCEDURES THAT

18   THE EMPLOYEES OF THE I.R.S. USE TO CONDUCT THEIR WORK.

19   Q.    AND WHEN YOU SAY "IT'S A SET OF PROCEDURES THAT THE

20   INTERNAL REVENUE AGENTS USE TO CONDUCT THEIR WORK," IS IT

21   REALLY A GUIDE TO HOW TO DO AUDITS AND OTHER INTERNAL REVENUE

22   PROCEDURES?

23   A.    WELL, YOU SAID I.R.S. AGENTS.  IT ACTUALLY INVOLVES ALL

24   I.R.S. EMPLOYEES BECAUSE THE INTERNAL REVENUE MANUAL TALKS

25   ABOUT NOT JUST AUDITS BUT ALSO COLLECTION, PROCESSING, THE

CROSS OERTEL

```
1    WHOLE BIT.

2    Q.   SO IT WOULD COVER YOUR CONDUCT AS A FIELD AGENT?

3    A.   YES.

4    Q.   IT WOULD COVER YOUR CONDUCT AS YOU SIT HERE IN THIS

5    COURTROOM UNDER OATH?

6    A.   WELL, ACTUALLY MY CONDUCT IS UNDER OUR ETHICS RULES, BUT

7    THE INTERNAL REVENUE MANUAL IS MORE ABOUT THE PROCEDURES AND

8    STEPS THAT WE TAKE DURING THE COURSE OF OUR WORK.

9    Q.   WELL, WHEN YOU ANSWERED QUESTIONS OF MS. SISKIND ABOUT THE

10   CORRESPONDENCE AUDITS AND OTHER PROCEDURES, DID YOU HAVE IN

11   MIND THE INTERNAL REVENUE MANUAL?

12   A.   WELL, I FOLLOW THE INTERNAL REVENUE MANUAL.

13   Q.   IN OTHER WORDS, YOU FOLLOW THE PROVISIONS OF THE INTERNAL

14   REVENUE MANUAL?

15   A.   YES.

16   Q.   AND WHATEVER THAT MANUAL STATES, YOU FOLLOW THE

17   GUIDELINES?

18   A.   IF I'M AWARE OF THE PROCEDURES.  THEY CHANGE OFTEN.

19   Q.   AND HOW DO YOU KEEP UP TO DATE WITH THE CHANGES AND THE

20   PROCEDURES?

21   A.   WELL, WE'RE GIVEN NOTICES OF CHANGES.  USUALLY THE EASIEST

22   WAY TO FIND A CHANGE IS IF YOU'RE DOING A PARTICULAR THING, YOU

23   JUST LOOK IT UP ON THE I.R.S.'S INTERNAL WEBSITE UNDER WHATEVER

24   SUBJECT THERE IS AND YOU FOLLOW THE PROCEDURES THAT YOU FIND.

25   Q.   NOW, IF YOU WOULD BE KIND ENOUGH TO TURN TO THE
```

CROSS OERTEL

1    DEFENDANT'S EXHIBIT BOOK, THERE'S AN EXHIBIT CALLED GG-1.  DO

2    YOU HAVE THAT BEFORE YOU?  THAT'S THE LETTER GG-1?

3    A.   YEAH, I WAS LOOKING AT G.  I'M SORRY.

4    Q.   THAT'S ALL RIGHT.  TAKE YOUR TIME.

5    A.   OKAY.

6    Q.   YOU HAVE THAT; CORRECT?

7    A.   YES.

8    Q.   AND CAN YOU IDENTIFY THAT DOCUMENT?

9    A.   THIS IS AN E-MAIL FROM ME TO THE SPECIAL AGENT IN THIS

10   CASE MICHAEL HELGESEN.

11   Q.   AND WHO IS SITTING RIGHT HERE, CORRECT (INDICATING)?

12   A.   THAT'S RIGHT.

13   Q.   AND WHAT IS THE DATE OF THE E-MAIL?

14   A.   JUNE 6TH, 2012.

15           MR. SCHAINBAUM:  I MOVE EXHIBIT GG-1 INTO EVIDENCE.

16           MS. SISKIND:  OBJECTION, HEARSAY.

17           MR. SCHAINBAUM:  YOUR HONOR, THE AUTHOR OF THE

18   E-MAIL --

19           THE COURT:  EXCUSE ME.  IS THIS TRIPLE G OR DOUBLE

20   G?  I'M SORRY.

21           MR. SCHAINBAUM:  DOUBLE G.

22           MS. SISKIND:  AND THERE'S A RELEVANCE OBJECTION AS

23   WELL, YOUR HONOR.

24           THE COURT:  GG-1 DID YOU SAY?

25           MR. SCHAINBAUM:  YES, GG-1.

CROSS OERTEL

```
 1                 THE COURT:  ALL RIGHT.  LET ME SEE COUNSEL, PLEASE,

 2      AT SIDE-BAR.

 3            (SIDE-BAR CONFERENCE ON THE RECORD.)

 4                 THE COURT:  ALL RIGHT.  WE'RE AT SIDE-BAR AND YOU'RE

 5      ASKING THAT GG-1 BE ADMITTED.  THERE'S A HEARSAY OBJECTION?

 6                 MS. SISKIND:  HEARSAY AND RELEVANCE.  I'LL START

 7      WITH THE HEARSAY OBJECTION.  THIS IS AN OUT-OF-COURT STATEMENT

 8      BY THE WITNESS.

 9            THE FOUNDATION THAT MR. SCHAINBAUM BEGAN TO LAY HAS TO DO

10      WITH HOW HE CONDUCTS VARIOUS PROCEDURES AND THIS DISCUSSES SOME

11      ACTIONS HE TOOK.  SO I SEE NO OTHER WAY TO CONSTRUE THIS OTHER

12      THAN IT'S BEING OFFERED FOR THE MATTER ASSERTED AS TO WHAT

13      ACTIONS HE TOOK.

14            BUT THERE IS ALSO A RELEVANCE OBJECTION.  IF THE COURT

15      READS THIS, IT'S TALKING ABOUT METHODS OF CALCULATING TAX.

16      THE -- SO IT'S IRRELEVANT BECAUSE THIS WITNESS HAS NOT BEEN

17      CALLED UPON TO -- TWO THINGS.

18            IT'S BEYOND THE SCOPE OF DIRECT BECAUSE DIRECT EXAMINATION

19      DID NOT INCLUDE ANY CALCULATION OF TAX DUE.  IT WAS A

20      CALCULATION OF INCOME AND HOW TO BALANCE.

21            ALSO, THIS IS NOT A TAX EVASION CASE.  SO TAX DUE AND

22      OWING IS NOT AN ELEMENT THAT THE GOVERNMENT MUST PROVE.  IN

23      FACT, I BELIEVE THERE MAY EVEN BE A JURY INSTRUCTION ON THIS

24      THAT THE JURY IS NOT TO CONSIDER THE BOTTOM LINE OF HOW MUCH

25      ADDITIONAL TAX WOULD BE OWED.
```

 1          SO THIS RELATES DIRECTLY TO THE CALCULATION OF TAX.  IT'S

 2     AN OUT-OF-COURT STATEMENT BY THE WITNESS, AND IT'S BEYOND THE

 3     SCOPE OF DIRECT.

 4          THE COURT:  MR. SCHAINBAUM.

 5          MR. SCHAINBAUM:  THIS RELATES TO TWO OF THE

 6     THREE YEARS THAT ARE INVOLVED.  THIS RELATES TO NOT ONLY

 7     WHETHER THERE IS ANY KIND OF CORRECTNESS OF TAX RETURN, WHICH

 8     INCLUDES CALCULATION OF A TAX, BUT ADDITIONALLY THIS RELATES TO

 9     WILLFULNESS BECAUSE HERE'S THE AGENT WRITING TO ANOTHER AGENT

10     AND POINTING OUT WHAT THE TAXPAYER FAILED TO DO AND WHAT HE

11     FORGOT TO DO.

12          SO THIS GOES -- BEARS ON WILLFULNESS.  AND UNDER CHEEK,

13     THE DEFENSE CAN PUT IN ANY EVIDENCE WHICH MIGHT SHOW LACK OF

14     WILLFULNESS.  AND YOU ALSO, BY THE WAY, WENT THROUGH A WHOLE

15     SERIES OF QUESTIONS BEFORE WE ENDED THE DIRECT EXAMINATION

16     WHERE WE WENT THROUGH HIM READING VARIOUS AUDIT AND EXPRESSING

17     HIS VIEWS ON CORRESPONDENCE AUDITS OR WHATEVER.

18          SO ALL I'M TRYING TO DO HERE IS TO POINT OUT THAT THIS IS

19     WHAT HE DETERMINED AND SENT TO THE OTHER AGENT REGARDING THE

20     TAX POSITION OF THE DEFENDANT AND WHETHER THE GOVERNMENT HAS TO

21     PROVE ADDITIONAL TAX.

22          AND THAT'S NOT THE ASPECT.  ONE ASPECT OF A FALSE RETURN

23     IS THAT IT DOESN'T HAVE THE CORRECT TAX, BUT THEY DON'T HAVE TO

24     PROVE WHAT THE CORRECT TAX IS.

25          BUT WHEN YOU TAKE IT ALL TOGETHER, IT BEARS ON HIS

```
 1     WILLFULNESS, AND THIS IS AN INDEPENDENT DETERMINATION.

 2          ON THE HEARSAY, THIS WITNESS IS THE AUTHOR OF THIS

 3     DOCUMENT.  SO HE'S IN COURT AND CAN BE CROSS-EXAMINED ABOUT

 4     WHAT HE WAS THE AUTHOR OF.

 5               THE COURT:  IT'S TECHNICALLY STILL A HEARSAY

 6     DOCUMENT.  BUT AS TO CHEEK, THE THRESHOLD IS THAT THE EVIDENCE

 7     HAS TO BE ADMISSIBLE BEFORE IT CAN BE ADMITTED.  THE CHEEK CASE

 8     DOESN'T DO AWAY WITH ANY OF THE FEDERAL EVIDENCE.

 9               MR. SCHAINBAUM:  I AGREE.  BUT, I MEAN, ANYTHING

10     THAT INTENDS TO ESTABLISH A FACT IS RELEVANT WHEN IT COMES TO

11     THE MAIN ISSUE OF WILLFULNESS.

12          AND IN THIS CASE THIS COMES UPON THE MAIN ISSUE OF

13     WILLFULNESS, AMONG OTHER ISSUES.

14               THE COURT:  WELL, THIS SPEAKS TO INCOME TAX, AND I'M

15     NOT SURE THE EVIDENCE HERE IS -- I UNDERSTAND THE GLOBAL ISSUE

16     IS THE INCOME TAX, BUT HERE IT WAS UNREPORTED INCOME.

17          MS. SISKIND.

18               MS. SISKIND:  YOUR HONOR, THE INDICTMENT CHARGES TWO

19     SPECIFIC ITEMS ON THE RETURN AS BEING FALSE:  ONE IS THE

20     DEFENDANT'S FAILURE TO REPORT INTEREST INCOME; AND, TWO, THE

21     FAILURE TO CHECK THE BOX IN THE FOREIGN BANK ACCOUNT QUESTION.

22          WE DIDN'T ALLEGE THE TAX DUE TO BE FALSE.  SO WE HAVE PUT

23     NO EVIDENCE BEFORE THE JURY SO FAR ABOUT THE BOTTOM LINE TAX

24     CALCULATION FROM THIS WITNESS AND NOR WOULD WE DO SO BECAUSE IT

25     WOULD BE IRRELEVANT TO ELICIT SUCH A CALCULATION FROM THIS
```

CROSS OERTEL

 1    WITNESS.

 2         AND MR. SCHAINBAUM IS AWARE HE HAD DONE THE CALCULATION

 3    BECAUSE THIS CASE WAS ORIGINALLY CHARGED AS TAX EVASION.  BUT

 4    AFTER WE SUPERSEDED AND SAID FILING FALSE TAX RETURNS, THAT WAS

 5    IRRELEVANT WHAT --

 6         MR. SCHAINBAUM:  BUT THAT'S WHAT THIS IS ALL ABOUT.

 7    THIS IS ABOUT HIS -- IT'S A COURSE OF CONDUCT IN PREPARING TAX

 8    RETURNS WHICH THEY SAY IS FALSE.

 9         ONE ASPECT OF THAT IS DID HE INTENTIONALLY PREPARE A

10    RETURN OR WAS HE NEGLIGENT OR CARELESS OR INADVERTENT OR

11    WHATEVER?

12         THE COURT:  THIS DOESN'T SHOW THAT.  IT DOESN'T SHOW

13    NEGLIGENCE, CARELESSNESS OR INADVERTENCE.

14         MR. SCHAINBAUM:  THIS SHOWS THAT THE TAXPAYER FAILED

15    TO USE THE CORRECT METHOD, WHICH MEANS THAT THIS AGENT, WHO HAS

16    ALREADY TESTIFIED ABOUT A WHOLE SERIES OF SO-CALLED

17    "CORRESPONDENCE NOTICES," MADE HIS OWN INDEPENDENT USE OF

18    THE --

19         THE COURT:  EXCUSE ME.  DID THIS WITNESS DO AN

20    ANALYSIS OF THE DEFENDANT'S TAX RETURNS?

21         MR. SCHAINBAUM:  YES, HE DID.

22         MS. SISKIND:  YES.  INITIALLY WE CHARGED THE CASE AS

23    TAX EVASION, AND WE WERE GOING TO NEED HIM TO COME IN AND PROVE

24    THAT THERE WAS A SUBSTANTIAL TAX DUE AND OWING.

25         THE COURT:  SO, MS. SISKIND, SHOULDN'T THIS WITNESS

1    BE PERMITTED TO AT LEAST TESTIFY THAT HE LOOKED AT TAX --

2    PERHAPS NOT THIS.

3              MS. SISKIND:  THERE'S STILL THE HEARSAY PROBLEM.

4              THE COURT:  I UNDERSTAND.  BUT TO TESTIFY THAT HE

5    DID RESEARCH ON THE DEFENDANT'S TAX RETURNS AND FOUND THAT THE

6    DEFENDANT HAD IN SOME CIRCUMSTANCES MADE ERRORS IN HIS -- THE

7    DEFENDANT'S CALCULATIONS ON THE TAX RETURNS.

8              MS. SISKIND:  I THINK THAT WOULD BE FAIR, BUT THE

9    DOCUMENT WOULD STILL BE HEARSAY.

10             THE COURT:  RIGHT, I UNDERSTAND THAT.

11        SO WHAT I'M SAYING, MR. SISKIND -- THERE I GO AGAIN.  I'M

12   SORRY.

13             MR. KENNEDY:  THAT'S ALL RIGHT.  IT'S

14   MR. SCHAINBAUM.

15             THE COURT:  I THINK IT'S FAIR FOR YOU TO ASK HIM

16   WHAT WORK HE DID ON YOUR CLIENT'S TAX RETURNS, AND YOU CAN

17   CERTAINLY ELICIT TESTIMONY IF HE, THIS WITNESS, DETERMINED THAT

18   THE TAXPAYER FAILED TO FILL OUT THE FORM ACCURATELY IN THE 2009

19   RETURN, THAT HE FAILED TO GIVE HIMSELF A CREDIT, AND THAT HE

20   WAS DUE.

21        I'LL SUSTAIN THE OBJECTION TO THE HEARSAY OF THIS

22   DOCUMENT, BUT I THINK YOU'RE PERMITTED TO INQUIRE ABOUT WHAT

23   HE, WHEN HE, THIS WITNESS, REVIEWED THE TAX RETURN AND BECAUSE

24   OF HIS EXPERIENCE, HIS DETERMINATION ABOUT THE FAILURE OF THE

25   TAXPAYER TO USE CORRECT CALCULATION METHODS IN THOSE ANALYSIS

AND THAT'S IT. THAT'S IT. WE DON'T NEED TO GET INTO THE AMOUNTS AND WE DON'T NEED -- IN FACT, THE ISSUE FOR YOU IS, AS I UNDERSTAND IT, AND I THINK IT'S APPROPRIATE, IS THAT HE DETERMINED THAT THE TAXPAYER FAILED TO ACCURATELY PREPARE THE RETURN. THERE WERE ERRORS IN THE RETURNS, IN THE TAXPAYER RETURNS.

AND I DON'T RECALL WHETHER OR NOT THESE WERE -- I THINK THESE WERE YEARS THAT HE SIGNED AND HE PREPARED THE RETURNS.

MR. SCHAINBAUM: HE PREPARED ALL OF THE RETURNS SO IT'S HIGHLY RELEVANT.

THE COURT: SO I'LL ALLOW YOU TO EXAMINE AS TO THAT, BUT NOT AS TO THE ADMISSIBILITY OF THE DOCUMENT ITSELF.

MR. SCHAINBAUM: WELL, TO THAT THEN I OBJECT TO THE RULING THAT I CANNOT PUT THIS DOCUMENT INTO EVIDENCE.

THE COURT: OKAY.

MR. SCHAINBAUM: BECAUSE I THINK, ONE, IT'S A DOCUMENT FROM THE WITNESS WHO IS ON THE STAND AND HE'S SUBJECT TO REDIRECT OR CROSS-EXAMINATION; AND HE'S THE AUTHOR OF THE DOCUMENT; AND THE DOCUMENT IS HIS STATEMENT AS TO WHAT HE BELIEVED -- WHAT HE BELIEVED TO BE THE TRUTH OF THE MATTER AS A MATTER OF FACT.

THE COURT: OKAY. I'LL ALLOW YOU TO EXAMINE, AS I INDICATED, AND I THINK IT'S APPROPRIATE TO ALLOW YOU TO EXAMINE ABOUT HIS OBSERVATION OF YOUR CLIENT'S PREPARATIONS AND HE CAN TESTIFY ABOUT THIS.

CROSS OERTEL

1           MR. ALLEN:  IF A PROPER FOUNDATION WERE LAID, COULD

2    THIS DOCUMENT QUALIFY AS AN 803(6) BUSINESS RECORD?

3           THE COURT:  I DON'T KNOW ANSWER TO THAT QUESTION.

4           MR. ALLEN:  CAN AN ATTEMPT BE MADE?

5           THE COURT:  IT'S UP TO YOU IF YOU CAN ATTEMPT TO

6    MAKE THAT.  I'M NOT SURE A SINGLE E-MAIL --

7           MR. ALLEN:  IN THE ORDINARY COURSE OF BUSINESS.

8           MR. SCHAINBAUM:  YEAH, I COULD TRY TO LAY THE

9    FOUNDATION.

10          THE COURT:  THERE'S NO HARM IN TRYING.

11          MR. SCHAINBAUM:  NO, OF COURSE NOT.

12          THE COURT:  OKAY.  THANK YOU.

13       (END OF DISCUSSION AT SIDE-BAR.)

14          THE COURT:  I'LL SUSTAIN THE OBJECTION.

15   MR. SCHAINBAUM.

16          MR. SCHAINBAUM:  YES.

17   Q.   MR. OERTEL, DID YOU SEND GG-1 MARKED FOR IDENTIFICATION IN

18   YOUR ORDINARY COURSE OF BUSINESS AS A REVENUE AGENT?

19   A.   YES.

20   Q.   AND DO YOU REGULARLY SEND E-MAILS IN THE REGULAR COURSE OF

21   YOUR BUSINESS AS A REVENUE AGENT?

22   A.   YES.

23   Q.   AND DO YOU RELY ON E-MAIL TRANSMISSIONS SUCH AS GG-1 IN

24   PERFORMING YOUR DUTIES?

25   A.   YES.

1    Q.   AND WITH RESPECT TO GG-1, DID YOU RELY ON IT WHEN YOU SENT

2    IT TO SPECIAL AGENT HELGESEN WITH RESPECT TO YOUR DUTIES ON OR

3    ABOUT JUNE 6TH, 2012?

4    A.   YES.

5         MR. SCHAINBAUM:  YOUR HONOR, I MOVE GG-1.

6         MS. SISKIND:  OBJECTION, YOUR HONOR.  IT'S AN

7    INSUFFICIENT 803(6) FOUNDATION AND IT ADDRESSES THIS WITNESS'S

8    USE OF THE E-MAIL BUT NOT THE E-MAIL RECORDKEEPING SYSTEM AT

9    THE I.R.S.

10        THE COURT:  SUSTAINED AS TO THE FOUNDATION

11   OBJECTION.

12   BY MR. SCHAINBAUM:

13   Q.   DO YOU USE -- GG-1, WHAT WAS THE PURPOSE OF SENDING THIS

14   E-MAIL?

15   A.   IT WAS TO TELL THE SPECIAL AGENT SOME OF THE CALCULATIONS

16   THAT I HAD DONE.

17   Q.   AND WAS THAT PART OF YOUR DUTIES IN THIS MATTER OF

18   MR. DESAI?

19   A.   YES.

20   Q.   SO DID YOU RELY ON ANY PART OF THIS E-MAIL KNOWN AS GG-1?

21   A.   DID I RELY ON IT?

22   Q.   YES.

23   A.   I DIDN'T RELY ON IT.  I DON'T KNOW WHAT THE SPECIAL AGENT

24   DID.

25   Q.   BUT YOU SENT IT TO THE SPECIAL AGENT IN THE ORDINARY

1    REGULAR COURSE OF BUSINESS?

2    A.   YES.

3    Q.   AND WAS IT FOR THE PURPOSE OF POINTING OUT HOW MR. DESAI

4    FAILED TO USE METHODS IN CALCULATING HIS TAX?

5    A.   YES.

6    Q.   AND WAS IT FOR THE PURPOSE OF POINTING OUT TO THE SPECIAL

7    AGENT THAT THE TAXPAYER FORGOT TO TAKE THE WORK PAY CREDIT?

8    A.   YES.

9    Q.   AND DID YOU BELIEVE THAT BECAUSE OF THESE FORGETFULNESSES

10   OF --

11          MS. SISKIND:  OBJECTION, YOUR HONOR, WHAT THE

12   WITNESS BELIEVED ABOUT FORGETFULNESS.

13          MR. SCHAINBAUM:  I HAVEN'T FINISHED THE SENTENCE.

14          THE COURT:  WHY DON'T YOU FINISH YOUR QUESTION AND

15   THEN I'LL HEAR THE OBJECTION.

16          MR. SCHAINBAUM:  OKAY.

17   Q.   BASED UPON WHAT YOU SAID THAT HE FAILED TO USE THE CORRECT

18   METHOD OF CALCULATING TAX AND FORGOT TO TAKE THE WORK PAY

19   CREDIT, DID YOU MAKE CHANGES THAT BENEFITTED THE TAXPAYER?

20   A.   WHEN I WAS DOING SOME TAX CALCULATIONS, YES.

21   Q.   I SEE.  NOW, WITH RESPECT TO THIS E-MAIL, CAN YOU TELL US

22   IF THE I.R.S. HAS A POLICY AT THE -- TO USE E-MAILS TO CONDUCT

23   THEIR REGULAR AND ORDINARY COURSE OF BUSINESS?

24   A.   YES.

25   Q.   AND DID YOU USE THAT POLICY IN SENDING AND ISSUING THIS

```
 1          E-MAIL DATED JUNE 6TH, 2012?

 2          A.   YES.

 3          Q.   AND IS THERE A SYSTEM IN PLACE AT THE I.R.S. AS TO

 4          MAINTAINING AND TRANSMITTING E-MAILS?

 5          A.   YES.

 6          Q.   AND DO YOU RELY ON THAT SYSTEM?

 7          A.   YES.

 8          Q.   AND ARE E-MAILS MADE IN THE ORDINARY COURSE OF I.R.S.

 9          BUSINESS AT OR NEAR THE TIME OF THE TRANSACTION?

10                MS. SISKIND:  OBJECTION, BEYOND THE SCOPE OF THIS

11          WITNESS'S KNOWLEDGE ABOUT HOW E-MAILS GENERALLY ARE MAINTAINED

12          AT THE I.R.S.

13                THE COURT:  SUSTAINED.  IF YOU WANT TO REFINE YOUR

14          QUESTION.

15          BY MR. SCHAINBAUM:

16          Q.   YEAH.  DO YOU KNOW HOW E-MAILS ARE MAINTAINED AT THE

17          I.R.S.?

18          A.   NO, I DON'T.

19          Q.   AND DO YOU KNOW HOW YOU RECEIVE E-MAILS?

20          A.   I HAVEN'T GOT A CLUE AS TO HOW THAT WORKS.

21          Q.   DO YOU KNOW HOW YOU RECEIVE E-MAILS?

22          A.   I RECEIVE E-MAILS.  I SEND E-MAILS.  HOW THE WHOLE SYSTEM

23          WORKS, I WILL HAVEN'T GOT A CLUE.

24          Q.   SO -- BUT YOU DO FOLLOW THE POLICY OF THE I.R.S. IN

25          SENDING AND RECEIVING E-MAILS?
```

CROSS OERTEL

1    A.   YES, I BELIEVE SO.

2    Q.   AND WAS EXHIBIT GG-1 SENT WITHIN THAT POLICY?

3    A.   YES.

4    Q.   SO THERE'S NOTHING EXTRAORDINARY OUTSIDE OF THE ORDINARY

5    COURSE OF I.R.S. BUSINESS ABOUT THIS E-MAIL?

6    A.   NO.

7             MR. SCHAINBAUM:  I, AGAIN, MOVE THE ADMISSION OF

8    GG-1.

9             MS. SISKIND:  OBJECTION, YOUR HONOR, THE WITNESS HAS

10   STATED THAT HE'S NOT FAMILIAR WITH HOW E-MAILS ARE RECEIVED IN

11   THE I.R.S. SYSTEM.

12            THE COURT:  I THINK THAT THERE'S AN ELEMENT MISSING,

13   IT'S 6(A) OF THE CODE.

14            MR. SCHAINBAUM:  I DON'T HAVE THAT.  I THINK I HAVE

15   ASKED THIS QUESTION.

16   Q.   WAS THIS E-MAIL, GG-1, MADE AT OR NEAR THE TIME THAT YOU

17   PUT THE INFORMATION ON THE E-MAIL?

18   A.   YES, I BELIEVE SO.

19   Q.   AND YOU DID HAVE KNOWLEDGE ABOUT THE INFORMATION THAT YOU

20   PUT ON THIS E-MAIL?

21   A.   YES.

22   Q.   AND IT WAS PUT ON THERE CONTEMPORANEOUSLY AT THE TIME THAT

23   YOU TRANSMITTED IT TO MR. HELGESEN?

24   A.   YES.

25   Q.   AND YOU RELIED ON IT?

CROSS OERTEL

```
 1    A.  WELL, AGAIN, I -- I MEAN, WHAT DO YOU MEAN THAT I RELIED

 2    ON IT?

 3    Q.  I MEAN, YOU RELIED ON THE INFORMATION THAT YOU PUT ON THE

 4    E-MAIL THAT IT WAS CORRECT?

 5    A.  WELL, I BELIEVE IT WAS CORRECT, YES.

 6    Q.  AND YOU BELIEVE IT WAS TRUE AND CORRECT?

 7    A.  WELL, YES.

 8    Q.  AND YOU'RE THE AUTHOR OF THE E-MAIL?

 9    A.  YES.

10          MR. SCHAINBAUM:  ALL RIGHT.  I MOVE FOR ADMISSION.

11          MS. SISKIND:  YOUR HONOR, THERE'S STILL A PROBLEM

12    UNDER 803(6)(B) UNLESS THIS WITNESS IS FAMILIAR WITH HOW THE

13    I.R.S. SERVER WORKS AND CAN SAY HOW THE E-MAILS ARE KEPT AT THE

14    I.R.S. IN THE ORDINARY COURSE OF BUSINESS.

15          THE COURT:  DO YOU WANT TO ASK THAT QUESTION?

16          MR. SCHAINBAUM:  SURE.

17    Q.  WHEN YOU TRANSMITTED THIS E-MAIL, DID YOU RETAIN THIS

18    E-MAIL?

19    A.  I DON'T REMEMBER.

20    Q.  WELL, IN THE ORDINARY COURSE OF YOUR BUSINESS AS A REVENUE

21    AGENT, DO YOU RETAIN E-MAILS?

22    A.  DO I RETAIN THEM?  WELL, I DON'T SAVE THEM TO MY COMPUTER,

23    USUALLY NOT.

24    Q.  AND WHAT IS THE POLICY OF THE I.R.S.?

25    A.  ABOUT SAVING E-MAILS?
```

CROSS OERTEL

1    Q.   ABOUT SAVING E-MAILS, YES.

2    A.   I DON'T KNOW.

3    Q.   SO DID YOU MAKE A RECORD OF THE E-MAIL?

4    A.   WHAT KIND OF RECORD?

5    Q.   DID YOU PRINT OUT THE E-MAIL?

6    A.   I DON'T REMEMBER.

7    Q.   YOU DON'T REMEMBER?

8    A.   I DON'T REMEMBER.

9    Q.   BUT YOU REMEMBER THAT THIS IS A TRUE AND ACCURATE COPY OF

10   THE E-MAIL THAT YOU PREPARED AND AUTHORED?

11   A.   IT CERTAINLY LOOKS LIKE IT.

12   Q.   AND IN THE NORMAL COURSE OF YOUR DUTIES HERE AS A REVENUE

13   AGENT FOR THE GOVERNMENT, DID YOU COLLECT INFORMATION AND PUT

14   IT IN A FILE OR OTHER RECORDKEEPING PLACE SO THAT YOU COULD

15   UTILIZE IT AT A SUBSEQUENT TIME?

16   A.   I DON'T REALLY -- I'M NOT -- WHAT DO YOU MEAN?

17   Q.   WHAT I MEAN IS THAT WHEN YOU HAVE PROVIDED INFORMATION TO

18   THE GOVERNMENT ATTORNEYS, DID YOU KEEP A RECORD OF IT?

19   A.   AS FAR AS I KNOW, YEAH.

20   Q.   AND HOW DID YOU DO THAT?

21   A.   JUST SET IT ASIDE IN A FOLDER.

22   Q.   AND DID YOU SET ASIDE E-MAILS IN THAT FOLDER?

23   A.   I DON'T REMEMBER.  I DON'T KNOW.  YOU KNOW, YOU DO A LOT

24   OF STUFF WHENEVER YOU'RE WORKING ON A TRIAL, AND YOU CAN'T

25   REMEMBER IF YOU PRINTED SOMETHING OUT OR IF IT'S ON THE

```
 1      COMPUTER OR IF IT'S MAYBE SOME SERVER HAS IT.

 2          I REALLY DON'T KNOW.  I DON'T KNOW EXACTLY WHAT YOU MEAN.

 3      Q.  I MEAN, IS THERE A POLICY AT THE I.R.S. THAT ANY PART OF

 4      YOUR WORK, WORK PRODUCT IS KEPT AND MAINTAINED IN THE REGULAR

 5      COURSE IN SOME FILE OR OTHER RECEPTACLE THAT WOULD MAKE IT PART

 6      OF YOUR -- THE OFFICIAL RECORDS OF THE I.R.S.?

 7      A.  YES.

 8      Q.  AND WAS THIS EXHIBIT GG-1 PART OF THE OFFICIAL FILES OF

 9      THE I.R.S.?

10      A.  UM, I WOULD THINK SO.

11              MR. SCHAINBAUM:  YOUR HONOR, I MOVE EXHIBIT GG-1 IN.

12              MS. SISKIND:  YOUR HONOR, WE STILL HAVE AN ISSUE

13      WITH SAYING THAT THIS WAS KEPT AS AN E-MAIL IN THE ORDINARY

14      COURSE OF BUSINESS.  UNLIKE A PREVIOUS RECORDS CUSTODIAN THAT

15      THE GOVERNMENT CALLED WHO COULD SPEAK HOW THE COMPUTER SERVER

16      WORKS, THAT'S NOT THE TESTIMONY THAT WE HAVE HERE.

17              THE COURT:  THANK YOU.  I THINK THERE'S BEEN A

18      SUFFICIENT RECORD.  I'LL ADMIT IT OVER OBJECTION.

19              MR. SCHAINBAUM:  THANK YOU, YOUR HONOR.

20              THE COURT:  YOU'RE WELCOME.

21          (DEFENDANT'S EXHIBIT GG-1 WAS RECEIVED IN EVIDENCE.)

22              MR. SCHAINBAUM:  THANK YOU, YOUR HONOR.

23      Q.  NOW, MR. OERTEL, WOULD YOU BE KIND ENOUGH TO READ WHAT YOU

24      AUTHORED AND SENT TO SPECIAL AGENT HELGESEN?

25      A.  SURE.  "HI MIKE, HERE IS THE RAR FOR DESAI.  BEFORE YOU
```

1    LOOK AT IT, I NEED TO LET YOU KNOW THAT THE TAX REPORTED ON THE

2    ORIGINAL RETURNS WAS NOT CORRECT.  IT WAS CHANGED BY THE

3    SERVICE CENTER.  ON BOTH THE 2007 AND 2008 RETURNS, THE

4    TAXPAYER FAILED TO USE THE CORRECT METHOD OF CALCULATING TAX

5    WHEN YOU RECEIVE A LARGE AMOUNT OF QUALIFIED DIVIDENDS."

6    Q.   CAN YOU STOP FOR A SECOND.  I WANT TO INTERRUPT YOU, AND I

7    APOLOGIZE FOR THAT.

8         BUT I'M CURIOUS WHAT THE BASIS OF YOUR STATEMENT THAT "ON

9    BOTH THE 2007 AND 2008 RETURNS THE TAXPAYER FAILED TO USE THE

10   CORRECT METHOD OF CALCULATING TAX WHEN YOU RECEIVE A LARGE

11   AMOUNT OF QUALIFIED DIVIDENDS"?

12   A.   WHAT DID I MEAN BY THAT?

13   Q.   YES.

14   A.   WELL, IT MEANS THAT WHENEVER I LOOKED AT THE TAX RETURN, I

15   REVIEWED IT AND IT APPEARED TO ME THAT HE DIDN'T DO THAT RIGHT.

16   Q.   WHAT DO YOU MEAN "IT APPEARED TO YOU THAT HE DIDN'T DO

17   THAT RIGHT"?  WHAT DOES THAT MEAN?

18   A.   WELL, THERE'S A WAY OF CALCULATING CERTAIN TYPES OF TAX,

19   CERTAIN TYPES OF INCOME, AND IT APPEARED TO ME THAT, THAT

20   WASN'T DONE CORRECTLY.

21   Q.   WHEN YOU SAY IT WASN'T DONE CORRECTLY, COULD YOU BE MORE

22   PRECISE?

23   A.   IT WASN'T ACCURATE.

24   Q.   AND IN WHAT MANNER?

25   A.   THE WAY HE CALCULATED THE TAX.

1    Q.   IN OTHER WORDS, DID HE USE THE WRONG METHOD?

2    A.   THAT'S WHAT I BELIEVE, YEAH.

3    Q.   OKAY.  SO --

4         THE COURT:  BEFORE YOU GO ON, WHY DON'T WE TAKE OUR

5    NOON RECESS AT THIS TIME.

6         MR. SCHAINBAUM:  THANK YOU.

7         THE COURT:  YOU'RE WELCOME.  WE'LL TAKE OUR NOON

8    RECESS, LADIES AND GENTLEMEN.  WE'LL RESUME AT 1:30, 1:30 AND

9    WE'LL SEE YOU THEN.

10        (LUNCH RECESS TAKEN.)

11                       **AFTERNOON SESSION**

12        (JURY IN AT 1:35 P.M.)

13        THE COURT:  WE'RE BACK IN SESSION ON THE DESAI

14   MATTER.  ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT ONCE AGAIN.

15   OUR JURY AND ALTERNATES ARE PRESENT.

16       WOULD YOU LIKE TO CONTINUE WITH YOUR CROSS-EXAMINATION?

17        MR. SCHAINBAUM:  YES, YOUR HONOR.  THANK YOU.

18        THE COURT:  YOU'RE WELCOME.

19   BY MR. SCHAINBAUM:

20   Q.   MR. OERTEL, WOULD YOU BE KIND ENOUGH TO TURN TO GG-1?

21   A.   YEAH, I HAVE IT.

22   Q.   YOU HAVE IT IN FRONT OF YOU?

23   A.   YES.

24   Q.   OKAY.  WE LEFT OFF WHERE YOU HAD WRITTEN "ON BOTH THE 2007

25   AND 2008 RETURNS THE TAXPAYER FAILED TO USE THE CORRECT METHOD

CROSS OERTEL

```
1      OF CALCULATING TAX WHEN YOU RECEIVE A LARGE AMOUNT OF QUALIFIED

2      DIVIDENDS."

3           YOU WROTE THAT, CORRECT?

4      A.   YES.

5      Q.   AND THEN WOULD YOU STATE WHAT ELSE YOU WROTE?

6      A.   IT CONTINUES: "HIS RETURNS SHOWED INCOME TAX OF $8,019

7      AND $6,156 FOR 2007 AND 2008 RESPECTIVELY.  THE TAX SHOULD HAVE

8      BEEN REPORTED AS" 52 -- OR EXCUSE ME -- "$5,232 AND $5,992

9      RESPECTIVELY.

10          "FOR 2009 THE TAXPAYER FORGOT TO GIVE HIMSELF THE MAKE

11     WORK PAY CREDIT.  FOR ALL THREE YEARS MY RAR ACCOUNTS FOR THESE

12     CHANGES MADE BY THE SERVICE CENTER BECAUSE EACH CHANGE BENEFITS

13     THE TAXPAYER.  LET ME KNOW IF YOU HAVE ANY QUESTIONS, JIM."

14     Q.   AND THAT'S YOU, JIM?

15     A.   THAT'S ME.

16     Q.   AND DID MR. HELGESEN, THE SPECIAL AGENT HERE, DID HE HAVE

17     ANY QUESTION?

18     A.   I DON'T RECALL.

19     Q.   YOU DON'T RECALL?

20     A.   I DON'T REMEMBER IF HE DID OR NOT.

21     Q.   EXCUSE ME?

22     A.   I DON'T REMEMBER IF HE DID OR NOT.

23     Q.   WOULD YOU BE KIND ENOUGH TO TURN TO GG-2.  AND I'D LIKE TO

24     ASK YOU THIS QUESTION:  DID YOU PREPARE WHAT WE HAVE IDENTIFIED

25     IN THE RECORD HERE AS GG-2?
```

1    A.   YES.

2    Q.   AND YOU'RE THE AUTHOR OF THAT?

3    A.   YES.

4    Q.   AND MS. SISKIND ASKED YOU A NUMBER OF QUESTIONS YESTERDAY,

5    I BELIEVE, ABOUT YOUR METHODOLOGY; CORRECT?

6    A.   METHODOLOGY OF WHAT?

7    Q.   HOW YOU CALCULATED EITHER NUMBERS FOR INTEREST OR ACCOUNT

8    BALANCES?

9    A.   YES.

10   Q.   ALL RIGHT.  SO I WANT TO KNOW IF ONE OF YOUR METHODOLOGIES

11   IS BACKING INTO AMOUNTS, IS THAT A METHODOLOGY YOU USED?

12   A.   FOR CALCULATING INTEREST?

13   Q.   NO.  JUST THE METHODOLOGY THAT YOU USE?

14   A.   IN REGARDS TO WHAT?

15   Q.   WELL, FIRST LET ME ASK THIS QUESTION TO BE CLEAR:  DO YOU

16   USE A METHOD OF CALCULATING SOME SUM THE METHODOLOGY CALLED

17   BACKING INTO AMOUNTS?

18   A.   WELL, IF I ONLY HAVE -- LIKE ON HERE, IT EXPLAINS THAT

19   THERE WAS A POSTING OF AN AMOUNT OF TAX ON THE TAXPAYER'S

20   ACCOUNT AND THERE WAS SOME DIFFERENCE AND SO I HAD TO FIGURE

21   OUT WHAT WOULD ACCOUNT FOR THAT DIFFERENCE IN TAX.

22        SO I BACKED INTO THAT TAXABLE INCOME.

23   Q.   AND SO YOU BACKED INTO THAT AMOUNT BY YOU MAKING THE

24   DETERMINATION; CORRECT?

25   A.   WELL, I DID SOME CALCULATIONS, YEAH.

1    Q.   OKAY.  SO THIS MEMO IS, HOWEVER, IS YOUR AUTHORSHIP?

2    A.   YES.

3    Q.   AND I MOVE EXHIBIT GG-2 INTO EVIDENCE.

4         MS. SISKIND:  NO OBJECTION.

5         THE COURT:  IT'S RECEIVED WITHOUT OBJECTION.

6         (DEFENDANT'S EXHIBIT GG-2 WAS RECEIVED IN EVIDENCE.)

7    BY MR. SCHAINBAUM:

8    Q.   ALL RIGHT.  MR. OERTEL, DO YOU SEE ON THE THIRD PARAGRAPH

9    THERE'S A SENTENCE CALLED THE 2007 INFOLT ALSO SHOWED A 290

10   POSTING OF 11,575.  DO YOU KNOW WHAT A 290 POSTING IS?

11   A.   A 290 POSTING IS AN ADDITIONAL TAX ASSESSMENT.

12   Q.   AND ATTACHED TO THE RETURN IS CORRESPONDENCE BACK AND

13   FORTH FROM THE TAXPAYER TO THE I.R.S.  DO YOU SEE THAT?

14   A.   YES.

15   Q.   AND YOU SAW THAT CORRESPONDENCE; CORRECT?

16   A.   I MUST HAVE SEEN SOMETHING, YEAH.

17   Q.   PARDON ME?

18   A.   WELL, I SAW SOMETHING, YEAH.  I SAW SOME CORRESPONDENCE.

19   Q.   AND YOU WROTE ON ONE LETTER THE TAXPAYER WROTE THAT THERE

20   WAS 40,774 IN UNREPORTED INTEREST; IS THAT CORRECT?

21   A.   YEAH, THAT'S WHAT IT SAYS.

22   Q.   AND THE TAXPAYER HIMSELF SENT IN A LETTER TO THE I.R.S.

23   SAYING, LOOK, I FORGOT TO REPORT $40,774 IN INTEREST?

24   A.   I DON'T KNOW WHAT THE WORDING OF THE LETTER WAS, SIR.

25   Q.   WELL, WHATEVER THE WORDING OF THE LETTER WAS, YOU WROTE ON

1    ONE LETTER THE TAXPAYER WROTE THAT THERE WAS 40,774 IN

2    UNREPORTED INTEREST?

3    A.   YES.

4    Q.   AND THEN FURTHER DOWN YOU WROTE THE 2008 INFOLT?  WHAT IS

5    AN INFOLT?  I-N-F-O-L-T?

6    A.   OH, THAT'S AN ON-LINE WAY OF PRINTING OUT OR SEEING AND

7    PRINTING OUT THE SAME KIND OF INFORMATION THAT YOU WOULD SEE ON

8    THOSE TRANSCRIPTS THAT WE SAW EARLIER.

9        AN INFOLT IS JUST INSTEAD OF REQUESTING A TRANSCRIPT, YOU

10   CAN ACTUALLY JUST GO ON THE ON-LINE SYSTEM WITHIN THE I.R.S.

11   AND LOOK AT THE TRANSCRIPT, AND THAT'S WHAT AN INFOLT IS.  IT'S

12   I.R.S. JARGON.

13   Q.   AND PART OF THIS I.R.S. JARGON IS THERE A NUMBER 150

14   POSTING?  WHAT DOES THAT MEAN?

15   A.   A 150 POSTING STATES -- WELL, A 150 POSTING IS HOW MUCH

16   TAX WAS ASSESSED ON AN ORIGINAL RETURN?

17   Q.   I SEE.  AND WITH RESPECT TO THIS MEMO OF BACKING INTO

18   AMOUNTS, YOU WROTE, WITHOUT KNOWING OR BEING ABLE TO DETERMINE

19   THE CAUSE OF THE $165 DIFFERENCE BETWEEN THE RETURN'S AMOUNT OF

20   TAX AND THE INFOLT AMOUNT, I" -- THAT MEANS YOU; CORRECT?

21   A.   YEAH, THAT'S ME.

22   Q.   YEAH.  -- "CHOSE TO BACK INTO THE CUMULATIVE AMOUNT OF TAX

23   FROM THE 150, THE INFOLT -- THE 150 POSTING AND THE SUBSEQUENT

24   290 POSTING OF 5,293."  IS THAT RIGHT?

25   A.   YEAH.

1    Q.   AND AS A RESULT OF YOUR BACKING INTO AMOUNTS, HOW MUCH TAX

2    DID YOU COME UP WITH?

3    A.   DO YOU MEAN THE 290 POSTING OR -- WHICH PART?

4    Q.   I'M --

5    A.   WHICH SENTENCE ARE YOU REFERRING TO, SIR?

6    Q.   I'M LOOKING AT THE INCOME REPORTING THE TAX RATE IS

7    5 PERCENT SO THE DIFFERENCE IS 5293 DIVIDED BY 0.25 TO GET A

8    CHANGE TO INCOME OF 21,172.

9         YOU WROTE THAT?

10   A.   YES.

11   Q.   AND THE RGS, WHAT DOES THAT STAND FOR?

12   A.   THAT IS REPORT GENERATING SYSTEM.  IT'S THE COMPUTER

13   PROGRAM THAT REVENUE AGENTS USE TO CALCULATE AUDIT REPORTS.

14   Q.   AND YOU ALSO WROTE "RGS SHOWED A VARIANCE WITH THIS CHANGE

15   SO BY TRIAL AND ERROR."

16        IS THAT A METHODOLOGY THAT YOU USED?

17   A.   THAT'S WHAT I USED HERE, YEAH.

18   Q.   AND SO THAT WAS YOUR METHOD HERE, TRIAL AND ERROR?

19   A.   TO BACK INTO A CERTAIN NUMBER.

20   Q.   TO BACK INTO A CERTAIN NUMBER.  "THE INCOME AMOUNTS INPUT

21   INTO THE RGS WERE REVISED UNTIL THERE WAS A VARIANCE OF ONLY $1

22   IN TAX."  RIGHT?

23   A.   RIGHT.

24   Q.   AND THIS WAS WITH RESPECT TO YOUR DUTIES IN THIS CASE?

25   A.   THAT'S CORRECT, IT'S ABOUT THIS CASE.

1    Q.   AND THEN YOU FURTHER WENT ON FOR AMI'S 2009 AMT.  WHAT DID

2    YOU WRITE ABOUT THAT?  WHAT DID YOU DO WITH THAT?

3    A.   DO YOU WANT ME TO READ IT?

4    Q.   SURE.

5    A.   "THE AGENT'S RAR PROGRAM" -- CAN I JUST EXPLAIN THAT RAR

6    MEANS REVENUE AGENT'S REPORT?

7    Q.   THANK YOU.

8    A.   OKAY.  "THE AGENT'S RAR PROGRAM FOUND AN ERROR ON THE

9    RETURN IN THE AMOUNT OF $6,479 OF ALTERNATIVE MINIMUM TAX THAT

10   WAS NOT DISCOVERED BY THE TAXPAYER OR THE SERVICE CENTER.  AN

11   ADJUSTMENT WAS MADE IN THE RAR PROGRAM TO ELIMINATE THIS ERROR

12   FROM BEING CONSIDERED IN THE DEFICIENCY."

13   Q.   AND ARE YOU STATING HERE THAT YOU -- THAT NEITHER THE

14   TAXPAYER NOR THE SERVICE CENTER DISCOVERED THE ERRORS THAT

15   YOU -- THAT YOU CORRECT IN THE RECORD?

16   A.   THAT'S WHAT IT SAYS.

17   Q.   AND YOU CORRECTED IT BY TRIAL AND ERROR?

18   A.   IT DOESN'T SAY THAT.

19   Q.   BUT YOU USE THAT TERM TRIAL AND ERROR?

20   A.   I USED IT IN A PRIOR PARAGRAPH.

21   Q.   AND THAT PRIOR PARAGRAPH RELATED TO WHAT, THE YEAR 2008?

22   A.   YES.

23   Q.   AND SO WHAT DID YOU COME OUT WITH IN YOUR DETERMINATION OF

24   THE TAX FOR 2007 AND '08?

25        MS. SISKIND:  OBJECTION, YOUR HONOR.  RELEVANCE TO

CROSS OERTEL

```
1    THE RESULT.  METHODOLOGY IS ONE THING, BUT THE CALCULATION IS A
2    SEPARATE ISSUE.
3              THE COURT:  SUSTAINED.  MR. SCHAINBAUM.
4              MR. SCHAINBAUM:  ALL RIGHT.
5    Q.   BUT USING YOUR METHODOLOGY OF BACKING INTO AMOUNTS AND
6    TRIAL AND ERROR, WOULD YOU BE KIND ENOUGH TO TURN TO EXHIBIT --
7    LET'S SEE -- 134.
8    A.   DO YOU WANT ME TO KEEP THIS OPEN?
9    Q.   YES.  BUT YOU CAN CLOSE IT FOR THE MOMENT.
10   A.   OKAY.
11   Q.   WE'LL GET BACK TO IT.
12   A.   SURE.  134?
13   Q.   YES.
14   A.   OKAY.  I'VE GOT IT.
15   Q.   NOW, YOU UTILIZED EXHIBIT 134, WHICH IS AN ACCOUNT
16   SUMMARY; CORRECT?
17   A.   YES.
18   Q.   AND FOR WHAT PURPOSE?
19   A.   I USE THAT, I BELIEVE, TO CALCULATE THE AMOUNT OF INTEREST
20   INCOME, AND I THINK IT'S ALSO PART OF THE HIGH BALANCE
21   CALCULATION.
22   Q.   NOW, TURNING TO 136.
23   A.   OKAY.
24   Q.   DID YOU USE EXHIBIT 136 FOR WHAT PURPOSE?
25   A.   THE SAME PURPOSE, NOTING THAT I DID FIND SOME
```

1    DISCREPANCIES BETWEEN A PART OF IT AND THE SCREEN SHOT.  SO I

2    USED THE SCREEN SHOT.

3    Q.   OH.  WHICH SCREEN SHOT DID YOU USE?

4    A.   LET'S SEE.  GIVE ME A MOMENT BECAUSE I CAN'T REMEMBER

5    WHICH.

6    Q.   ALL RIGHT.  TAKE YOUR TIME.

7         I'LL JUST ASK YOU WHILE YOU'RE LOOKING FOR THE SCREEN

8    SHOT --

9    A.   SURE.

10   Q.   -- YOU USED THE SCREEN SHOT TO VERIFY THE EXHIBITS AT 136

11   AND 134; CORRECT?

12   A.   YES.

13   Q.   AND 136 REPRESENTS A LIST OF BANK ACCOUNTS; CORRECT?

14   A.   OF CD'S, YES.

15   Q.   OF CD'S?

16   A.   YES.

17   Q.   AND BUT YOU HEARD AARTI KUMAR TESTIFY THAT THERE WERE ONLY

18   TWO BASIC ACCOUNTS, ONE FOR THE FATHER AND ONE FOR THE MOTHER,

19   AND THE SONS AND DAUGHTERS WERE ADDED TO EACH ACCOUNT?

20   A.   THERE ARE ALSO ACCOUNTS FOR THE TWO CHILDREN SEPARATELY.

21   Q.   AND WERE THOSE SUBACCOUNTS?

22   A.   I DON'T KNOW WHAT YOU MEAN BY A "SUBACCOUNT."  I THINK

23   THEY EACH HAVE THEIR OWN ACCOUNT.

24   Q.   AND WHAT WAS THE SOURCE OF THE FUNDS OF THOSE ACCOUNTS?

25   A.   THE EVIDENCE WOULD SHOW THAT IT -- THAT THERE WERE CHECKS

```
1    FROM MR. DESAI, AS WELL AS TRANSFERS FROM MR. DESAI'S ACCOUNTS

2    AT HSBC INDIA, THAT HE PUT INTO HIS CHILDREN'S ACCOUNTS.

3    Q.   AND SO ALL OF THE SOURCE -- STRIKE THAT.

4         SO THE TOTAL SOURCE OF THE FUNDS CAME FROM MR. DESAI?

5    A.   AS FAR AS I RECALL, YEAH.

6    Q.   ALL RIGHT.  LET'S GO BACK TO 136.  136, DID YOU VERIFY THE

7    LIST OF ACCOUNTS ON THAT PAGE?

8    A.   YES.

9    Q.   AND SO AS YOU SIT THERE TODAY UNDER OATH, YOU CAN TELL US

10   THAT ALL OF THOSE ACCOUNTS THAT YOU CLAIMED ARE SEPARATE

11   ACCOUNTS EXIST; CORRECT?

12   A.   YES.

13   Q.   AND WHAT DID YOU USE AS THE VERIFICATION SOURCE?

14   A.   THE PRINT SCREEN.

15   Q.   THE WHAT?

16   A.   THE SCREEN SHOT OR SCREEN DUMP, WHATEVER YOU WANT TO CALL

17   IT.

18   Q.   AND WHICH SCREEN SHOT OR SCREEN DUMP?  I APOLOGIZE IF I

19   INTERRUPTED YOUR SEARCH FOR WHICH ONE IT WAS.

20   A.   THAT'S ALL RIGHT.

21        IT WAS 72, EXHIBIT 72.

22   Q.   EXHIBIT 72.  AND WHY DID YOU USE EXHIBIT 72?

23   A.   BECAUSE IT'S IN EVIDENCE.

24   Q.   AND WHY DID YOU USE -- EXCUSE ME.  WHY DID YOU USE THAT

25   PARTICULAR EXHIBIT, 72?
```

```
1    A.   I DIDN'T USE JUST ONE PARTICULAR EXHIBIT IN MY

2    CALCULATIONS.  I LOOKED AT ALL OF THE EXHIBITS, AS WELL AS

3    LISTENED TO ALL OF THE TESTIMONY.

4    Q.   WELL, WHY DID YOU PARTICULARLY USE SCREEN SHOTS TO VERIFY

5    THE EXHIBITS HERE, EXHIBITS 136 AND 134?

6    A.   BECAUSE ACCORDING TO THE TESTIMONY OF MS. KATJU AND

7    MS. KUMAR THOSE WERE STRAIGHT OUT OF THE HSBC INDIA COMPUTER

8    SYSTEM.  SO I ASSUMED THAT THOSE WERE THE MOST ACCURATE.

9    Q.   AND WHY DID YOU ASSUME THAT THOSE WERE THE MOST ACCURATE?

10   A.   BECAUSE THEY CAME OUT OF A BANK COMPUTER SYSTEM.

11   Q.   WHAT DOES THAT MEAN?  ARE YOU SAYING SIMPLY BECAUSE A

12   COMPUTER SYSTEM IS FROM A BANK THAT IT'S ACCURATE?

13   A.   I'M SAYING THAT THE INFORMATION THAT WAS PUT INTO EVIDENCE

14   INCLUDES COMPUTER SCREENS AND THEY'RE FROM A BANK COMPUTER AND

15   I USED THEM TO MAKE MY CALCULATIONS.

16   Q.   WELL, DO YOU RECALL TESTIFYING IN ANSWER TO THE QUESTION

17   FROM THE PROSECUTOR HERE, MS. SISKIND, THAT -- THE QUESTION

18   WAS:  "NOW, GIVEN" -- THIS APPEARS ON THE TRANSCRIPT AT PAGE

19   1258, LINE 20.

20        "NOW, GIVEN THAT YOU NOTICE THE TRANSPOSITION ERROR --"

21   AND THE TRANSPOSITION ERROR, WOULD YOU AGREE WITH ME, APPEARS

22   ON PAGE 2 OF EXHIBIT 136?

23   A.   THAT'S THE START AND MATURITY DATES, YES.

24   Q.   AND ISN'T THAT THE TRANSPOSITION ERROR?

25   A.   YES.
```

1    Q.   AND THAT'S WHERE THIS PARTICULAR DOCUMENT COMING FROM A

2    BANK COMPUTER SHOWS THAT THE MATURITY DATE OCCURS BEFORE THE

3    START DATE; CORRECT?

4    A.   YES.

5    Q.   AND YOU TRANSPOSED IT BACK TO WHAT YOU BELIEVE IS THE

6    ACCURATE DATE?

7    A.   WELL, YOU CAN'T START A CD IN THE YEAR BEFORE IT MATURES.

8         SO I USED THE START DATE AS IN 2008 AND THE MATURITY DATE

9    AS IN 2009.

10   Q.   WELL, I'M A LITTLE PUZZLED NOW.  YOU TOLD ME THAT THIS

11   DOCUMENT REPRESENTED BY EXHIBIT 136 CAME OUT OF A BANK

12   COMPUTER, AND BECAUSE IT CAME OUT OF A BANK COMPUTER, YOU

13   RELIED ON IT AS BEING ACCURATE.

14   A.   NO, THAT'S NOT AT ALL WHAT I SAID.

15   Q.   OH.  WHAT DID YOU SAY?

16   A.   WHAT I SAID IN MY TESTIMONY WITH MS. SISKIND IS THAT 136

17   IS A SPREADSHEET THAT I BELIEVE WAS MADE AT THE FREMONT

18   REPRESENTATIVE OFFICE.

19   Q.   AND WHERE WAS THAT LOCATED?

20   A.   FREMONT.

21   Q.   AND WHERE IS FREMONT?

22   A.   IT'S ABOUT 15 MILES NORTH OF HERE.

23   Q.   AND THAT'S HERE IN CALIFORNIA?

24   A.   YEP.

25   Q.   AND THAT'S HERE IN THE UNITED STATES OF AMERICA?

1    A.   YEP.

2    Q.   OKAY.  SO -- BUT YOUR ANSWER TO MS. SISKIND'S QUESTION

3    WAS, "NOW, GIVEN THAT YOU NOTICE THAT THIS TRANSPOSITION ERROR,

4    AS YOU CALLED IT, WHAT DID YOU DO IN ORDER TO DETERMINE WHAT

5    THE CORRECT START AND MATURITY DATES SHOULD BE FOR THESE

6    CERTIFICATES OF DEPOSITS?"

7         YOUR ANSWER WAS:  "I ALWAYS FELL BACK ON WHATEVER THE

8    SCREEN SHOT SHOWED."

9         IS THAT ACCURATE?

10   A.   YES, TO THE EXTENT THAT THERE WAS A SCREEN SHOT AVAILABLE

11   FOR THAT CD AND THAT PERIOD.

12   Q.   AND THEN MS. SISKIND FOLLOWED UP.  THE QUESTION WAS:  "AND

13   WHY WAS THAT?"

14        AND YOUR ANSWER WAS:  "BECAUSE THE SCREEN SHOTS CAME FROM

15   A COMPUTER WHICH WOULD MEAN, I BELIEVE, THAT THEY ARE ABSENT OF

16   HUMAN ERROR."

17        IS THAT CORRECT?  IS THAT WHAT YOU --

18   A.   THAT'S WHAT I SAID, YEAH.

19   Q.   "AND SO IF THEY CAME RIGHT OUT OF A COMPUTER, I

20   ASSUMED --" YOU MADE AN ASSUMPTION; CORRECT?

21   A.   IF THAT'S WHAT I SAID.

22   Q.   WELL, IT SAYS HERE "BECAUSE THE SCREEN SHOTS CAME FROM A

23   COMPUTER WHICH WOULD MEAN, I BELIEVE, THAT THEY'RE ABSENT OF

24   HUMAN ERROR.  AND SO IF THEY CAME RIGHT OUT OF A COMPUTER, I

25   ASSUMED THEY WERE CORRECT."

CROSS OERTEL

1    A.   THAT'S WHAT I SAID.

2    Q.   NOW, HOW MANY YEARS HAVE YOU BEEN A REVENUE AGENT?

3    A.   TWENTY-SEVEN YEARS AS OF LAST SATURDAY.

4    Q.   CONGRATULATIONS.

5    A.   THANK YOU.

6    Q.   NOW, WHAT KIND OF INFORMATION GETS INTO A COMPUTER?

7    A.   WHAT KIND OF INFORMATION?

8    Q.   RIGHT.  WHO PUTS IT IN?

9    A.   I GUESS THERE ARE DIFFERENT WAYS OF PUTTING IT IN.

10   Q.   AND IN ALL OF THOSE DIFFERENT WAYS, DOES A HUMAN PUT IN

11   THE INFORMATION?

12          MS. SISKIND:  OBJECTION TO THE VAGUENESS OF THE

13   QUESTION.  WHAT COMPUTER SYSTEM?  WHAT RECORD?  THERE'S LOTS OF

14   DIFFERENT --

15          THE COURT:  DID YOU UNDERSTAND THE QUESTION, SIR?

16          THE WITNESS:  WELL, ACTUALLY SHE'S RIGHT.  IT IS

17   KIND OF VAGUE.

18          THE COURT:  YOU DON'T UNDERSTAND.

19          THE WITNESS:  YEAH.

20          THE COURT:  WHY DON'T YOU ASK A QUESTION?

21   BY MR. SCHAINBAUM:

22   Q.   IN GETTING INFORMATION OUT OF A COMPUTER, DO YOU KNOW THE

23   SOURCE OF HOW THE INFORMATION GETS INTO THE COMPUTER?

24          THE COURT:  WE'RE TALKING ABOUT THE I.R.S. COMPUTER

25   SYSTEM HERE?

CROSS OERTEL

```
 1                    MR. SCHAINBAUM:  WE'RE TALKING ABOUT ANY COMPUTER

 2      SYSTEM.

 3                    MS. SISKIND:  I OBJECT TO TALK ABOUT ANY COMPUTER

 4      SYSTEM.

 5                    THE COURT:  SUSTAINED AS --

 6                    MR. SCHAINBAUM:  ALL RIGHT.  NOW WE'LL TALK ABOUT

 7      THE I.R.S. COMPUTER.

 8      Q.   DO YOU KNOW HOW INFORMATION GETS INTO THE I.R.S. COMPUTER?

 9      A.   THERE ARE DIFFERENT WAYS.  YOU CAN GET IT ELECTRONICALLY.

10      YOU CAN GET IT BY SOMEONE INPUTTING IT.  ALL OF THAT.

11      Q.   AND WELL, WHEN SOMEONE INPUTS IT, IS THAT A PERSON?  A

12      HUMAN?

13      A.   YES, IT'S A HUMAN BEING AT THE SERVICE CENTER.

14      Q.   AND IN ALL OF YOUR 27 YEARS, HAVE YOU EVER FOUND THAT

15      THERE HAS BEEN AN ERROR OR ERRORS INPUT INTO THE COMPUTER

16      SYSTEM?

17      A.   YES.

18      Q.   HOW OFTEN IN YOUR EXPERIENCE HAS THAT OCCURRED?

19      A.   THAT'S PRETTY RARE.

20      Q.   PRETTY RARE?

21      A.   IT'S PRETTY RARE BECAUSE IF SOMEONE WERE TO MAKE AN ERROR,

22      LET'S SAY, IN INPUTTING SOMETHING, NORMALLY IT IS FOUND.  IT

23      DEPENDS ON WHAT TYPE OF INPUT ERROR AND THE WHOLE THING.

24           THERE'S A LOT OF AREAS.

25      Q.   IN THE I.R.S., HAVE YOU EVER HEARD OF THE CONCEPT OF GIGO?
```

1    A.   NO.

2    Q.   YOU NEVER HEARD OF THE CONCEPT OF INPUTTING INTO THE

3    COMPUTER SYSTEM GIGO?

4    A.   I NEVER HEARD THAT.  IS THAT A NAME?  INITIALS?  ACRONYM?

5    Q.   IT'S AN ACRONYM FOR GARBAGE IN, GARBAGE OUT.

6    A.   I HEARD THAT TERM.

7    Q.   OH, GOOD.  AND SO LOOKING AT THE SCREEN SHOTS THAT YOU

8    RELIED ON FROM SOME COMPUTER LOCATED ALLEGEDLY IN INDIA, YOU'RE

9    SAYING THAT WITHOUT MORE, YOU RELIED ON THE SCREEN SHOTS, THOSE

10   DUMP SHOTS FOR YOUR ANALYSIS; CORRECT?

11   A.   WELL, ACTUALLY I HAVE TO USE WHAT IS IN EVIDENCE.  AS A

12   SUMMARY WITNESS, IT IS MY JOB TO SUMMARIZE THE EVIDENCE, OKAY?

13   I HAVE TO TAKE IT AT FACE VALUE, AND THAT'S WHAT I DO.

14        IF SOMETHING IS IN EVIDENCE, I USE IT.  AND AS IN THE CASE

15   OF EXHIBIT 136, WHEN I FIND A DISCREPANCY, I ELIMINATE THE

16   DISCREPANCY SO THAT MY CALCULATIONS CAN BE THE MOST ACCURATE

17   THAT THEY POSSIBLY CAN BE.

18   Q.   SO YOU MAKE THE DETERMINATION AND CHANGE THE EVIDENCE,

19   EVEN THOUGH THE EVIDENCE MIGHT BE IN ERROR OR THERE MIGHT BE A

20   DISCREPANCY.  DO I GET THAT FROM YOUR TESTIMONY?

21   A.   I DON'T CHANGE EVIDENCE.

22   Q.   EXCUSE ME.  YOU JUST SAID THAT WHEN YOU FIND AN ERROR, YOU

23   JUST CORRECT IT.

24   A.   IF I FIND AN ERROR, I CORRECT IT.  I DON'T CHANGE

25   ANYTHING.

1    Q.  WELL, FOR EXAMPLE, JUST TO KEEP IT SIMPLE, IF YOU HAVE THE

2    MATURITY DATES SET FORTH SPECIFICALLY ON EXHIBIT 136 AND THE

3    START DATE SET FORTH SPECIFICALLY, YOU SAID YOU TRANSPOSED IT

4    TO WHAT YOU BELIEVED WAS THE TRUE START DATE AND THE TRUE

5    MATURITY DATE; CORRECT?

6    A.  I USED ALL OF THE EVIDENCE.  I DIDN'T USE JUST ONE SOURCE.

7    I -- YOU KNOW, IF SOMETHING WAS A DISCREPANCY, I FIXED IT.

8    THAT'S --

9    Q.  YOU FIXED THE EVIDENCE; IS THAT WHAT YOU'RE SAYING?

10   A.  I DON'T FIX EVIDENCE, SIR.

11   Q.  WELL, LET'S EXAMINE THAT.  LET'S EXAMINE THAT.

12       FOR EXAMPLE, LOOKING AT -- LET'S GO TO -- LOOK AT 137.  ON

13   137, THE LAST PAGE, THERE ARE WHAT APPEARS TO BE -- OH, IT'S

14   NOT THE LAST PAGE.  THERE'S A PAGE CALLED DUPLICATE STATEMENT

15   OF ACCOUNT.  DO YOU SEE THAT?

16            MS. SISKIND:  YOUR HONOR, THERE ARE SEVERAL PAGES

17   CALLED THAT.  COULD MR. SCHAINBAUM IDENTIFY WHICH OF THOSE?

18            THE COURT:  ARE THEY PAGINATED?

19            THE WITNESS:  IF YOU COULD TELL ME WHICH YEAR AND

20   WHICH ACCOUNT, THAT WOULD HELP.

21            MR. SCHAINBAUM:  OKAY.

22   Q.  I'M LOOKING AT EXHIBIT 137, AND I'M LOOKING AT THE PAGE

23   THAT SAYS DUPLICATE STATEMENT OF ACCOUNT THAT HAS A COLUMN ON

24   THE LEFT WITH IDENTIFICATION AND A COLUMN IN THE MIDDLE WITH

25   NUMBERS THAT HAS ON THE SECOND PAGE ONE ACCOUNT, AND I'M

```
 1    LOOKING AT THAT, DUPLICATE STATEMENT OF ACCOUNT?

 2    A.   AND THIS IS IN 137?

 3    Q.   CORRECT.  THIS WOULD BE -- LET'S SEE.

 4    A.   WELL, COULD YOU TELL ME WHICH ACCOUNT IT IS IN REFERENCE

 5    TO, PLEASE.  IF YOU CAN TELL ME WHICH ACCOUNT AND FOR WHICH

 6    YEAR, THEN IT WOULD MAKE IT MUCH EASIER FOR ME TO FIND.

 7    Q.   SURE.  THE ACCOUNT WOULD BE 2479.

 8    A.   2479?

 9    Q.   THE CUSTOMER IS SUPPOSEDLY 3679.  YOU KNOW THAT NUMBER?

10         MS. SISKIND:  YOUR HONOR, JUST FOR CLARITY, THERE

11    ARE FOUR PAGES THAT ARE THE LAST FOUR PAGES OF THE EXHIBIT, ALL

12    OF WHICH SAY DUPLICATE STATEMENT OF ACCOUNT AND ALL THAT RELATE

13    TO 3679.  IS THAT ONE OF THE LAST FOUR PAGES IN THE EXHIBIT?

14    IF SO, WHICH ONE?

15         MR. SCHAINBAUM:  IT'S THE FIRST OF THE LAST

16    FOUR PAGES.  IT'S THE FIRST TWO PAGES.

17         THE COURT:  DOES THAT HELP YOU, SIR?

18         THE WITNESS:  IT'S THE -- I'M SORRY.  SAY IT AGAIN.

19         MR. SCHAINBAUM:  IT'S THE FIRST TWO OF THE LAST

20    FOUR PAGES.

21         THE WITNESS:  IT'S THE FIRST TWO OF THE LAST

22    FOUR PAGES.  OKAY.

23    BY MR. SCHAINBAUM:

24    Q.   DO YOU SEE HOW MANY ACCOUNTS YOU HAVE THERE?

25    A.   YES.
```

```
 1     Q.   OKAY.  WHEN YOU ARE LOOKING AT EXHIBIT 136, FOR EXAMPLE, I
 2     ASKED YOU IF YOU COULD -- IF ALL OF THOSE ACCOUNTS ARE REAL.
 3     BY LOOKING AT 0049689 --
 4     A.   UH-HUH.
 5     Q.   -- 070 ON EXHIBIT 136, CAN YOU FIND THAT ACCOUNT ON THOSE
 6     TWO PAGES?
 7     A.   THE 9689 YOU SAID?
 8     Q.   YEAH.  I'M ASKING YOU IF YOU CAN FIND THAT CD ON THAT
 9     PAGE.  AND THAT'S THE CD THAT IS REFERENCED AS 9689-070.  ON
10     EXHIBIT 136, CAN YOU FIND THAT ON THE 2 PAGES IN THE
11     EXHIBIT 137?
12     A.   9689?  I DON'T SEE IT ON EITHER OF THOSE PAGES.
13     Q.   HOW ABOUT THE LAST TWO PAGES, DO YOU SEE IT THERE?
14     A.   WELL, YOU SAID THAT IT WAS THE LAST TWO PAGES.
15     Q.   NO.  I SAID THE FIRST TWO OF THE LAST FOUR PAGES, BUT YOU
16     CAN LOOK AT -- LOOK AT ALL FOUR PAGES.  JUST GO AHEAD AND LOOK
17     AT ALL FOUR PAGES AND SEE IF YOU CAN FIND THAT ACCOUNT.
18     A.   NO, IT'S NOT ON THERE.
19     Q.   BUT YOU USED THAT ACCOUNT, AMONG OTHER ACCOUNTS ON 137, TO
20     MAKE YOUR CALCULATION; CORRECT?
21     A.   WELL, YOU HAVE TO LOOK AT THOSE DUPLICATE STATEMENTS OF
22     ACCOUNT.  THEY HAVE MR. DESAI'S NAME ON THEM.  I WOULD ASSUME
23     THAT IF IT HAS MR. DESAI'S NAME ON THEM THAT THEY WOULD BE IN
24     MR. DESAI'S NAME.
25          BUT 9689, I BELIEVE, IS HIS SON.
```

```
 1    Q.   YEAH.  SO YOU SEE THAT ACCOUNT?

 2    A.   ON THE STATEMENT WITH MR. -- WELL, THE STATEMENT SHOWS

 3    THAT IT'S MR. DESAI'S ACCOUNT.  IT DOESN'T HAVE HIS SON'S NAME

 4    ON IT.

 5    Q.   WHAT -- I'LL PUT IT ANOTHER WAY.  WHAT DID YOU DO TO

 6    VERIFY THAT ALL OF THOSE ACCOUNTS APPEARING ON 136 ARE ACTUAL

 7    ACCOUNTS?

 8    A.   WELL, I MEAN I -- WHENEVER I DID MY ANALYSIS, I TRIED TO

 9    LOOK AT, YOU KNOW, THE SUBSTANCE OF EVERYTHING AND WHATEVER

10    WAS, YOU KNOW, OUT OF THE COMPUTER SYSTEM OR WHATEVER, THOSE

11    ARE THE ONES THAT I FELL BACK ON.

12    Q.   SO WHICH ONE OR WHICH COMPUTER PRINTOUTS DID YOU FALL BACK

13    ON IN THIS CASE?

14    A.   FOR WHAT?

15    Q.   FOR VERIFYING THAT THIS IS A REAL ACCOUNT.

16    A.   WHAT, THE 3679?  OR THE 9689?

17    Q.   THE 9689-070?

18    A.   OKAY.  IF YOU GO TO EXHIBIT 72, PAGE 8, THERE IS A SCREEN

19    SHOT THAT SHOWS 9689.

20    Q.   JUST ONE MOMENT, PLEASE.

21         OKAY, THANK YOU FOR YOUR PATIENCE.  I HAVE 72 IN FRONT OF

22    ME.

23    A.   OKAY.  GO TO PAGE 8, PLEASE.

24    Q.   PAGE 8.  DOES IT HAVE A BATES NUMBER IN THE LOWER

25    RIGHT-HAND CORNER?
```

1    A.   IT SAYS HSBC-DESAI 1498.

2    Q.   OKAY.  I HAVE THAT IN FRONT OF ME.  THAT'S ONE OF THE

3    COMPUTER PRINTOUTS?

4    A.   THAT'S A SCREEN DUMP OR A SCREEN SHOT, YES.

5    Q.   AND THAT'S IN YOUR STATEMENT, "BECAUSE THE SCREEN SHOTS

6    CAME FROM A COMPUTER WHICH WOULD MEAN, I BELIEVE, THAT THEY ARE

7    ABSENT OF HUMAN ERROR, AND SO IF THEY CAME RIGHT OUT OF THE

8    COMPUTER, I ASSUME THEY WERE CORRECT."

9         THAT'S WITHIN YOUR STATEMENT; CORRECT?

10   A.   THAT'S WHAT I SAID.

11   Q.   OKAY.  SO WHERE DO WE HAVE 070?  AND I'M LOOKING AT

12   HSBC-DESAI 0001498, PART OF EXHIBIT 72.

13   A.   SO YOU'RE LOOKING FOR WHICH ACCOUNT AGAIN?  070?

14   Q.   CORRECT.  THE ONE THAT HAS FULL IDENTIFICATION AS

15   0049689-070.  DO YOU SEE THAT ON THIS SCREEN SHOT?

16   A.   070?  I DON'T SEE 070 ON THE SCREEN SHOT.  IT CAN'T BE

17   THERE BECAUSE THAT CD DIDN'T EXIST UNTIL EIGHT DAYS LATER.

18   Q.   AND SO WHAT DID YOU USE FOR VERIFICATION?  HOW DO YOU KNOW

19   IT EXISTED EIGHT DAYS LATER?  YOU'RE PRECISE NOW.  YOU'RE

20   SAYING THAT IT EXISTS EIGHT DAYS LATER.  WHAT IS THE PRECISION

21   OF THAT STATEMENT?

22   A.   OKAY.  NOW, YOU HAVE TO REMEMBER WHAT I SAID.  WHENEVER

23   THERE IS A SCREEN SHOT AVAILABLE TO FALL BACK ON, THEN THAT'S

24   WHAT I USE.

25        NOW, I CAN'T USE THE SCREEN SHOT IN 72.  THAT WOULD BE

```
 1        WRONG BECAUSE THIS IS DATED EIGHT DAYS BEFORE THE ONE SHOWN

 2        THAT YOU'VE JUST REFERRED TO.

 3             THE SPREADSHEET IN 136, I DON'T SEE HOW IT CAN RELATE TO A

 4        SCREEN SHOT FROM EIGHT DAYS EARLIER BECAUSE THIS CD'S DIDN'T

 5        EXIST THEN.

 6   Q.   WELL, WHAT DID YOU USE TO VERIFY THAT THAT ACCOUNT EXISTS?

 7        I'M NOT ASKING YOU TO BE RESTRICTIVE TO THE SCREEN SHOT.

 8        YOU'RE THE ONE WHO MADE THE CALCULATIONS.  WHAT DID YOU USE TO

 9        VERIFY THAT IS A CORRECT ACCOUNT?

10   A.   OKAY.  YOU HAVE TO REMEMBER AGAIN, I'M A SUMMARY WITNESS.

11        I SUMMARIZE THE EVIDENCE.

12             136 IS IN EVIDENCE.  IT STATES THAT THERE IS A CD THAT

13        STARTED EIGHT DAYS AFTER THIS SCREEN SHOT.

14             I HAVE TO TAKE THE EVIDENCE AS IT IS ADMITTED AND IN THIS

15        PIECE OF EVIDENCE IT SHOWS CD'S ON 136, SO I USED 136.

16             IT WOULD BE WRONG IF I DIDN'T DO IT BECAUSE THAT WOULD

17        MEAN THAT I'M NOT TAKING INTO ACCOUNT ALL OF THE EVIDENCE.

18   Q.   NOW, MR. OERTEL, I'M A LITTLE CURIOUS.  THE TWO-PAGE

19        EXHIBIT, 136, THAT YOU CALL A SPREADSHEET, IT HAS NO DATE, DOES

20        IT, OTHER THAN THE TRANSPOSITIONAL ERROR OF THE START DATE

21        BEING LATER THAN THE MATURITY DATE?

22   A.   IT IS NOT DATED, THAT IS CORRECT.

23   Q.   SO HOW CAN YOU SAY THAT THE SCREEN SHOT IS EIGHT DAYS

24        LATER?

25   A.   SIR, WHAT I'M SAYING IS IF YOU LOOK AT 136 AND YOU LOOK AT
```

CROSS OERTEL

1    THE CD'S THAT IT MENTIONS IN THAT ACCOUNT NUMBER, IT SAYS

2    APRIL 18, 2008.

3         YOU ARE REFERRING TO A SCREEN SHOT FROM EIGHT DAYS

4    EARLIER, OKAY?

5         THE CD'S THAT STARTED EIGHT DAYS AFTER THE SCREEN SHOT

6    WOULD NOT BE ON THE SCREEN SHOT.

7         HOWEVER, IN THIS PIECE OF EVIDENCE, WHICH HAS BEEN

8    ADMITTED, AND WHICH I MUST USE, SAYS THAT THERE IS A CD THAT

9    STARTS -- WELL, SEVERAL CD'S THAT START APRIL 18TH, 2008.

10        ON ITS FACE VALUE, I HAVE TO TAKE THAT.  AND THAT'S WHAT I

11   DID.

12   Q.   SO YOU'RE SAYING THAT YOU DIDN'T VERIFY ANYTHING OTHER

13   THAN TAKING THE EVIDENCE AS ITS FACE VALUE EVEN THOUGH IT HAS

14   NO DATE AND NO OTHER VERIFICATION?

15   A.   SIR, I AM REQUIRED TO LOOK AT ALL OF THE EVIDENCE, USE ALL

16   OF THE EVIDENCE.

17        IT IS NOT UP TO ME TO JUDGE THE EVIDENCE.  IT IS UP TO ME

18   TO SUMMARIZE THE EVIDENCE.

19        AND THE EVIDENCE SAYS THAT STARTING ON APRIL 18TH, 2008,

20   THAT THERE WERE A BUNCH OF CD'S STARTED.  SO THAT'S WHAT I

21   USED.

22   Q.   SO YOU SAY THAT YOU USE THE EVIDENCE AS YOU FIND IT?

23   A.   I USE THE EVIDENCE WHAT?

24   Q.   YOU USE THE EVIDENCE AS IT EXISTS.  YOU DON'T DO ANYTHING

25   TO THE EVIDENCE; CORRECT?

1    A.   NO.   OKAY, NOW YOU HAVE USED THE TERM BEFORE "FIX" THE

2    EVIDENCE WHICH IMPLIES THAT SOMEHOW I MANIPULATE IT OR

3    SOMETHING, BUT I DON'T.

4         WHAT I DO IS THAT IF I FIND A DISCREPANCY, AS WE HAD SHOWN

5    BEFORE IN THE TRANSPOSITION ERRORS ON 136, IF THERE'S AN ERROR,

6    THEN I REMOVE IT BECAUSE I WANT MY CALCULATIONS TO BE AS

7    ACCURATE AS POSSIBLE.

8    Q.   WELL, WHEN YOU REMOVE IT, ARE YOU FIXING THE EVIDENCE OR

9    ARE YOU JUST LEAVING IT IN PLACE IF YOU'RE SUPPOSED TO FOLLOW

10   THE EVIDENCE?  I DON'T UNDERSTAND THAT.

11   A.   I HAVE TO USE THE CONTINUITY OF THE EVIDENCE AS A WHOLE.

12   I'M NOT SUPPOSED TO USE ONE PIECE OF EVIDENCE OR ANOTHER PIECE

13   OF EVIDENCE.  I'M SUPPOSED TO LOOK AT IT AS A WHOLE AND, BASED

14   ON THAT, DO THE BEST THAT I CAN TO COME UP WITH AN AMOUNT OF

15   INTEREST INCOME, WHICH IS WHAT I DID.

16   Q.   WELL, MR. OERTEL, YOU ALSO TESTIFIED THAT YOU CHANGED THE

17   NUMBERS ON EXHIBIT 23-1.  DO YOU HAVE THAT BEFORE YOU?

18   A.   BEAR WITH ME.

19        YES.

20   Q.   YOU CHANGED THE NUMBERS; CORRECT?

21   A.   I DIDN'T -- NO.  WHAT THIS REFERS TO -- IF I UNDERSTAND

22   WHAT YOU'RE GETTING AT -- I THINK YOU'RE REFERRING TO THE

23   COLUMN THAT SAYS "INTEREST PAID PER HSBC STATEMENT."  AND THERE

24   ARE -- THE NUMBER 4, 5, AND 6 AMOUNTS SHOWN THERE I DETERMINED

25   WERE IN ERROR.

CROSS OERTEL

```
 1              THAT'S WHY WHENEVER I DETERMINED THE AMOUNT OF APPROXIMATE
 2    INTEREST INCOME, I DID NOT USE THEM.  RATHER, I USED MY OWN
 3    CALCULATION, WHICH I BELIEVE IS THE MOST ACCURATE.
 4    Q.   BUT YOU THEN CHANGE THE EVIDENCE?  YOU FIX THE EVIDENCE BY
 5    WHAT YOU BELIEVE, NOT WHAT THE EVIDENCE SHOWS, BUT WHAT YOU
 6    BELIEVE IS MORE ACCURATE; AM I CORRECT?
 7    A.   I'M NOT CHANGING EVIDENCE.  IN FACT, THIS COLUMN STATES
 8    WHAT THE EVIDENCE STATES.  IT SAYS WHAT IS ON THE HSBC
 9    STATEMENT.  IT SAYS 171,000 BLAH, BLAH, BLAH.  SO THAT'S WHAT I
10    PUT DOWN.
11    Q.   ALL RIGHT.
12    A.   NOW, ACCORDING TO MY TESTIMONY, WHAT I DID TO CALCULATE
13    THE INTEREST INCOME, I WANTED TO VERIFY THAT EVERYTHING WAS
14    CORRECT.  THAT'S MY JOB.  I VERIFY THINGS TO MAKE SURE THAT
15    THEY ARE AS ACCURATE AS POSSIBLE.
16              SO BECAUSE I KNEW THAT THOSE THREE NUMBERS FROM THE HSBC
17    STATEMENT WERE NOT CORRECT, I USED MY OWN CALCULATION TO COME
18    UP WITH WHAT I BELIEVE IS A FAIR ESTIMATION OF HIS INTEREST
19    INCOME FOR THAT ACCOUNT FOR THAT YEAR.
20    Q.   AND YOU'RE SAYING THAT WHAT I BELIEVE IS A FAIR ESTIMATION
21    SUPERSEDES WHAT THE EVIDENCE SHOWS?  DO I GET THAT OUT OF YOUR
22    TESTIMONY?  IT'S A YES OR NO.
23    A.   NO.  I'M GOING TO EXPLAIN.
24    Q.   ALL RIGHT.  YOU GO AHEAD AND EXPLAIN, BUT THE ANSWER IS,
25    "NO, I'M GOING TO EXPLAIN."
```

1    A.   THAT'S NOT WHAT I SAID.

2         IT IS MY JOB TO USE THE EVIDENCE TO DETERMINE HOW MUCH

3    INTEREST WAS PAID ON AN ACCOUNT.

4         THERE'S EVIDENCE IN THE RECORD, WHENEVER YOU LOOK AT THE

5    SPREADSHEET THAT THIS -- OR THIS HSBC STATEMENT, YOU CAN SEE

6    VERY CLEARLY THAT IT'S NOT ACCURATE, OKAY.  IT'S NOT ACCURATE.

7         IF SOMETHING IS NOT ACCURATE, I SHOULDN'T BE USING IT.  I

8    SHOULD BE, INSTEAD, USING THE OTHER EVIDENCE WHICH SHOWS WHAT

9    IS CORRECT.

10        AND I USED WHAT WAS CORRECT TO COME UP WITH MY AMOUNT OF

11   INTEREST PAID.

12   Q.   WHAT IS THE OTHER EVIDENCE?  WHAT IS THE OTHER EVIDENCE

13   THAT MAKES THIS CORRECT?  ALL YOU'RE SAYING HERE IS THAT, AS I

14   UNDERSTAND IT, IS THAT I MADE A DECISION THAT SOMETHING WAS

15   MORE FAIR, THEREFORE, I CHANGED THE NUMBERS WHICH ARE NOT THE

16   EVIDENCE.

17   A.   SIR, I EXPLAINED THIS SEVERAL TIMES.

18   Q.   YEAH, WELL, EXPLAIN TO ME WHERE YOU GET THE OTHER NUMBERS

19   FROM THE EVIDENCE.  IF THAT'S ALL YOU ARE IS A SUMMARY

20   WITNESS --

21   A.   THAT'S RIGHT.

22   Q.   -- YOU'RE NOT SOMEONE ELSE WHO IS PUT IN THE, WHAT, IN THE

23   MERLIN'S MAGICIAN CATEGORY --

24             MS. SISKIND:  OBJECTION, YOUR HONOR, ARGUMENTATIVE.

25             MR. SCHAINBAUM:  ALL RIGHT.  I'LL WITHDRAW THE

1    QUESTION.

2              THE COURT:  ALL RIGHT.  WITHDRAW THE QUESTION.

3         DO YOU HAVE ANOTHER QUESTION?

4              MR. SCHAINBAUM:  HUH?

5              THE COURT:  DO YOU HAVE ANOTHER QUESTION?

6              MR. SCHAINBAUM:  YES, I DO.

7    Q.   SO, MR. OERTEL, ON EXHIBIT 23-1, YOU CHANGE THE NUMBERS

8    AND YOU SAY THERE IS OTHER EVIDENCE.  I TURN TO EXHIBIT 137,

9    THE PAGE THAT SHOWS A GRID FOR 2007.

10        DO YOU HAVE THAT BEFORE YOU?

11   A.   136?  OR, I'M SORRY, 137?

12   Q.   YES.

13   A.   THERE ARE SEVERAL GRIDS.  WHICH ONE ARE YOU REFERRING TO?

14   Q.   I'M REFERRING TO THE GRID THAT SAYS 2007.

15   A.   OKAY.  YEAH, THERE'S A -- ACCORDING TO THE LETTER IN FRONT

16   OF IT -- ARE YOU REFERRING TO 2007 ACCOUNT 3679?

17   Q.   YES.

18   A.   OKAY.  WHAT DO YOU WANT TO KNOW?

19   Q.   EXCUSE ME.  DO YOU SEE IN THAT GRID ACCOUNT 3679-051,

20   SUBACCOUNT 052, SUBACCOUNT 053, SUBACCOUNT 054, SUBACCOUNT 055,

21   AND SUBACCOUNT 056?  DO YOU SEE THOSE NUMBERS?

22   A.   YES, I DO.

23   Q.   AND WHAT IS THE ALLEGED SUPPOSED INTEREST AMOUNTS?

24   A.   IT IS, LIKE IT SAYS ON MY CALCULATION -- NOW, THIS IS IN

25   RUPEES.

1    Q.   I'M ASKING YOU WHAT IS THE EXACT NUMBER THAT IS IN THE

2    GRID, WHAT IS THAT NUMBER?

3    A.   IT IS 171,492.50.

4    Q.   AND DOES THAT NUMBER REPEAT ITSELF FROM SUBACCOUNT 051 TO

5    SUBACCOUNT 056?

6    A.   YES, IT DOES.

7    Q.   NOW, TURNING BACK TO 23-1?

8    A.   UH-HUH.

9    Q.   DO YOU SEE THOSE NUMBERS CONTINUE AFTER ACCOUNT NUMBER

10   053?

11   A.   YES.

12   Q.   YOU SEE 171,492.50, THE COLUMN CALLED INTEREST PAID PER

13   HSBC STATEMENT, AND THAT'S THE STATEMENT THAT WE JUST LOOKED AT

14   IN EXHIBIT 136, PAGE 2?

15   A.   YES, AND THEY MATCH.

16   Q.   OH?  WHAT ABOUT THE NUMBER 68,597?  WHERE IS THAT FOUND IN

17   THE STATEMENT THAT YOU REFER TO?

18   A.   68,197?

19   Q.   YES.  NO, 68,597.

20        MS. SISKIND:  YOUR HONOR, DOES MR. SCHAINBAUM HAVE

21   THE MOST UP-TO-DATE VERSION OF THIS EXHIBIT?

22        MR. SCHAINBAUM:  I'M NOT SURE.  IS THERE ANOTHER

23   NUMBER?

24        MS. SISKIND:  I DON'T SEE ON MY COPY 68,597.

25        MR. SCHAINBAUM:  THAT'S THE NUMBER I HAVE, BUT IF

1    THERE'S ANOTHER NUMBER, I'LL TAKE IT.  IT APPEARS AT

2    EXHIBIT 137, PAGE 2.

3    Q.   WHATEVER YOU HAVE, IS IT THE SAME AS 171,492.50?

4    A.   YEAH, UNDER HSBC -- ON 23-1 IT SAYS 171,492.0.  ON 137 IT

5    SAYS 171,492.50.

6    Q.   HOW MANY TIMES DOES IT SAY 171,492.50?

7    A.   SIX.

8    Q.   AND HOW MANY TIMES DOES IT SAY ON EXHIBIT 23-1,

9    171,492.50?

10   A.   SIX.

11   Q.   IT SAYS SIX?

12   A.   YES.

13   Q.   AND DIDN'T YOU CHANGE IT TO A LOWER NUMBER?

14   A.   NO, THAT'S -- UNDER THAT COLUMN IT'S FOR HSBC STATEMENT

15   THAT'S WHAT I HAVE.

16   Q.   YOU HAVE COMPLETELY THE SAME NUMBER ALL OF THE WAY

17   THROUGH?

18   A.   YES.

19   Q.   ALL RIGHT.  THEN I MUST HAVE A DIFFERENT VERSION THAT WAS

20   GIVEN TO ME BECAUSE MINE SAYS --

21        MAY I APPROACH THE WITNESS, YOUR HONOR?

22             THE COURT:  YES, WITH COUNSEL.  DO YOU WANT TO LOOK

23   AT THE DOCUMENT?  IS THAT WHAT YOU WANT?

24             MR. SCHAINBAUM:  YES.

25             THE COURT:  WHY DON'T YOU LOOK AT MS. SISKIND'S

```
1    DOCUMENT.

2              MS. SISKIND:  IT'S IN EVIDENCE AND IT WAS ON THE

3    SCREEN -- OR IT'S A DEMONSTRATIVE.

4              THE COURT:  WHAT NUMBER IS IT?

5              MS. SISKIND:  23-1.

6              MR. SCHAINBAUM:  THE ONE I HAVE IS 23-1 AND IT HAS

7    DIFFERENT NUMBERS.  THIS ONE HAS DIFFERENT NUMBERS.

8              THE WITNESS:  THE ONE THAT I'M LOOKING AT, IT HAS

9    ALL SIX OF THOSE SAME NUMBERS.

10             MR. SCHAINBAUM:  ALL RIGHT.  WELL, MINE HAS

11   DIFFERENT NUMBERS.  I'LL JUST MOVE ON.

12   Q.   WHEN YOU CALCULATED THE INTEREST, HOW DID YOU CALCULATE

13   THE INTEREST?

14   A.   I DID IT BY LOOKING AT THE START AND MATURITY DATE TO

15   FIGURE OUT HOW LONG IT LASTED; I LOOKED AT THE PRINCIPAL; I

16   USED THE INTEREST RATE; I CAME UP -- THROUGH AN EXCEL

17   SPREADSHEET FORMULA THING, I CAME UP WITH AN AMOUNT.

18        AND THEN IF IT WAS IN A FOREIGN CURRENCY, I USED THE

19   EXCHANGE RATE.

20   Q.   AND HOW DID YOU COMPOUND THE INTEREST?  WAS IT QUARTERLY?

21   DAILY?  ANNUALLY?

22   A.   I BELIEVE IT WAS DONE DAILY.

23   Q.   AND WHERE DO YOU FIND THE JUSTIFICATION FOR DOING IT

24   DAILY?

25   A.   THAT WAS THE METHOD THAT I USED.
```

CROSS OERTEL

1    Q.   BUT WAS THAT THE METHOD THAT THE HSBC BANK SUPPOSEDLY

2    COMPOUNDED THE INTEREST ANNUALLY?

3    A.   THAT THEY FOUNDED IT ANNUALLY?

4    Q.   YES.

5    A.   WELL, NO.  IF YOU COMPOUND IT ANNUALLY -- YOU MEAN JUST

6    DO -- INSTEAD OF DOING IT DAY AFTER DAY AFTER DAY, THEY'RE ONLY

7    GOING TO MULTIPLY IT BY THE INTEREST RATE AT THE MATURITY TERM?

8    Q.   YES.

9    A.   I DIDN'T DO THAT.

10   Q.   THE COMPOUNDING DAILY IS AN I.R.S. FORMULA; CORRECT?

11   A.   WELL, IT'S A FORMULA IN THE EXCEL SPREADSHEET THAT I USE.

12   Q.   AND THAT FORMULA IS THE I.R.S. FORMULA THAT IS ON THE

13   I.R.S. COMPUTER; CORRECT?

14   A.   NO, I DIDN'T USE THAT.  I USED AN EXCEL SPREADSHEET

15   FORMULA.

16   Q.   WHEN YOU USE AN EXCEL SPREADSHEET, DOESN'T THE I.R.S.,

17   WHEN THEY'RE COMPOUNDING INTEREST, COMPOUND INTEREST DAILY?

18   A.   YEAH, WE DO DO IT DAILY.

19   Q.   AND SO THAT'S THE METHOD THAT YOU USED?

20   A.   I COMPOUNDED IT DAILY.  I DID NOT USE AN I.R.S. FORMULA.

21   I USED A FORMULA IN AN EXCEL SPREADSHEET.

22   Q.   AND WOULD COMPOUNDING ANNUALLY RESULT IN A LOWER NUMBER

23   THAN IF YOU COMPOUNDED DAILY?

24   A.   I BELIEVE SO.

25   Q.   SO YOUR METHOD INHERENTLY RESULTS IN A LARGER NUMBER;

1        CORRECT?

2        A.   IT RESULTED IN WHAT I FELT WAS AN ACCURATE OR AT LEAST A

3        FAIR ESTIMATION OF AN AMOUNT.

4        Q.   WHEN YOU SAY "IT RESULTED IN WHAT I THOUGHT WAS A FAIR

5        ESTIMATION," AND IT'S YOUR THOUGHT, AND NOT NECESSARILY BASED

6        ON THE EVIDENCE?

7        A.   NO.  I BELIEVE I FOLLOWED THE EVIDENCE.

8        Q.   SO YOU BELIEVE YOU FOLLOWED THE EVIDENCE AND COMPOUNDED

9        DAILY AND CAME UP WITH A LARGER FIGURE THAN WHAT THE BANK

10       COMPOUNDS?

11       A.   WELL, NO.  WHAT I DID WAS I USED THE LOWER OF THE TWO

12       AMOUNTS.  WHETHER IT WAS FROM THE HSBC STATEMENT OR FROM MY

13       CALCULATION, I USED THE LOWER OF THE TWO.

14       Q.   YOU USED THE LOWER OF THE TWO, EVEN THOUGH YOU COMPOUNDED

15       DAILY?

16       A.   SIR, IF YOU LOOK AT 23-1, OKAY, AND YOU LOOK AT HOW THE

17       NUMBER THAT I CAME UP WITH, WHICH IS 4 -- LET'S TAKE THE VERY

18       FIRST LINE.  4,282.37.  WHAT THE HSBC STATEMENT SAID WAS

19       $4,246.15.

20            NOW, I USED THE LOWER FIGURE, BUT THE POINT THAT I'M

21       MAKING IS THAT THERE IS ONLY A $36 DIFFERENCE.

22            SO IF THERE WAS A $36 DIFFERENCE, THAT TELLS ME THAT MOST

23       LIKELY, AND I HAVE TO BELIEVE, THAT WITH ONLY A $36 DIFFERENCE,

24       THAT THE METHOD THAT I'M USING IS VERY CLOSE TO WHAT HSBC USED.

25       Q.   BUT IT'S NOT THE METHOD THAT THEY USED?

1    A.   ALL I COULD TELL YOU IS THAT MY NUMBERS ARE VERY CLOSE TO

2    THEIRS BECAUSE MY NUMBERS REPRESENT A, YOU KNOW, A VERY CLOSE

3    APPROXIMATION TO THEIRS.  THAT IS THE REASON THAT I USE THEM.

4    Q.   AND WHEN YOU SAY "THAT," ARE YOU ALSO SAYING THAT YOU

5    DIDN'T FIX THE EVIDENCE?

6    A.   FIXING THE EVIDENCE IMPLIES THAT SOMEHOW I'M MANIPULATING

7    OR WHATEVER IN SOME BAD WAY.  I DON'T FIX EVIDENCE.  I

8    SUMMARIZE EVIDENCE.

9         SO WHAT I DID WAS THAT I TOOK THE EVIDENCE, I PUT IT INTO

10   A CALCULATION.

11        WHERE THERE ARE DISCREPANCIES BETWEEN EVIDENCE, I CHOSE TO

12   USE THE SCREEN SHOT, AND AS I HAVE SAID SO MANY TIMES BEFORE,

13   THAT IS HOW I CAME UP WITH MY CALCULATION OF INTEREST INCOME.

14   Q.   AND SO YOU USE THE SCREEN SHOT WHICH IS SOME KIND OF A

15   REFERENCE FROM A COMPUTER LOCATED 8000 MILES AWAY IN INDIA, AND

16   YOU BELIEVE THAT'S ACCURATE?

17   A.   THAT IS WHAT IS IN EVIDENCE, SIR.

18   Q.   AND --

19   A.   IF IT'S IN EVIDENCE, I USE IT.  AND IF THERE IS A

20   DISCREPANCY BETWEEN THE EVIDENCE, I FELL BACK ON THE SCREEN

21   SHOT.

22   Q.   AND AFTER YOU FELL BACK ON THE SCREEN SHOT, YOU MADE

23   FURTHER ADJUSTMENTS BY MANIPULATING THE EVIDENCE TO COME OUT

24   WITH WHAT YOU BELIEVED IS FAIR?

25   A.   I DO NOT MANIPULATE EVIDENCE.  I SUMMARIZE EVIDENCE.

1    THERE'S A BIG DIFFERENCE, OKAY.

2         WHAT THE EVIDENCE SHOWS IS WHAT I USE.

3         NOW, I --

4    Q.   WHEN YOU SAY WHAT THE EVIDENCE SHOWS, THAT'S WHAT YOU

5    USED, YOU JUST TESTIFIED THAT WHEN YOU FOUND THERE WAS A

6    DISCREPANCY, YOU SAID YOU MADE WHAT YOU THINK WAS THE BETTER

7    AMOUNT AND USED THAT.

8    A.   WELL, IF THERE IS A DISCREPANCY, THEN I HAVE TO DECIDE IN

9    ORDER TO DO A CALCULATION WHICH ONE WOULD BE CORRECT, OKAY.

10        OKAY.  NOW, HOLD ON.  IN ORDER TO DO THE CALCULATION, THAT

11   IS WHAT I HAVE TO DO.  THAT'S WHAT I'M SUPPOSED TO DO.

12        SO USING THAT EVIDENCE I DID MY CALCULATION THE WAY I HAVE

13   EXPLAINED SO MANY TIMES.

14   Q.   NOW, WHEN YOU TALK ABOUT SO MANY TIMES, LET ME ASK YOU

15   THIS QUESTION:  HOW LONG HAVE YOU BEEN WORKING ON THIS CASE?

16   A.   OVER A YEAR.

17   Q.   AND HOW MANY CALCULATIONS AND VARIATIONS HAVE YOU MADE OF

18   YOUR SUMMARY NUMBERS?

19   A.   I DON'T KNOW.  AS I RECEIVED MORE INFORMATION, I WOULD

20   REVISE MY NUMBERS ACCORDINGLY.

21   Q.   DID YOU -- IF YOU WOULD BE KIND ENOUGH TO TURN TO

22   EXHIBITS -- LET'S START WITH EXHIBIT TRIPLE O.

23        YOUR HONOR, FOR HOUSEKEEPING, DID I MOVE GG-2 IN EVIDENCE?

24             MS. SISKIND:  I BELIEVE HE DID, YOUR HONOR.

25             THE COURT:  IT WAS RECEIVED WITHOUT OBJECTION.

```
1              MR. SCHAINBAUM:  THANK YOU.

2              THE WITNESS:  OKAY.  I'M SORRY.  WHICH EXHIBIT DID

3      YOU WANT ME TO LOOK AT?

4      BY MR. SCHAINBAUM:

5      Q.   THE ONE THAT IS CALLED OOO, TRIPLE O?

6      A.   TRIPLE O.

7              THE COURT:  BEFORE YOU DO THAT, LET'S JUST LET OUR

8      JURY STAND UP AND STRETCH FOR JUST A MOMENT.

9              MR. SCHAINBAUM:  OKAY.

10             THE COURT:  FOLKS, IF YOU WANT TO STAND UP AND

11     STRETCH IN OUR BOX, JUST GO RIGHT AHEAD.

12         MR. SCHAINBAUM.

13     BY MR. SCHAINBAUM:

14     Q.   THANK YOU.  IS TRIPLE O SOMETHING YOU HAVE SEEN BEFORE?

15     A.   YES.

16     Q.   AND IS THAT YOUR WORK?

17     A.   YES.

18     Q.   AND WHEN DID YOU CREATE THIS WORK?

19     A.   THIS IS APRIL 29, 2013.

20     Q.   AND ON THIS PARTICULAR DOCUMENT, WHICH CONSISTS OF

21     TWO PAGES, ARE THERE NOTES AT THE END OF THE DOCUMENT?

22     ACTUALLY IT'S THREE PAGES.  I STAND CORRECTED.

23     A.   I ONLY HAVE TWO.

24     Q.   AND IF YOU WOULD TURN TO -- I THOUGHT I HAD TWO, BUT

25     THERE'S ANOTHER PAGE.
```

1    A.   OH, SORRY.

2    Q.   YEAH, YOU AND I HAVE THE SAME MISTAKE.   THERE ARE

3    THREE PAGES HERE.

4    A.   OKAY.

5    Q.   THE FOOTNOTES AT THE END?

6         MS. SISKIND:  OBJECTION TO THE CONTENTS OF THE

7    DOCUMENT.

8         MR. SCHAINBAUM:  OKAY.  I MOVE THIS DOCUMENT IN

9    EVIDENCE.

10         MS. SISKIND:  AND, YOUR HONOR, WE OBJECT TO THIS

11    EVIDENCE.

12         THE COURT:  MAY WE HAVE A SIDE-BAR WITH COUNSEL FOR

13    JUST A MOMENT?

14         MS. SISKIND:  SURE.

15      (SIDE-BAR CONFERENCE ON THE RECORD.)

16         THE COURT:  WE'RE AT SIDE-BAR.

17    MS. SISKIND.

18         MS. SISKIND:  YOUR HONOR, THIS WITNESS WAS CALLED AS

19    A SUMMARY WITNESS, WHICH MEANS HE'S SUMMARIZING THE EVIDENCE

20    INTRODUCED AT TRIAL.

21         THE DATE ON THIS SPREADSHEET, APRIL 29, 2013, PREDATES OUR

22    TRIAL DATE BY SOME TIME.  THESE MAY BE PRELIMINARY COMPUTATIONS

23    HE DID, BUT THE COMPUTATIONS THAT THE JURY SHOULD CONSIDER ARE

24    THOSE THAT ACTUALLY SUMMARIZE THE EVIDENCE THAT CAME IN AT

25    TRIAL.

1    FOR ALL WE KNOW THERE WERE REFERENCES IN THESE TWO

2    EXHIBITS THAT THEY HAVEN'T SEEN.  IN FACT, I'M FAIRLY CONFIDENT

3    THAT THERE ARE REFERENCES IN THESE TWO EXHIBITS THAT THEY

4    HAVEN'T SEEN, PARTICULARLY THE BATES NUMBERS ON THE NEXT PAGE.

5    I DON'T KNOW IF THEY'RE ALL IN EVIDENCE.

6    AND CERTAINLY THE FACT THAT HE MAY HAVE HAD PRIOR DRAFTS

7    MAY BE FOR QUESTIONING, BUT FOR THE JURY TO SEE THE

8    CALCULATIONS THAT PREDATES TRIAL AND PREDATES EVIDENCE BEING

9    PRESENTED THAT THIS WITNESS IS SUMMARIZING WOULD BE

10   INAPPROPRIATE.

11            MR. SCHAINBAUM:  YOUR HONOR, HE IS SUMMARIZING THE

12   SAME EVIDENCE AND THE JURY -- IT GOES TO THE WEIGHT.  THEY HAVE

13   A RIGHT TO CONSIDER EVERYTHING THAT GOES INTO HIS TESTIMONY,

14   AND THIS IS PART OF HIS TESTIMONY AS REVISED.

15   AND WHAT THE GOVERNMENT DOESN'T WANT IS THE FOOTNOTES AT

16   THE SECOND AND THIRD PAGE WHICH TELL YOU THE SOURCE OF ALL THIS

17   AND POINT OUT THE UNRELIABILITY OF THIS INFORMATION AND THAT'S

18   WHY THE GOVERNMENT KEEPS REVISING.

19   BUT THE JURY CAN GIVE IT WHATEVER WEIGHT THEY WANT.  THEY

20   CAN SAY HE'S A VERY EFFICIENT, DEDICATED PERSON WHO CHANGES THE

21   WORK PRODUCT TO THE LAST FINAL --

22            THE COURT:  EXCUSE ME.  LET ME ASK, WHAT IS TRIPLE

23   O, THE THREE PAGES, WHAT IS THIS?

24            MR. SCHAINBAUM:  THIS IS HIS WORK ON THE NUMBERS,

25   WHAT HE BELIEVES -- I'LL HAVE TO LOOK AT THE HEADING.  LET ME

1    GET MY MAGNIFYING GLASSES.

2            THE COURT:  IS THIS HIS WORK PRODUCT OR CALCULUS OF

3    SOME OF THESE ACCOUNTS?  IS THAT ACTUALLY WHAT THIS IS?

4            MR. SCHAINBAUM:  THESE ARE EXHIBITS ACTUALLY GIVEN

5    TO US AND THAT'S WHAT WE HAVE, AND ALONG THE WAY HE HAS SAID

6    THIS IS WHAT HIS CALCULATION WAS AND THEN THEY KEEP CHANGING.

7            THE COURT:  WHY DON'T YOU TELL ME?

8            MS. SISKIND:  I THINK THIS WAS TURNED OVER EITHER AS

9    JENCKS OR AS A PRELIMINARY COMPUTATION.

10        BUT HE WAS NOT ASKED ANY QUESTIONS ON DIRECT ABOUT

11   COMPUTATIONS DONE BEFORE SEEING ALL OF THE EVIDENCE.

12        WHAT I'M MOST CONCERNED ABOUT IS NOT ONLY THE DATE, BUT I

13   DON'T KNOW -- THESE ARE ALL BATES REFERENCES IN THE FOOTNOTES.

14   THIS WAS MADE BEFORE DOCUMENTS CAME INTO EVIDENCE.

15        I DON'T KNOW IF ALL OF THOSE CAME INTO EVIDENCE.  IF THEY

16   DIDN'T, IT'S NOT APPROPRIATE BECAUSE HE'S SUPPOSED TO SUMMARIZE

17   THE EVIDENCE.  AND HERE HE MAY BE TAKING INTO ACCOUNT THINGS

18   THAT DIDN'T COME INTO EVIDENCE, WHICH IS GOING TO GIVE A

19   DIFFERENT IMPRESSION OF HIS CALCULATIONS.

20           MR. SCHAINBAUM:  I DON'T BELIEVE HE DID.

21        BUT ANOTHER POINT IS THAT IT TOOK HIM SO LONG TO DO THESE

22   CALCULATIONS, IT'S ANOTHER EXAMPLE OF, YOU KNOW, THEY'RE

23   CHARGING THE CLIENT WITH FAILURE TO REPORT INTEREST AND THE

24   CALCULATIONS ARE SO COMPLICATED IT TOOK HIM SO LONG.

25           SO THE JURY CAN LOOK AT THIS AND SAY, HERE'S SUPPOSEDLY AN

```
1    EXPERT, QUOTE-UNQUOTE --

2              THE COURT:  I THINK YOU'LL BE ENTITLED TO ASK HIM

3    HOW LONG IT TOOK HIM TO DO THE CALCULATIONS, BUT THE ACTUAL

4    WORK PRODUCT AND HIS NOTES LEADING UP TO THE CALCULATIONS --

5              MR. SCHAINBAUM:  BUT THAT'S IMPORTANT.

6              THE COURT:  BUT WHAT IS THE RELEVANCE OF HIS WORK

7    UNTIL HE DEVELOPS THE ULTIMATE NUMBERS?

8              MR. SCHAINBAUM:  THE RELEVANCE OF HIS WORK IS TO

9    SHOW THAT A PERSON LIKE MR. DESAI'S LACK OF WILLFULNESS AND

10   SHOWS HOW UNRELIABLE ALL OF THIS INFORMATION IS.

11        FIRST HE SAYS HSBC MADE ERRORS, AND THEN THE SPECIAL AGENT

12   MADE ERRORS, AND THEN HE CORRECTED THEM ALL.

13        SO IT GOES TO SHOW THE COMPLEXION -- I MEAN, THEY'RE

14   SAYING IN THE SUMMARIES THAT THEY PUT IN THAT I OBJECTED TO,

15   LOOK, THERE'S A MILLION SOMETHING THAT HE DIDN'T REPORT.

16        IT'S NOT THAT SIMPLE.  IT'S SO COMPLICATED THAT THIS IS

17   EVIDENCE OF THE COMPLICATIONS.

18              MS. SISKIND:  FIRST, I DON'T THINK IT -- AS YOUR

19   HONOR WELL KNOWS, WE HAD MULTIPLE TRIAL DATES IN THIS CASE, SO

20   THE FACT THAT THERE'S AN EARLIER DATE ON HERE I THINK IS WHEN

21   WE WERE PREPARING FOR AN EARLIER TRIAL, NOT THAT HE'S BEEN

22   WORKING ON CALCULATIONS.  IT DOESN'T SAY HOW LONG HE WAS

23   WORKING ON IT.  IT'S JUST THAT WE WERE PREPARING FOR TRIAL AT

24   EARLIER POINTS IN TIME.

25              BUT HE'S HERE TO SUMMARIZE THE EVIDENCE THAT CAME INTO
```

1    TRIAL, NOT THE THINGS THAT THE JURY HAS NOT SEEN AND CAN'T RELY

2    ON, AND THAT'S THE PROBLEM WITH THIS CHART.  WHEN HE MADE IT HE

3    WAS IN A POSITION TO RELY ON A WHOLE UNIVERSE OF DOCUMENTS THAT

4    WE MIGHT NOT HAVE DECIDED TO PUT INTO EVIDENCE AND THAT THE

5    JURY MAY NOT HAVE SEEN.

6           MR. SCHAINBAUM:  BUT THE EVIDENCE IS IN THE RECORD.

7    I HAVE ALREADY COMPLAINED THAT IT'S INACCURATE AND INCOMPETENT

8    AND HE NOTED THAT IN THE FOOTNOTE.

9           THE COURT:  SO YOU CAN ASK HIM ABOUT THE WORK HE HAS

10   DONE AS YOU'RE EXAMINING ON HIS CALCULATIONS, HIS THOUGHTS, HOW

11   HE PUT IT TOGETHER.  YOU CAN CERTAINLY ASK HIM, ABOUT HOW LONG

12   DID IT TAKE YOU?  WHETHER THERE WERE ERRORS?  DID YOU MAKE

13   ERRORS?  IS IT DIFFICULT?  YOU CAN GET THAT IN THROUGH HIM.

14      BUT GETTING IN HIS NOTES OF THINGS THAT ARE NOT PART OF

15   THE SUMMARY, I'M NOT GOING TO LET YOU DO THAT BECAUSE THAT'S

16   LIKE GETTING IN ALL OF THE WORK THAT YOU DID BEFORE THAT MAY OR

17   MAY NOT BE RELEVANT TO THE ACTUAL NUMBER THAT HE DID.

18      NOW, YOU CAN CERTAINLY ASK HIM, WAS IT DIFFICULT?  DID YOU

19   MAKE MISTAKES?  YOU CAN TALK TO HIM ABOUT HOW LONG IT TOOK HIM

20   TO GET THE CALCULATIONS, THOSE TYPES OF THINGS.

21      BUT GETTING IN THE EXACT -- TO THESE THREE PAGES, I'M NOT

22   GOING TO ALLOW THIS TO COME IN.

23           MR. SCHAINBAUM:  OKAY.  ONE FURTHER POINT.  I TAKE

24   EXCEPTION TO WHAT YOU'RE SAYING, BUT BECAUSE WE'RE TALKING

25   ABOUT WILLFULNESS IN A COMPLICATED COMPLEX TAX CASE AND THEY'RE

1    BASICALLY SAYING UNREPORTED INTEREST INCOME AS IF YOU ADD HOT

2    WATER AND YOU GET INSTANT COFFEE.  THIS SHOWS YOU THAT IT TAKES

3    SUCH EFFORT IN COMPLICATIONS THAT EVEN SOMEONE WHO IS TRAINED

4    TO DO THIS KIND OF WORK HAD A HARD TIME AND DIDN'T GET IT

5    RIGHT.

6              THE COURT:  I'M NOT PRECLUDING YOU FROM ASKING HIM

7    THAT.  YOU CAN CERTAINLY ASK HIM THAT.

8              MR. SCHAINBAUM:  BUT I THINK IT WOULD BE IMPORTANT

9    TO SHOW TO THE JURY HOW COMPLICATED IT IS AND HOW --

10             THE COURT:  I THINK YOU CAN GET THAT FROM HIS

11   TESTIMONY AND ASK HIM ABOUT COMPLICATIONS AND YOU CAN ASK HIM.

12   AND IF HE SAYS I DON'T REMEMBER, YOU CAN CERTAINLY USE THIS TO

13   REFRESH HIS RECOLLECTION ABOUT HOW COMPLICATED IT IS.

14        BUT THE DOCUMENT DOESN'T COME IN.  YOU CAN CERTAINLY ASK

15   HIM ABOUT THAT.

16             MR. SCHAINBAUM:  OKAY.

17             THE COURT:  AND THESE OTHER ITEMS --

18             MR. SCHAINBAUM:  WELL, I TAKE EXCEPTION FOR THE

19   RECORD.

20        BY THE WAY, WHEN DO YOU PLAN TO TAKE A BREAK?

21             THE COURT:  WE'LL TAKE A BREAK AT 3:00 O'CLOCK,

22   ANOTHER 12 MINUTES.

23             MR. SCHAINBAUM:  OKAY.

24        (END OF DISCUSSION AT SIDE-BAR.)

25             THE COURT:  THANK YOU, COUNSEL.

CROSS OERTEL

```
1    BY MR. SCHAINBAUM:

2    Q.   MR. OERTEL --

3              THE COURT:  FOR THE RECORD, I'M SUSTAINING THE

4    OBJECTION.  PARDON ME.

5              MR. SCHAINBAUM:  OKAY.  AND YOU'VE NOTED MY

6    EXCEPTION?

7              THE COURT:  ABSOLUTELY.

8              MR. SCHAINBAUM:  THANK YOU.

9    Q.   NOW, MR. OERTEL, YOU HAVE HAD SEVERAL COMPUTATIONS TO COME

10   TO THE COMPUTATION THAT YOU'RE USING IN THIS -- AT THIS TIME;

11   CORRECT?

12   A.   YES.

13   Q.   AND YOU SAID YOU HAVE BEEN WORKING ON THIS FOR OVER A

14   YEAR?

15   A.   WELL, I MEAN, I DON'T DO IT ON A DAILY BASIS, BUT AS

16   SOMETHING HAS COME UP I'VE WORKED ON IT AS NEEDED OVER THE LAST

17   YEAR.

18   Q.   AND PUTTING TOGETHER A COMPUTATION FOR WHAT YOU BELIEVE IS

19   UNREPORTED INTEREST INCOME, DID YOU FIND THAT IT WAS A COMPLEX,

20   COMPLICATED PROCESS?

21   A.   NO.

22   Q.   IT WAS NOT A COMPLEX, COMPLICATED PROCESS?

23   A.   NO.

24   Q.   DID YOU EVER MAKE A NOTATION THAT HSBC HAD MADE ERRORS?

25   A.   YES.
```

```
1    Q.   DID YOU EVER MAKE A NOTATION THAT THE SPECIAL AGENT HAD

2    MADE ERRORS?

3    A.   IN HIS CALCULATIONS?

4    Q.   YES.

5    A.   LIKE AN INTEREST?

6    Q.   YES.

7    A.   YES.

8    Q.   SO YOU MADE NOTATIONS THAT HSBC, THE BANK MADE ERRORS, AND

9    THAT THE SPECIAL AGENT MADE ERRORS?  AM I RIGHT?

10   A.   I HAVE ALREADY TALKED ABOUT THE ERRORS THAT HSBC HAD MADE.

11        AND WHENEVER IT COMES TO THE SPECIAL AGENT'S NUMBERS, I

12   KNOW THAT THERE WAS SOME DISCREPANCIES, AND OFF THE TOP OF MY

13   HEAD, I DON'T REMEMBER WHAT THEY WERE.

14   Q.   I SEE.  HOW ABOUT THE REVENUE AGENT, THAT'S YOU, DID YOU

15   MAKE DISCREPANCIES?

16   A.   DID I MAKE MISTAKES?

17   Q.   YES.

18   A.   YES, AND I -- I AM HOPING THAT I FIXED ALL OF THEM.

19   Q.   THAT'S NOT LIKE FIXING THE EVIDENCE, IS IT?

20   A.   CORRECTING AN ERROR IS NOT MANIPULATING EVIDENCE, SIR.

21   Q.   ALL RIGHT.  SO YOU BELIEVE THAT, NOTWITHSTANDING THE

22   ERRORS OF THE BANK, THE SPECIAL AGENT, AND YOUR OWN, YOU HAVE A

23   CORRECT COMPUTATION?

24   A.   THAT IS MY TESTIMONY, YES.

25   Q.   ALL RIGHT.  THAT IS YOUR TESTIMONY.
```

1        OKAY.  AND EVEN USING AN INTEREST CALCULATION ON A DAILY

2   BASIS, COMPOUNDED DAILY, YOU BELIEVE THAT THAT'S A CORRECT

3   ANALYSIS, ALTHOUGH THE BANK USES AN ANNUAL COMPUTATION.

4   A.   I -- WHERE DOES IT SAY THAT THE BANK USES AN ANNUAL

5   COMPUTATION?

6   Q.   HAVE YOU LOOKED AT THE RECORDS?

7   A.   YES.  IS THERE SOMETHING THAT I DIDN'T SEE?

8   Q.   I BELIEVE --

9        (PAUSE IN PROCEEDINGS.)

10  BY MR. SCHAINBAUM:

11  Q.   DID YOU SEE ANY RECORDS THAT SAID THAT THE BANK USED

12  QUARTERLY COMPUTATIONS?

13  A.   HONESTLY, I DON'T REMEMBER ALL OF THE PIECES OF THE

14  EVIDENCE.

15       IF YOU COULD POINT OUT SOMETHING, IT WOULD HELP.

16  Q.   OKAY.  AT THIS MOMENT I CANNOT.  I HAVE TO -- MAYBE AFTER

17  THE BREAK I WILL COME BACK WITH AN ANSWER.

18  A.   SURE.

19  Q.   IF YOU LOOK AT EXHIBIT 9?  DO YOU HAVE EXHIBIT 9 BEFORE

20  YOU?

21  A.   YES.

22  Q.   AND DO YOU SEE ON EXHIBIT 9 -- WHEN YOU WERE LOOKING AT

23  YOUR EVIDENCE FOR THE FBARS, DID YOU SEE THAT EXHIBIT 9

24  CONTAINS SOME INSTRUCTIONS?

25  A.   YES.

1    Q.   AND DO YOU SEE ON THE SECOND PAGE UNDER EXCEPTIONS --

2              THE COURT:  DO YOU WANT THIS DISPLAYED,

3    MR. SCHAINBAUM?

4              MR. SCHAINBAUM:  YES, OKAY.

5              THE COURT:  CAN WE DO THAT?  THANK YOU.

6    BY MR. SCHAINBAUM:

7    Q.   AND DO YOU SEE THE LAST PARAGRAPH OF THE EXCEPTIONS?

8    A.   THE LAST PARAGRAPH?

9    Q.   CORRECT.

10   A.   WHERE IT STARTS "REPORT ANY"?

11   Q.   RIGHT.  DO YOU SEE THAT PARAGRAPH?

12   A.   YES.

13   Q.   AND DO YOU SEE THE LAST SENTENCE?

14   A.   YES.

15   Q.   DO YOU WANT TO READ THAT?

16   A.   "DO NOT REPORT ANY ACCOUNT MAINTAINED WITH A BRANCH,

17   AGENCY OR OTHER OFFICE OF A FOREIGN BANK OR OTHER CONSTITUTION

18   THAT IS LOCATED IN THE UNITED STATES, GUAM, PUERTO RICO, AND

19   THE VIRGIN ISLANDS."

20   Q.   NOW, YOU HEARD THAT EVIDENCE WHEN THE FINCEN

21   REPRESENTATIVE READ THAT INTO THE RECORD?

22   A.   YES.

23   Q.   AND WHEN YOU MADE YOUR CALCULATIONS, DID YOU GIVE ANY

24   CONSIDERATION TO THAT EXCEPTION?

25   A.   NO.  I USED THE DEFINITIONS.

CROSS OERTEL

1   Q.   THE DEFINITIONS?  IS THAT NOT FROM THE I.R.S. REGS?

2   A.   IS NOT WHAT FROM THE I.R.S. REGS?

3   Q.   THE EXCEPTION, DO NOT REPORT ANY ACCOUNT MAINTAINED WITH A

4   BRANCH, AGENCY OR OTHER OFFICE OF A FOREIGN BANK OR OTHER

5   CONSTITUTION THAT IS LOCATED IN THE UNITED STATES, GUAM,

6   PUERTO RICO, AND THE VIRGIN ISLANDS.

7   A.   I'M ASSUMING IT'S FROM A STATUTE OR REGULATION, YES.

8   Q.   RIGHT.  AND SO DID YOU GIVE ANY CONSIDERATION TO THAT?

9   A.   NO, I DID NOT.

10   Q.   JUST ONE SECOND, PLEASE.

11        WOULD YOU BE KIND ENOUGH TO TURN TO ITEM NUMBER 22 OF THIS

12   EXHIBIT, WHICH IS HEADED UP ACCOUNT VALUATION?

13   A.   ITEM 22?

14   Q.   RIGHT, ACCOUNT VALUATION.  IT'S ON PAGE 4.

15   A.   YES.

16   Q.   NOW, COULD YOU TELL US AGAIN HOW YOU CONVERTED THE FOREIGN

17   CURRENCY?

18   A.   I USED AN ONLINE SOURCE.

19   Q.   AND WHAT WAS THE NAME OF THAT SOURCE?

20   A.   OANDA.

21   Q.   AND WHAT PERIOD OF TIME DID YOU USE TO MAKE THE

22   CONVERSION?

23   A.   TO CONVERT WHICH PART?

24   Q.   ANY PART.  WHEN YOU WERE CONVERTING, LET'S SAY, INDIA

25   RUPEES TO U.S. DOLLARS, WHAT WAS THE PERIOD OF TIME THAT YOU

1    USED FOR THE CONVERSION?

2    A.   I USED THE DATE AT ISSUE IN THAT TRANSACTION.

3    Q.   WHEN YOU WERE CONVERTING EUROS TO U.S. DOLLARS USING,

4    WHAT, THE OANDA SYSTEM, WHAT DATE DID YOU USE?

5    A.   I WOULD HAVE USED THE DATE FOR WHATEVER THE TRANSACTION

6    WAS.

7    Q.   WHAT DOES THAT MEAN?

8    A.   WELL, LIKE IF SOMETHING MATURED ON, LET'S SAY,

9    SEPTEMBER 20TH, I LOOKED AT THE EXCHANGE RATE FOR THAT DAY,

10   SEPTEMBER 20TH FOR WHICHEVER YEAR.

11   Q.   AND WHAT WAS YOUR BASIS FOR USING THAT KIND OF CRITERIA?

12   A.   WELL, IF IT HAPPENED ON A CERTAIN DAY, I USED THAT DAY.

13   Q.   WHY?

14   A.   BECAUSE THE DAYS WOULD MATCH.

15   Q.   WHAT WAS THE AUTHORITY FOR USING THAT DATE?

16   A.   COMMON SENSE.

17   Q.   COMMON SENSE?

18   A.   YES.

19   Q.   ALL RIGHT.

20   A.   IF SOMETHING HAPPENED ON A CERTAIN DAY, I USED THAT DAY.

21   Q.   NOW, DID YOU HAVE IN MIND AT THE TIME THAT YOU WERE USING

22   COMMON SENSE THE FORM TD F 90-22.1, TD F 90-22.1, BETTER KNOWN

23   AS THE FBAR?

24   A.   I USED THE FBAR, YES.

25   Q.   SO WHAT IS IN PART IS COUNT 6, 7, AND 8 IS WHETHER OR NOT

1    AN FBAR WAS REQUIRED TO BE FILED AND WHETHER OR NOT IT WAS

2    WILLFUL TO NOT FILE?

3                MS. SISKIND:  OBJECTION, YOUR HONOR.  IT'S GOING

4    THROUGH THE COUNTS OF THE CRIME.

5                MR. SCHAINBAUM:  I DIDN'T FINISH THE QUESTION.

6                THE COURT:  WHY DON'T YOU FINISH THE QUESTION,

7    MR. SCHAINBAUM?

8                MR. SCHAINBAUM:  OKAY.

9    Q.   SO DID YOU REFER TO THE FBAR IN DETERMINING WHICH DATE TO

10   USE FOR THE CONVERSION?

11   A.   I BELIEVE SO.

12   Q.   OKAY.  IF YOU WOULD LOOK AT ITEM 22 CALLED ACCOUNT

13   VALUATION?

14   A.   OKAY.

15   Q.   DO YOU SEE THAT FIRST PARAGRAPH?

16   A.   YES.

17   Q.   AND DO YOU SEE IN THE MIDDLE OF THE FIRST PARAGRAPH

18   THERE'S THE WORDS "CONVERT FOREIGN CURRENCY"?

19   A.   UH-HUH.

20   Q.   AND WHAT DOES THAT SAY?

21   A.   "CONVERT FOREIGN CURRENCY BY USING THE OFFICIAL EXCHANGE

22   RATE AT THE END OF THE YEAR."

23   Q.   DID YOU DO THAT?

24   A.   I USED IT ON THE DATE OF THE TRANSACTION.

25   Q.   BECAUSE YOU WERE USING COMMON SENSE?

CROSS OERTEL

```
 1    A.   I -- THAT IS HOW I DID IT.

 2    Q.   BECAUSE YOU WERE USING COMMON SENSE AND NOT WHAT WAS

 3    REQUIRED BY THE FBAR?

 4    A.   I USED THE EXCHANGE RATE, THAT I DID ON THE DATE OF THE

 5    TRANSACTION.

 6         SO IF SOMETHING MATURED ON A CERTAIN DATE, I USED THAT

 7    DATE.

 8    Q.   AND THAT'S NOT WHAT THE FBAR REQUIRES; CORRECT?

 9    A.   IT STATES AT THE END OF THE YEAR.

10    Q.   OKAY.

11         YOUR HONOR, THIS MAY BE A GOOD TIME TO HAVE THE RECESS.

12              THE COURT:  ALL RIGHT.  WE'LL DO THAT.

13              MR. SCHAINBAUM:  THANK YOU, YOUR HONOR.

14              THE COURT:  WE'LL HAVE OUR AFTERNOON RECESS, LADIES

15    AND GENTLEMEN.  IT'S 15 MINUTES.

16         (RECESS FROM 2:58 P.M. UNTIL 3:18 P.M.)

17              THE COURT:  WE'RE BACK ON THE RECORD.  ALL PARTIES

18    PREVIOUSLY PRESENT ARE PRESENT ONCE AGAIN.

19         MR. SCHAINBAUM, WOULD YOU LIKE TO CONTINUE WITH YOUR

20    EXAMINATION?

21              MR. SCHAINBAUM:  YES.

22    Q.   MR. OERTEL, WOULD YOU BE KIND ENOUGH TO TURN TO

23    EXHIBIT 147, PAGE 6.  DO YOU RECALL THIS MORNING MS. SISKIND

24    ASKED YOU A SERIES OF QUESTIONS ABOUT NOTICES RECEIVED FROM THE

25    I.R.S. BY MR. AND MRS. DESAI THAT PERTAIN TO INTEREST?
```

1    A.    YES.

2    Q.    AND I THINK YOU GLOSSED OVER CITIBANK, AND I JUST WANTED

3    TO PICK THAT UP THAT THERE IS A REFERENCE TO CITIBANK ON PAGE 6

4    OF 18 OF EXHIBIT 147.

5         DO YOU SEE THAT CITIBANK SINGAPORE LIMITED --

6              THE COURT:  147?

7              MR. SCHAINBAUM:  YES, YOUR HONOR.  THE EXHIBIT

8    NUMBER IS 147, AND I'M LOOKING AT PAGE 6.

9              THE WITNESS:  OKAY.  I HAVE THAT.

10   BY MR. SCHAINBAUM:

11   Q.    YOU HAVE THAT?  DO YOU SEE IN THE SECOND GRID IT SAYS

12   INTEREST?

13   A.    ITEM NUMBER 2, YES.

14   Q.    AND WHAT IS THE NAME OF THE PAYEE?

15   A.    CITIBANK SINGAPORE LIMITED.

16   Q.    AND DOES IT HAVE AN ADDRESS, A FOREIGN ADDRESS?

17   A.    IT ONLY HAS A PORTION OF THE ADDRESS.

18   Q.    AND A PORTION OF THE ADDRESS IS SOME NUMBER 3 TEMASEK

19   AVENUE, 1200 CENTENNIAL TOWER, FIVE ZEROS?

20   A.    YES.

21   Q.    AND IS THIS A FOREIGN BANK?

22   A.    I DON'T KNOW.

23   Q.    AND IS SINGAPORE IN THE UNITED STATES?

24   A.    NO, IT IS NOT.

25   Q.    AND IS CITIBANK SINGAPORE LIMITED A FOREIGN BANK?

```
 1        A.   I DON'T KNOW.

 2        Q.   YOU DON'T KNOW?  BUT DO YOU KNOW THAT THEY ISSUED A FORM

 3   1099 INTEREST?

 4        A.   THAT'S WHAT IT SAYS HERE.

 5        Q.   AND YOU HAVE TESTIFIED THAT FOREIGN BANKS ARE NOT SUPPOSED

 6   TO BE ISSUING 1099'S?

 7        A.   THEY'RE NOT REQUIRED TO.

 8        Q.   THEY'RE NOT REQUIRED TO?

 9        A.   YEP.

10        Q.   BUT DO YOU SEE THAT THERE'S A CALCULATION OF THE ORIGINAL

11   AMOUNT PUT ON MR. AND MRS. DESAI'S TAX RETURN?

12        A.   YES.

13        Q.   AND DO YOU SEE THAT THERE'S A CORRECTED AMOUNT?

14        A.   THERE'S AN AMOUNT REPORTED TO THE I.R.S., THERE'S AN

15   AMOUNT ON THE RETURN, AND THEN THERE'S A DIFFERENCE.

16        Q.   AND DO YOU SEE THAT IT'S A CORRECTED AMOUNT?

17        A.   WHAT DO YOU MEAN BY THE "CORRECTED"?  THEY ARE WHAT THEY

18   ARE.

19        Q.   LET ME ASK YOU THIS:  IN YOUR 27 YEARS OF EXPERIENCE, HAVE

20   YOU EVER SEEN A FORM 1099 CORRECTED, THE PAYEE -- EXCUSE ME --

21   THE PAYOR ISSUES A CORRECTED 1099?

22        A.   YES, I'VE SEEN THAT.

23        Q.   AND HAVE YOU SEEN THEM A LOT?

24        A.   A LOT?  NO.

25        Q.   BUT THEY HAPPEN, DO THEY NOT?
```

1    A.   I HAVE SEEN THEM HAPPEN, YES.

2    Q.   AND CAN YOU TELL FROM THIS DOCUMENT WHETHER OR NOT

3    CITIBANK SINGAPORE ISSUED A CORRECTED 1099?

4    A.   THERE'S NOTHING INDICATED ON HERE OTHER THAN WHAT IS

5    SHOWN.

6    Q.   SO YOU CAN'T TELL IF THEY ISSUED A CORRECTED 1099?

7    A.   THERE IS NO CORRECTED 1099 PUT INTO EVIDENCE.

8    Q.   THE ONLY THING THAT YOU HAVE IS THIS FORM, THIS LETTER

9    THAT SAYS FORM 1099 INTEREST UNDER ACCOUNT INFORMATION?

10   A.   WELL, IT -- IT SAYS WHAT IT SAYS, YEAH.  IT JUST SAYS THAT

11   THERE'S AN INTEREST IN CITIBANK SINGAPORE.  IT GIVES AN AMOUNT

12   GIVEN TO THE I.R.S.; AN AMOUNT ON THE RETURN; AND A DIFFERENCE.

13   Q.   AND AS YOU SIT HERE TESTIFYING, YOU KNOW FROM THE EVIDENCE

14   THAT HSBC NEVER ISSUED A 1099?

15   A.   I DID NOT SEE A 1099 PUT INTO EVIDENCE FROM HSBC.

16   Q.   DO YOU KNOW IF CITIBANK SINGAPORE HAD A REPRESENTATIVE

17   OFFICE IN THE UNITED STATES?

18   A.   I HAVE NO IDEA.

19   Q.   YOU HAVE NO IDEA.  IF YOU WOULD TURN TO EXHIBIT 148, PAGE

20   6.  DO YOU SEE ON PAGE 6 A GRID AND IT SAYS INTEREST?

21   A.   YES.

22   Q.   AND WHAT IS THE -- WHO IS THE PAYOR?

23   A.   IT'S THE SAME ONE, CITIBANK SINGAPORE LIMITED WITH THE

24   SAME ADDRESS.

25   Q.   AND WHAT DO YOU MEAN THE SAME ADDRESS?  IS THIS A MORE

1    COMPLETE ADDRESS?

2    A.   WELL, IT LOOKS LIKE IT'S THE -- HOLD ON.  THIS ONE SAYS

3    3 TEMASEK AVENUE, 1200 CENTENNIAL TOWER, FIVE ZEROS.  THIS SAYS

4    3 TEMASEK AVENUE, 1200 CENTENNIAL TOWER, OH, YEAH, SINGAPORE.

5    Q.   SO NOW YOU KNOW THAT THE IDENTITY OF THE BANK IS

6    SINGAPORE?

7    A.   THAT'S THE ADDRESS GIVEN.

8              THE COURT:  CAN YOU SPELL TEMASEK?

9              THE WITNESS:  I'M SORRY.  T-E-M-A-S-E-K.

10             THE COURT:  THANK YOU.

11   BY MR. SCHAINBAUM:

12   Q.   NOW, YOU KNOW THAT THIS CITIBANK SINGAPORE ISSUED A 1099;

13   CORRECT?

14   A.   CORRECT.

15   Q.   AND YOU CAN TELL THAT FROM THIS DOCUMENT?

16   A.   YES.

17   Q.   AND, NOW, IF I ASKED YOU THIS QUESTION -- MS. SISKIND

18   ASKED YOU A SERIES OF QUESTIONS ABOUT THE TRANSCRIPTS.

19   A.   YES.

20   Q.   AND YOUR ANSWERS ULTIMATELY WERE THAT EACH TRANSCRIPT FOR

21   EACH YEAR SHOWED A ZERO TAX LIABILITY OWED TO THE UNITED

22   STATES?

23   A.   THERE WAS ONE THAT SHOWED A CREDIT BALANCE OF AROUND $67,

24   BUT THE REST SHOWED A ZERO BALANCE.

25   Q.   RIGHT.  AND THAT INCLUDED TRANSACTIONS OF ADVANCED PAYMENT

```
 1    TO THE I.R.S. ON ADDITIONAL TAXES OWED?

 2    A.   CORRECT.

 3    Q.   NOW, I WANT TO SHOW YOU SOME BLOW UPS BECAUSE YOU

 4    TESTIFIED RATHER RAPIDLY TO MS. SISKIND'S QUESTIONS ABOUT WHAT

 5    WAS ON SCHEDULE B OF MR. AND MRS. DESAI'S TAX RETURNS.  SO IF

 6    YOU'LL BEAR WITH ME FOR A MINUTE, I'LL GET THE BLOW UPS.

 7    A.   SURE.

 8    Q.   THANK YOU.  I APPRECIATE YOUR PATIENCE.

 9         WHILE THEY'RE DOING THAT, I WANT TO ASK YOU A QUESTION.

10    ON THE GG-2, YOU AUTHORED THAT AND THERE'S A SENTENCE CALLED

11    THE 2008 INFOLT SHOWED 150 POSTING 5,991.55 AND WHICH IS ALSO A

12    NUMBER WRITTEN ON THE SECOND PAGE OF THE 1040 BY THE PURPLE

13    PENCIL PEOPLE?

14    A.   UH-HUH.

15    Q.   WHO ARE THE PURPLE PENCIL PEOPLE?

16    A.   THE PURPLE PENCIL PEOPLE ARE PEOPLE AT THE CENTER SERVICE

17    WHO GO THROUGH AND LOOK FOR ANY TYPE OF DISCREPANCIES BETWEEN

18    WHAT IS SHOWN ON A TAX RETURN AND WHAT THE CORRECT CALCULATION

19    SHOULD IT BE.

20         THE REASON THAT THEY CALL THEM THE PURPLE PENCIL PEOPLE IS

21    THAT WHENEVER THEY SHOW THE CHANGE ON THE ORIGINAL RETURN, THEY

22    ARE ALLOWED ONLY TO DO IT WITH A PURPLE PENCIL.

23    Q.   AND DO THEY DO THAT USING COMMON SENSE?

24         MS. SISKIND:  OBJECTION, YOUR HONOR.

25         THE COURT:  SUSTAINED.
```

```
 1                    MR. SCHAINBAUM:  I WAS JUST INQUIRING AS TO THEIR

 2     METHODOLOGY.

 3                    THE COURT:  HIS METHODOLOGY.

 4                    MR. SCHAINBAUM:  WELL, PERHAPS THERE ARE MORE

 5     PEOPLE.

 6                    THE COURT:  I'LL SUSTAIN THE OBJECTION.

 7                    MR. SCHAINBAUM:  ALL RIGHT.

 8                    THE COURT:  DOES THE WITNESS NEED TO SEE THIS?

 9                    MR. SCHAINBAUM:  YES.  ACTUALLY IT APPEARS IN THE

10     EXHIBIT 1.

11                    THE COURT:  OKAY.  THANK YOU.

12                    MR. SCHAINBAUM:  IT'S IN EXHIBIT 1, SCHEDULE B.

13     Q.   DO YOU HAVE THAT, MR. OERTEL?

14     A.   YES.

15     Q.   AND THIS IS JUST TO DISPLAY TO THE JURY.

16          THANK YOU, YOUR HONOR.

17     A.   THE 2007 SCHEDULE B?

18     Q.   ALL RIGHT.  LOOKING AT EXHIBIT 1 OF --

19                    MS. SISKIND:  YOUR HONOR, WOULD YOU LIKE TO DISPLAY

20     THIS ON THE SCREEN?

21                    THE COURT:  WOULD THAT BE OF SOME BENEFIT TO YOU,

22     MR. SCHAINBAUM?

23                    MR. SCHAINBAUM:  SURE.

24                    THE COURT:  I THINK MR. DEMARTINI AND MR. FROST MAY

25     NOT BE ABLE TO SEE.  IT'S ON THE OTHER SIDE.
```

1    MR. SCHAINBAUM:  OKAY.  WE'LL LEAVE THAT UP AND GO

2    ON THE SCREEN AS WELL.

3    THE COURT:  IF YOU WANT TO PUT THAT ON THE MIDDLE OR

4    SOMETHING SO THAT THE WHOLE JURY CAN SEE IT.

5    MS. SISKIND:  YOUR HONOR, I NOTICE THAT IS NOT

6    REDACTED, WHAT IS BEING DISPLAYED ON THE BLOWUP, WHEREAS OURS

7    THAT IS DISPLAYED ON THE SCREEN IS.

8    THE COURT:  THIS IS IN EVIDENCE, I THINK.

9    MS. SISKIND:  YES, YOUR HONOR, AND THAT'S A COPY

10   THAT'S UNREDACTED DISPLAYING ALL OF THE DEFENDANT'S BANK

11   ACCOUNT NUMBERS.

12   MR. SCHAINBAUM:  SORRY.

13   THE COURT:  SEE IF YOU CAN USE THIS CHART.

14   MR. SCHAINBAUM:  ALL RIGHT.  THANK YOU, YOUR HONOR.

15   THE COURT:  YES, OF COURSE.

16   Q.  MR. OERTEL, CAN YOU SEE THE PROJECTION UP THERE?

17   A.  I CAN'T SEE IT, BUT I CAN SEE THE PAPER COPY IN FRONT OF

18   ME.

19   Q.  OKAY.  DO YOU SEE ON SCHEDULE B THE REPORTING OF CITIBANK

20   SINGAPORE?

21   A.  YES.

22   Q.  AND DO YOU SEE TO THE LEFT OF THAT NOTATION THAT PART I

23   THE NOTE FROM THE I.R.S.  CAN YOU READ THAT NOTE?

24   A.  "IF YOU RECEIVE A FORM 1099-INT FORM 1099-OID, OR

25   SUBSTITUTE STATEMENT FROM A BROKERAGE FIRM, LIST THE FIRM'S

1    NAME AS THE PAYOR AND ENTER THE TOTAL INTEREST SHOWN ON THAT

2    FORM."

3    Q.   AND WITH RESPECT TO THAT NOTE, ARE THE ITEMS TO THE RIGHT

4    OF THAT IN COMPLIANCE WITH THAT NOTE ABOUT THE 1099'S?

5    A.   WELL, I DON'T KNOW EXACTLY WHAT THE CORRECT AMOUNT SHOULD

6    HAVE BEEN, I MEAN, JUST BY LOOKING AT THIS.  I CAN TELL YOU

7    THAT THERE'RE, I THINK, 15 ACCOUNTS NAMED AND 15 AMOUNTS

8    REPORTED.

9    Q.   AND ONE ACCOUNT IS CITIBANK SINGAPORE LIMITED; CORRECT?

10   A.   THAT'S RIGHT.

11   Q.   AND THAT HAS BEEN IDENTIFIED NOW AS A FOREIGN BANK;

12   CORRECT?

13   A.   NO.  YOU SAID IT WAS A FOREIGN BANK.

14   Q.   WELL, DIDN'T YOU READ OFF THE I.R.S. FORM THE ADDRESS IN

15   SINGAPORE?

16   A.   THE ADDRESS IS IN SINGAPORE.

17   Q.   AND SO WOULD YOU SAY THAT IF THE BANK IS LOCATED IN

18   SINGAPORE, A FOREIGN COUNTRY, IT'S A FOREIGN BANK?

19   A.   TYPICALLY THE LOCATION OF THE BANK DICTATES WHETHER OR NOT

20   IT IS FOREIGN, SO YOU'RE CORRECT.

21   Q.   OKAY.  THANK YOU.  NOW, LOOKING AT PART III, FOREIGN

22   ACCOUNT AND TRUST, DO YOU SEE THE ANSWER TO 7(A)?

23   A.   YES.

24   Q.   AND WHAT IS THE ANSWER?

25   A.   THE ANSWER IS "NO."

CROSS OERTEL

```
 1      Q.   AND THE ANSWER IS NO.

 2           "AT ANY TIME DURING 2007, DID YOU HAVE AN INTEREST IN OR A

 3      SIGNATURE OR OTHER AUTHORITY OVER A FINANCIAL ACCOUNT IN A

 4      FOREIGN COUNTRY, SUCH AS A BANK ACCOUNT, SECURITIES ACCOUNT, OR

 5      OTHER FINANCIAL ACCOUNT?

 6           SEE PAGE B-2 FOR EXCEPTIONS AND FILING REQUIREMENTS FOR

 7      FORM TD F 90-22.1."

 8           DO YOU SEE THAT?

 9      A.   YES.

10      Q.   AND SO, IN YOUR 27 YEARS OF EXPERIENCE, DO YOU BELIEVE

11      THAT THIS TAXPAYER WHO PREPARED THIS RETURN AND ENTERED

12      CITIBANK SINGAPORE AND ALSO ANSWERED NO DID IT DELIBERATELY?

13                MS. SISKIND:  OBJECTION, YOUR HONOR.

14                THE COURT:  SUSTAINED.

15      BY MR. SCHAINBAUM:

16      Q.   DO YOU HAVE AN EXPLANATION?

17                MS. SISKIND:  OBJECTION, YOUR HONOR.

18                THE COURT:  SUSTAINED.

19      BY MR. SCHAINBAUM:

20      Q.   DO YOU SEE IN ANY OF THE EVIDENCE A LETTER FORM 3800

21      ISSUED BY THE I.R.S. REGARDING FBARS?

22      A.   THE FORM 3800?

23      Q.   DO YOU KNOW WHAT A FORM 3800 IS?

24      A.   THAT'S A GENERAL BUSINESS CREDIT.

25      Q.   THAT'S A WHAT?
```

CROSS OERTEL

1    A.   I BELIEVE 3800 IS A GENERAL BUSINESS CREDIT.

2    Q.   A GENERAL BUSINESS?

3    A.   CREDIT.  IF MEMORY SERVES I BELIEVE 3800 IS A GENERAL

4    BUSINESS CREDIT.

5    Q.   PERHAPS I MISSPOKE.  ARE YOU AWARE OF A FINCEN FORM 3800?

6    A.   THE FINCEN FORM 3800?  NO, I'M NOT.

7    Q.   I SEE.  HAVE YOU EVER, AS A FIELD AGENT, EVER CONSIDERED

8    ISSUING A NOTICE ABOUT AN FBAR TO A TAXPAYER?

9    A.   I'VE ASSERTED FBAR PENALTIES, YES.

10   Q.   WELL, YOU'VE SEEN IN ALL OF THOSE NOTICES THAT CAME OUT

11   THAT YOU TALKED ABOUT THIS MORNING, THEY ALL CONTAIN REFERENCE

12   TO CITIBANK SINGAPORE; CORRECT?

13   A.   NOT ALL OF THEM, BUT SOME OF THEM DID, I BELIEVE.

14   Q.   WELL, I DON'T WANT TO GO THROUGH THEM ALL, BUT I WOULD SAY

15   THAT --

16   A.   THERE WAS SOME.

17   Q.   A MAJORITY OF THEM?

18   A.   HONESTLY, I DON'T REMEMBER HOW MANY.  BUT I'LL ACCEPT YOUR

19   REPRESENTATION THAT MOST OF THEM.

20   Q.   OKAY.  DO YOU SEE ANYTHING FURTHER FROM THE I.R.S., ANY

21   KIND OF NOTICE TO THE TAXPAYER THAT YOU MAY HAVE A FOREIGN BANK

22   ACCOUNT AND YOU MAY HAVE TO DO CERTAIN THINGS?

23   A.   DID I SEE IT?  NO.

24   Q.   NO.  DID YOU SEE ANY REFERENCE TO WHETHER CITIBANK

25   SINGAPORE HAD A REPRESENTATIVE OFFICE IN THE UNITED STATES?

1    A.   I DON'T KNOW IF THEY DID, AND I DIDN'T SEE ANYTHING ABOUT

2    THAT.

3    Q.   OKAY.  LOOKING AT EXHIBIT 3 -- EXCUSE ME, 2.  CAN YOU TURN

4    TO SCHEDULE B.

5    A.   OKAY.

6    Q.   DO YOU SEE ON SCHEDULE B A LIST OF INTEREST BANK ACCOUNTS,

7    OR BANK ACCOUNTS AND INTEREST?

8    A.   YES.

9    Q.   DO YOU SEE A REFERENCE TO A CITIBANK SINGAPORE?

10   A.   YES, IT'S ON LINE 3, OR ON THE THIRD LINE I SHOULD SAY.

11   Q.   RIGHT.  YOU ALSO SEE A REFERENCE TO THE STATE BANK OF

12   INDIA?

13   A.   YES.

14   Q.   OKAY.  AND YOU SEE THE SAME NOTE ABOUT "IF YOU RECEIVE THE

15   FORM 1099-INT OR FORM 1099-OID OR SUBSTITUTE STATEMENT FROM A

16   BROKERAGE FIRM, LIST THE FIRM'S NAME AS THE PAYOR AND ENTER THE

17   TOTAL INTEREST SHOWN ON THAT FORM"?

18   A.   THAT'S WHAT IT SAYS.

19   Q.   RIGHT.  AND SO YOU SEE A LIST OF ALL OF THESE BANK

20   ACCOUNTS, CORRECT, OR FINANCIAL PAYORS?

21   A.   YES.

22   Q.   AND AT THE BOTTOM, THE QUESTION 7(A), "AT ANY TIME DURING

23   2008, DO YOU HAVE AN INTEREST IN OR A SIGNATURE OR OTHER

24   AUTHORITY OVER A FINANCIAL ACCOUNT IN A FOREIGN COUNTRY, SUCH

25   AS A BANK ACCOUNT, SECURITIES ACCOUNT, OR OTHER FINANCIAL

CROSS OERTEL

1    ACCOUNT.

2         "SEE PAGE B-2 FOR EXCEPTIONS AND FILING REQUIREMENTS FOR

3    FORM TD F 90-22.1."

4    A.    YES.

5    Q.    AND YOU SEE THE BOX IS CHECKED "NO."

6    A.    CORRECT.

7    Q.    AND AS A 27-YEAR I.R.S. REPRESENTATIVE, DO YOU HAVE AN

8    EXPLANATION FOR THAT?

9              MS. SISKIND:  OBJECTION, YOUR HONOR.  CAN WE GO TO

10   SIDE-BAR, PLEASE?

11             THE COURT:  OBJECTION IS SUSTAINED.

12        (SIDE-BAR CONFERENCE ON THE RECORD.)

13             THE COURT:  WE'RE AT SIDE-BAR NOW.

14        MS. SISKIND.

15             MS. SISKIND:  HE'S ASKING THE SAME QUESTION OBJECTED

16   TO EARLIER.  IT'S A COMPLETELY INAPPROPRIATE QUESTION.

17             MR. SCHAINBAUM:  IT'S NOT A COMPLETELY INAPPROPRIATE

18   QUESTION.  HE'S UP THERE GIVING EXPERT TYPE REFERENCES ON

19   VARIOUS THINGS.  HE SAID THAT HE'S BEEN IN THE I.R.S. FOR

20   27 YEARS.  IT'S A FAIR QUESTION TO SEE IF HE HAS AN

21   EXPLANATION.

22             THE COURT:  HIS EXPLANATION IS NOT RELEVANT TO THIS.

23   IT CALLS FOR SPECULATION AND YOU'RE TRYING TO -- IT APPEARS

24   THAT YOU'RE TRYING TO GET HIM TO COMMENT ON POSSIBILITIES OF

25   ERRORS OR WHATEVER IT MIGHT BE, AND YOU CAN'T -- HIS OPINION

1   ABOUT THAT IS NOT RELEVANT.

2          MR. SCHAINBAUM:  HIS STATEMENT AS TO WHAT HE

3   DETERMINES TO WHAT IT IS, IS KIND OF RELEVANT IN LIGHT OF THE

4   DIRECT EXAMINATION AND I JUST WANT TO MAKE A RECORD ON THAT

5   BECAUSE THEY WEREN'T -- YOU LET THEM GO VERY FAR IN THE DIRECT

6   EXAMINATION, AND TO NARROW IT AT THIS POINT JUST CONFINES US.

7          THE COURT:  WELL, I'M NOT LIMITING YOUR EXAMINATION.

8   I'M LIMITING THE TYPE OF QUESTIONS YOU CAN ASK.  YOU CAN ASK

9   HIM THE ULTIMATE OPINION.

10          MR. SCHAINBAUM:  I'M NOT ASKING HIM AN ULTIMATE

11   OPINION.

12          THE COURT:  WELL, THERE WAS A PREVIOUS QUESTION THAT

13   THERE WAS AN OBJECTION TO.  YOU CAN'T ASK HIM THOSE QUESTIONS.

14      YOU CAN CERTAINLY ASK HIM ABOUT THE FORM, ABOUT WHAT THE

15   FORM MEANS, ABOUT HIS CALCULATIONS AS YOU HAVE BEEN DOING AND

16   I'VE PERMITTED YOU AND THAT'S ENTIRELY APPROPRIATE.

17      AND WHEN YOU GET INTO, I THINK, BASICALLY ONE OF THOSE

18   PREVIOUS QUESTIONS YOU WERE ASKING HIM WHETHER OR NOT HE FELT

19   THAT THE CLIENT HAD INTENT OR NOT, HE CAN'T TESTIFY ABOUT THAT.

20          MR. SCHAINBAUM:  WELL, HE -- ALL I'M ASKING HIM IS

21   AS AN I.R.S. PERSON WHO HAS BEEN AROUND FOR 27 YEARS, DOES HE

22   HAVE AN EXPLANATION?  HE DOESN'T HAVE TO SAY -- HE CAN SAY YES

23   OR NO.

24          THE COURT:  AND IF HE SAYS YES, HE HAS AN

25   EXPLANATION, THAT'S JUST NOT APPROPRIATE AND I'M NOT GOING TO

1      LET YOU ASK HIM THAT EXPLANATION.

2          YOU CAN ASK HIM AND PERHAPS PRESENT HIM WITH THE FORM AND

3      ASK HIM QUESTIONS ABOUT HOW THE FORM IS PREPARED AND WHAT AN

4      OMISSION FROM A PARTICULAR BOX MIGHT MEAN.  YOU KNOW, THOSE

5      TYPES OF THINGS ARE PERMITTED, SURE.

6          BUT YOU CAN'T -- YOU CAN'T GO AND TRY TO GET HIM TO

7      TESTIFY ABOUT YOUR CLIENT'S INTENT OR THE INTENT OF SOMEBODY

8      BECAUSE OF THEIR ACTIONS ON THE FORM.  THAT'S NOT -- IN THE

9      ABSTRACT YOU CAN'T DO THAT.

10              MR. SCHAINBAUM:  I'LL ASK DOES HE HAVE AN

11     EXPLANATION?  HE MAY HAVE AN I.R.S. EXPLANATION.  HE MAY HAVE

12     ANYTHING.  HE MIGHT SAY COMMON SENSE.

13              THE COURT:  YOU'RE ASKING HIM TO GIVE AN EXPLANATION

14     OF WHY YOUR CLIENT FILLED OUT A FORM.

15              MR. SCHAINBAUM:  OR AN EXPLANATION OF WHY THIS

16     HAPPENED.

17              THE COURT:  I DON'T THINK YOU CAN DO THAT.

18              MR. SCHAINBAUM:  OKAY.

19              THE COURT:  ALL RIGHT.  THANK YOU.

20              MR. SCHAINBAUM:  I OBJECT.

21              THE COURT:  OF COURSE.

22          (END OF DISCUSSION AT SIDE-BAR.)

23     BY MR. SCHAINBAUM:

24     Q.  OKAY.  LOOKING AT EXHIBIT 3, AND TURNING TO SCHEDULE B, DO

25     YOU SEE ON EXHIBIT 3, SCHEDULE B, A REFERENCE TO THE CITIBANK

1    OF SINGAPORE?

2    A.   YES, I DO.

3    Q.   AND, NOW, BASED UPON THE EVIDENCE THAT THE GOVERNMENT PUT

4    INTO THE RECORD AND WE WENT OVER, CITIBANK OF SINGAPORE IS A

5    FOREIGN BANK; CORRECT?

6    A.   I BELIEVE SO.

7    Q.   AND UNDER THAT IS THE STATE BANK OF INDIA?

8    A.   CORRECT.

9    Q.   ALL RIGHT.  AND BELOW -- THE QUESTION AT 7(A), "AT ANY

10   TIME DURING 2009, DID YOU HAVE AN INTEREST IN OR A SIGNATURE OR

11   OTHER AUTHORITY OVER A FINANCIAL ACCOUNT IN A FOREIGN COUNTRY,

12   SUCH AS A BANK ACCOUNT, SECURITIES ACCOUNT, OR OTHER FINANCIAL

13   ACCOUNT.

14       "SEE INSTRUCTIONS ON BACK FOR EXCEPTIONS AND FILING

15   REQUIREMENTS FORM TD F 90-22.1?"

16       THAT'S THE FBAR; CORRECT?

17   A.   YES.

18   Q.   AND HOW IS THE BOX CHECKED?

19   A.   IT'S CHECKED NO.

20   Q.   AND THAT'S THE SAME FORM THAT CONTAINS THE BANK ACCOUNTS

21   FOR THE CITIBANK OF SINGAPORE AND THE STATE BANK OF INDIA?

22   A.   YES, THEY'RE ALL ON THE SAME PAGE.

23   Q.   NOW, THESE BANKS APPEARING ON PART I, THEY ISSUE 1099'S;

24   CORRECT?

25   A.   I WOULD THINK SO.  I DON'T KNOW FOR SURE.  I HAVEN'T SEEN

 1   THE 1099'S.  I DON'T THINK THAT ALL OF THE 1099'S ISSUED TO

 2   MR. AND MRS. DESAI WERE PUT INTO EVIDENCE.

 3   Q.   AND YOU KNOW, HOWEVER, FOR CERTAIN THAT HSBC DID NOT ISSUE

 4   A 1099?

 5   A.   THEY DID NOT.

 6   Q.   OKAY.  NOW, WITH RESPECT TO YOUR CALCULATIONS, YOUR

 7   COMPUTATIONS, WHETHER THEY'RE CORRECT OR NOT, WHETHER THEY'RE

 8   $6 OR $6 BILLION, IF MR. DESAI HAD A GOOD FAITH BELIEF THAT --

 9            MS. SISKIND:  OBJECTION, YOUR HONOR.

10            THE COURT:  SUSTAINED.

11   BY MR. SCHAINBAUM:

12   Q.   WHAT WOULD BE THE CIRCUMSTANCES OF MR. DESAI NOT HAVING TO

13   REPORT INTEREST INCOME BASED UPON HIS OWN GOOD FAITH BELIEF --

14            MS. SISKIND:  OBJECTION, YOUR HONOR.

15            THE COURT:  SUSTAINED.

16   BY MR. SCHAINBAUM:

17   Q.   WOULD YOUR CALCULATIONS IN ANY WAY BE AFFECTED BY THE

18   INTENTIONS OF MR. DESAI?

19            MS. SISKIND:  OBJECTION, YOUR HONOR.

20            THE COURT:  SUSTAINED.

21   BY MR. SCHAINBAUM:

22   Q.   WOULD YOUR CALCULATIONS IN ANY WAY BE IMPACTED BY ANY

23   FACTOR THAT PERTAINS TO THE STATE OF MIND OF MR. DESAI.

24            MS. SISKIND:  OBJECTION, YOUR HONOR.

25            THE COURT:  MR. SCHAINBAUM, SUSTAINED.  WE TALKED

1    ABOUT THIS.

2              MR. SCHAINBAUM:  OKAY.

3    Q.  WITH RESPECT TO WHETHER OR NOT YOUR CALCULATIONS FOR THE

4    HIGH BANK BALANCE IS CORRECT OR NOT, WHETHER IT'S ZERO OR

5    $6 MILLION, IS THERE ANY FACTOR THAT WOULD IMPACT WHETHER OR

6    NOT IT NEEDS TO BE CONSIDERED FOR THE FBAR?

7         LET ME REPHRASE IT FOR YOU.

8    A.  IF YOU COULD, YES.

9    Q.  AND IF THE FBAR IS NOT REQUIRED TO BE FILED, ARE THE HIGH

10   BALANCE BANK BALANCES RELEVANT?

11             MS. SISKIND:  OBJECTION, YOUR HONOR.

12             THE COURT:  SUSTAIN THE OBJECTION AS TO THE PHRASING

13   OF THE QUESTION.

14             MR. SCHAINBAUM:  ALL RIGHT.

15   Q.  IF THE FBAR IS NOT REQUIRED TO BE FILED IN THIS CASE FOR

16   2007, 2008, AND 2009, WHAT IS THE IMPACT ON YOUR HIGH BALANCE

17   BANK CALCULATIONS, WHETHER CORRECT OR NOT?

18   A.  I CAN'T ANSWER THAT BECAUSE IT DOESN'T FOLLOW THE

19   EVIDENCE.  THE EVIDENCE WOULD SHOW THAT AN FBAR IS REQUIRED.

20   Q.  BUT IF AN FBAR WAS NOT REQUIRED, WHAT WOULD BE THE IMPACT

21   ON YOUR CALCULATIONS?

22   A.  ON CALCULATIONS OF INTEREST AND HIGH BALANCE?

23   Q.  NO.  JUST THE HIGH BALANCE.

24   A.  MY CALCULATIONS WOULDN'T CHANGE.

25   Q.  WOULD THEY BECOME SOMETHING THAT WAS NECESSARY IF THERE IS

CROSS OERTEL

1    NO FBAR TO BE FILED?

2              MS. SISKIND:  OBJECTION, YOUR HONOR.  RELEVANCE.

3              MR. SCHAINBAUM:  WELL, IT IS RELEVANT.

4              THE COURT:  DID YOU UNDERSTAND THE QUESTION?

5              THE WITNESS:  NOT REALLY, NO.

6              THE COURT:  WHY DON'T REPHRASE THE QUESTION?

7    BY MR. SCHAINBAUM:

8    Q.  IF NO FBAR IS REQUIRED TO BE FILED, WOULD YOUR

9    CALCULATIONS FOR THE HIGH BANK BALANCES, WHETHER CORRECT OR

10   NOT, BE NECESSARY?

11             MS. SISKIND:  OBJECTION, YOUR HONOR.

12             THE COURT:  OVERRULED.

13        YOU CAN ANSWER THAT, IF YOU CAN.

14             THE WITNESS:  WELL, IT'S A HARD QUESTION TO ANSWER

15   BECAUSE IT DOESN'T FOLLOW THE EVIDENCE.  THE EVIDENCE SHOWS

16   THAT AN FBAR WAS REQUIRED.

17        ASKING "IF," YOU CAN ASK "IF" ABOUT ANYTHING.

18        BUT THE EVIDENCE SHOWS THAT AN FBAR WAS REQUIRED, AND SO I

19   HONESTLY DON'T KNOW HOW TO ANSWER YOUR QUESTION, SIR.

20   BY MR. SCHAINBAUM:

21   Q.  WELL, THAT'S A CONCLUSION THAT YOU'RE MAKING EVEN THOUGH

22   YOU HEARD THE EVIDENCE THAT THE REPRESENTATIVE OFFICES IN

23   NEW YORK AND FREMONT OF THE HSBC BANK WHERE TWO HSBC BANKERS

24   TESTIFIED THAT THEY WERE MANAGING AND OPERATING ACCOUNTS FROM

25   NEW YORK AND CALIFORNIA.

1    A.   WELL, IF WE GO TO THE -- I BELIEVE THE WAY THAT THE

2    EXCEPTION THAT YOU'RE MAYBE REFERRING TO IS STATED, I

3    BELIEVE -- WHICH EXHIBIT IS IT THAT HAS THAT FBAR?  OH, IT'S 9,

4    RIGHT?

5    Q.   9.

6    A.   OKAY.  THEY HAVE A REPRESENTATIVE OFFICE IN THE UNITED

7    STATES, OKAY.

8         NOW, WHAT THIS EXCEPTION SAYS, AND THE REASON IT WAS NOT

9    CONSIDERED, IS THAT IT SAYS, "DO NOT REPORT ANY ACCOUNT

10   MAINTAINED."

11        HIS ACCOUNTS WERE NOT MAINTAINED IN THE UNITED STATES,

12   SIR.  THEY WERE MAINTAINED IN THE COUNTRY OF INDIA.

13        THE BANKERS WHO TESTIFIED TALKED ABOUT HOW THEY WOULD, YOU

14   KNOW, BE A LIAISON AND HELP THEIR CLIENTS WHO WERE IN THE U.S.

15   WITH, YOU KNOW, GETTING THINGS DONE IN INDIA.

16        AND SO THAT TELLS ME THAT IT'S INDIA THAT IS MAINTAINING

17   THE ACCOUNT, NOT THE UNITED STATES.

18   Q.   COULD YOU READ THE WHOLE SENTENCE, MR. OERTEL?

19   A.   "DO NOT REPORT ANY ACCOUNT MAINTAINED WITH A BRANCH,

20   AGENCY, OR OTHER OFFICE OF A FOREIGN BANK OR OTHER INSTITUTION

21   THAT IS LOCATED IN THE UNITED STATES, GUAM, PUERTO RICO, AND

22   THE VIRGIN ISLANDS."

23        HIS ACCOUNTS WERE NOT MAINTAINED HERE.

24   Q.   NOW, IF THAT EXCEPTION OPERATES, DO YOU NEED TO FILE AN

25   FBAR?

```
1    A.   IF SOMEONE --

2    Q.   NO, THE QUESTION IS -- I'D LIKE THE ANSWER AND THEN YOU

3    CAN EXPLAIN IT.

4         IF THAT EXCEPTION OPERATES, IS EFFECTIVE, NO FBAR IS

5    REQUIRED; CORRECT?  YES OR NO?  AND THEN YOU CAN EXPLAIN IT?

6    A.   OKAY.  IF THIS --

7    Q.   WAIT A MINUTE.  I NEED TO GET AN ANSWER TO THAT PARTICULAR

8    QUESTION.

9              THE COURT:  CAN YOU ANSWER THAT?

10             THE WITNESS:  YES, YES.

11             MR. SCHAINBAUM:  YES, THAT --

12             THE COURT:  EXCUSE ME.  ONE AT A TIME, PLEASE.

13             THE WITNESS:  OKAY.

14             THE COURT:  CAN YOU ANSWER THAT YES OR NO?

15             THE WITNESS:  THE ANSWER IS YES IF SOMEONE'S ACCOUNT

16   IS NOT MAINTAINED OR -- IS NOT MAINTAINED IN A FOREIGN COUNTRY,

17   THEN YOU WOULD NOT HAVE TO FILE AN FBAR.

18        BUT IN THIS INSTANCE IT WAS MAINTAINED IN INDIA.  THEY

19   HAVE AN OFFICE IN FREMONT, A LIAISON OR REPRESENTATIVE OFFICE.

20        BUT THE BANKERS WERE VERY CLEAR THAT THEY REALLY COULDN'T

21   DO ANYTHING TO THAT ACCOUNT OR WITH THAT ACCOUNT.

22        AND IF YOU CAN'T DO ANYTHING WITH IT, IF YOU DON'T EACH

23   HAVE ACCESS TO IT, HOW CAN YOU POSSIBLY MAINTAIN IT?

24   BY MR. SCHAINBAUM:

25   Q.   WOULD YOU AGREE WITH ME THAT THE BANKERS FROM HSBC WHO
```

1     TESTIFIED WERE AGENTS OF THE REPRESENTATIVE BANK?

2            MS. SISKIND:  YOUR HONOR, IT CALLS FOR A LEGAL

3     CONCLUSION ABOUT AGENCY.

4            MR. SCHAINBAUM:  WELL, HE JUST GAVE A LEGAL

5     CONCLUSION.

6            THE COURT:  YOU CAN ANSWER THE QUESTION, IF YOU CAN.

7            THE WITNESS:  THEY SAID THAT THEY WORKED FOR THE

8     REPRESENTATIVE BANK.

9     BY MR. SCHAINBAUM:

10    Q.   YEAH.  WHAT I'M SAYING IS THAT THEY WERE AGENTS OF THE

11    REPRESENTATIVE BANK; CORRECT?

12    A.   I DON'T KNOW WHAT YOU MEAN BY "AGENTS."

13           THEY SAID THAT THEY WERE LIAISONS BETWEEN THE PEOPLE IN

14    THE U.S. AND THE PEOPLE IN -- OR THE BANK IN INDIA.  THAT'S

15    REALLY THE BEST ANSWER THAT I CAN GIVE YOU, SIR.

16    Q.   YEAH.  THEY SAID THAT THEY WERE EMPLOYED REPRESENTING HSBC

17    INDIA IN THE UNITED STATES; CORRECT?

18    A.   THEY SAID -- YES.

19    Q.   AND SO THEY WERE REPRESENTATIVES OF HSBC INDIA WORKING IN

20    THE UNITED STATES; CORRECT?

21    A.   THEY WERE REPRESENTATIVES, YES.

22    Q.   AND THEY WERE REPRESENTATIVES IN A REPRESENTATIVE OFFICE

23    OF HSBC INDIA IN THE UNITED STATES; CORRECT?

24    A.   YES.

25    Q.   SO THE RELATIONSHIP MANAGERS WERE AGENTS OF HSBC INDIA

```
1    WORKING IN THE UNITED STATES; CORRECT?

2    A.   THEY WERE RELATIONSHIP MANAGERS, SIR.  I HONESTLY DON'T

3    KNOW WHAT I MEAN BY "AGENTS."  I'M AN AGENT.

4    Q.   SO ARE YOU -- SO DO YOU REPRESENT THE INTERNAL REVENUE

5    SERVICE?

6    A.   YES.

7    Q.   ALL RIGHT.  DID VANDANA KATJU AND AARTI KUMAR AND

8    COLLEAGUES OF THAT SORT REPRESENT HSBC INDIA?

9    A.   YES.

10   Q.   ALL RIGHT.  I HAVE NO FURTHER QUESTIONS.

11             THE COURT:  REDIRECT?

12             MS. SISKIND:  YES, YOUR HONOR.

13             MR. SCHAINBAUM:  I THINK WE NEED A COUPLE OF MINUTES

14   TO MOVE.

15             THE COURT:  OF COURSE.

16             MR. SCHAINBAUM:  I APPRECIATE YOUR COURTESY.

17             THE COURT:  NOT AT ALL.

18        FOLKS, FEEL FREE TO STRETCH IF YOU'D LIKE DURING THESE

19   BREAKS.

20             THE WITNESS:  DO YOU MIND IF I POUR MORE WATER?

21             THE COURT:  OH, WE'LL GET YOU MORE WATER.

22             THE WITNESS:  IT GETS WARM.  THANK YOU.  I'M FINE.

23   THANK YOU, MA'AM.
```

**REDIRECT EXAMINATION**

```
25
```

1    BY MS. SISKIND:

2    Q.   GOOD AFTERNOON, MR. OERTEL.

3    A.   HI.

4    Q.   I WANT TO TAKE YOU -- START BY TAKING YOU BACK TO THOSE

5    TWO DEFENSE EXHIBITS THAT MR. SCHAINBAUM HAD YOU LOOK AT, GG-1

6    AND GG-2.

7    A.   OKAY.  SORRY, THEY'RE AT THE BOTTOM.  OKAY.

8    Q.   GENERALLY WHAT WAS THE SUBJECT OF THAT E-MAIL FROM YOU TO

9    AGENT HELGESEN IN JUNE OF LAST YEAR?

10   A.   BASICALLY I HAD FOUND SOME DISCREPANCIES BETWEEN HOW SOME

11   THINGS WERE CALCULATED ON THE TAX RETURNS.

12   Q.   AND DID YOU ACTUALLY, WHEN DOING -- PUTTING TOGETHER YOUR

13   REVENUE AGENT'S REPORT, GIVE THE DEFENDANT A CREDIT THAT HE HAD

14   FORGOTTEN TO CLAIM FOR HIMSELF?

15   A.   SURE.

16   Q.   AND AT THE END, YOU SAY THAT YOU MADE CHANGES BECAUSE THEY

17   BENEFIT THE TAXPAYER; RIGHT?

18   A.   THAT'S RIGHT.

19   Q.   AND IS THAT CONSISTENT WITH THE APPROACH THAT YOU TOOK TO

20   YOUR INTEREST INCOME CALCULATIONS IN THIS CASE?

21   A.   THAT'S CORRECT, MA'AM.

22   Q.   AND YOUR HIGH BALANCE CALCULATIONS?

23   A.   YES, MA'AM.

24   Q.   AND WHEREVER POSSIBLE, DID YOU GIVE A BENEFIT TO MR. DESAI

25   IN THOSE CALCULATIONS?

1    A.   YES, MA'AM.

2    Q.   AND DOES THIS E-MAIL, INCIDENTALLY, HAVE ANYTHING TO DO

3    WITH YOUR CALCULATION OF INTEREST INCOME?

4    A.   NO.

5    Q.   AND DOES IT HAVE ANYTHING TO DO WITH YOUR CALCULATION OF

6    HIGH BALANCE?

7    A.   NO.

8    Q.   AND THAT GG-2 THAT MR. SCHAINBAUM SHOWED YOU, SOMETHING

9    ABOUT BACKING INTO AMOUNTS ON IDRS?

10   A.   YES.  I DON'T THINK WE SAID WHAT IDRS.

11   Q.   WHAT IS IDRS?

12   A.   IDRS IS THE I.R.S.'S COMPUTER DATABASE OF ALL OF THE

13   THINGS THAT HAPPEN ON ANY TAX RETURN.

14        SO IF YOU FILE SOMETHING, YOU PAY SOMETHING, ALL OF THOSE

15   ARE GOING TO GET INPUT.  AND IF AN AGENT LIKE MYSELF WANTED TO

16   SEE WHAT HAPPENED ON YOUR ACCOUNT, I WOULD LOG INTO IDRS AND

17   THAT'S WHERE I WOULD FIND IT.

18   Q.   AND, AGAIN, DOES GG-2 THAT MR. SCHAINBAUM WENT OVER WITH

19   YOU AT SOME LENGTH HAVE ANYTHING TO DO WITH YOUR CALCULATION OF

20   INTEREST INCOME?

21   A.   NO.

22   Q.   AND DOES IT HAVE ANYTHING TO DO WITH YOUR CALCULATION OF

23   HIGH BALANCE?

24   A.   NO.

25   Q.   NOW, THE NEXT SUBJECT I THINK HE WAS ASKING YOU ABOUT WAS

1    CERTAIN CD'S AND WHICH DOCUMENTS THEY APPEARED ON.  DO YOU

2    RECALL THAT?

3    A.   YES, MA'AM.

4    Q.   AND I BELIEVE ONE OF THE ONES HE WAS ASKING YOU ABOUT WERE

5    SOME CD'S FOR ACCOUNT 9689.  DO YOU RECALL THOSE QUESTIONS?

6    A.   YES, MA'AM.

7    Q.   AND HE ASKED YOU WHETHER OR NOT THEY APPEARED ANYWHERE ON

8    THE INTEREST CERTIFICATES IN EXHIBIT 137?

9    A.   I DON'T REMEMBER IF IT WAS 137 OR 136.

10   Q.   WELL, HE WAS ASKING YOU IF THEY APPEARED ON THE INTEREST

11   CERTIFICATES; RIGHT?

12   A.   YES.

13   Q.   AND CAN YOU PLEASE TURN TO EXHIBIT 23- -- EXCUSE ME --

14   23-7, 23-7?

15   A.   SURE.  OKAY.

16   Q.   AND IS 23-7 YOUR INTEREST INCOME CALCULATION FOR ACCOUNT

17   9689?

18   A.   MY CALCULATION?

19   Q.   WELL, THE CALCULATION -- YOUR SUMMARY CHART FOR ACCOUNT

20   9689?

21   A.   IT'S MY CHART, YES.

22   Q.   AND THAT'S NEAL DESAI'S ACCOUNT; CORRECT?

23   A.   YES.

24   Q.   AND WHEN PREPARING THIS CHART, DID YOU ACCOUNT FOR THE

25   FACT THAT THE CD WASN'T ON THE INTEREST STATEMENT?

1    A.   UM --

2    Q.   WHAT DOES IT SAY IN THE INTEREST PAID PER HSBC STATEMENT

3    COLUMN?

4    A.   YEAH.  IT SAYS THAT WE DIDN'T HAVE THAT.

5    Q.   AND SO WHEN MR. SCHAINBAUM ASKED YOU TO LOOK FOR IT, IT

6    WAS KIND OF A TRICK QUESTION BECAUSE THERE WAS NONE?

7             MR. SCHAINBAUM:  I OBJECT, YOUR HONOR.  IT WAS A

8    STRAIGHTFORWARD QUESTION.

9             THE COURT:  THANK YOU.  SUSTAINED.  SHE'LL ASK

10   ANOTHER QUESTION.

11   BY MS. SISKIND:

12   Q.   BASED ON YOUR REVIEW OF THE INTEREST STATEMENTS, WAS THERE

13   ANY STATEMENT THAT HAS ACCOUNT 9689 ON IT?

14   A.   FOR 2009?  NO.

15   Q.   AND SO WHAT DID YOU HAVE TO DO IN ORDER TO CALCULATE

16   INTEREST INCOME FOR THAT ACCOUNT FOR THAT YEAR?

17   A.   I HAD TO USE THAT SAME PROCESS THAT I HAVE BEEN TALKING

18   ABOUT OVER AND OVER.

19   Q.   AND THAT'S WHERE YOU HAD TO LOOK AT EITHER THE SCREEN

20   SHOTS OR THE SPREADSHEETS OR BOTH?

21   A.   YES, MA'AM.

22   Q.   MR. SCHAINBAUM WAS ALSO ASKING YOU ABOUT YOUR DECISION TO

23   COMPOUND INTEREST ON A DAILY BASIS.

24   A.   YES.

25   Q.   AND WAS -- AND A QUESTION OF WHETHER THAT WAS CONSISTENT

1   WITH HOW THE BANK DOES THINGS?

2   A.   YES.

3   Q.   TO THE BEST OF YOUR RECOLLECTION, WAS THERE ANY DOCUMENT

4   OR ANY TESTIMONY INTRODUCED AT TRIAL ABOUT HOW THE BANK

5   COMPOUNDS INTEREST?

6   A.   NOT THAT I RECALL.

7   Q.   AND IF THERE HAD BEEN, WOULD YOU HAVE USED THAT IN YOUR

8   CALCULATIONS?

9   A.   YEAH, IF I HAD SEEN THAT -- OR, YEAH.

10   Q.   MR. SCHAINBAUM ALSO POINTED YOU TO THAT LINE IN THE FBAR

11   INSTRUCTIONS THAT INSTRUCTS PEOPLE TO VALUE THEIR ACCOUNT USING

12   THE EXCHANGE RATE ON THE LAST DAY OF THE YEAR; CORRECT?

13   A.   THAT'S CORRECT.

14   Q.   AND THAT'S NOT WHAT YOU DID FOR YOUR CALCULATIONS?

15   A.   THAT'S RIGHT.  I DID IT ON THE DATE WHEN SOMETHING

16   MATURED, YEAH.  I SHOULD HAVE DONE IT ON DECEMBER 31ST.

17   Q.   AND I BELIEVE I ASKED YOU WHEN YOU TOOK THE STAND

18   YESTERDAY IF ANYBODY POINTED OUT ANY ERRORS IN YOUR

19   CALCULATIONS, WHETHER YOU WOULD BE WILLING TO MAKE CHANGES.  IS

20   THAT RIGHT?

21   A.   SURE.

22   Q.   AND SO LET'S TAKE A LOOK AT 24-1.  AND I'M NOT GOING TO

23   ASK YOU TO DO TOO MUCH MATH ON THE STAND, BUT MAYBE JUST A

24   LITTLE.

25   A.   OKAY.

1   Q.   SO 24-1, THIS WAS YOUR HIGH BALANCE CALCULATION FOR

2   MR. DESAI'S HSBC ACCOUNT FOR 2007; CORRECT?

3   A.   THAT'S CORRECT.

4   Q.   AND ARE THERE CD'S IN ALL DIFFERENT CURRENCIES?

5   A.   THEY -- YEAH, FOUR DIFFERENT CURRENCIES.

6   Q.   AND WHAT ARE THEY?

7   A.   THEY WERE INDIAN RUPEES, UNITED STATES DOLLARS, GREAT

8   BRITAIN POUNDS, AND EUROS.

9   Q.   AND WOULD IT BE FAIR TO SAY THAT YOU ONLY HAVE TO DO AN

10  EXCHANGE RATE WHEN IT'S SOMETHING OTHER THAN U.S. DOLLARS;

11  RIGHT?

12  A.   WELL, YEAH, THAT'S RIGHT.

13  Q.   AND SO WHAT I WOULD LIKE YOU TO DO, IF YOU WOULD, IS JUST

14  ADD UP THOSE CD'S.  HOW MANY ARE IN U.S. DOLLARS BY THE WAY?

15  A.   THERE ARE ONE, TWO, THREE, FOUR, FIVE -- SIX.

16  Q.   AND SO WHAT I WOULD LIKE YOU TO DO, SO WE CAN PUT ASIDE

17  THE EXCHANGE RATE FOR A MINUTE, JUST HAVE YOU ADD UP THOSE CD'S

18  THAT ARE IN U.S. DOLLARS SO YOU DON'T HAVE TO DO A CONVERSION,

19  AND IF YOU NEED A PAPER AND PEN, I CAN GIVE IT TO YOU.

20          THE COURT:  DO YOU HAVE A CALCULATOR WITH YOU?

21          THE WITNESS:  I CAN KIND OF DO IT IN MY HEAD.  IS IT

22  OKAY IF I DO APPROXIMATION?

23          MS. SISKIND:  SURE.

24          THE WITNESS:  ABOUT FOUR AND A HALF.

25

BY MS. SISKIND:

Q.   FOUR AND A HALF WHAT?

A.   FOUR AND A HALF MILLION.

Q.   FOUR AND A HALF MILLION DOLLARS?

A.   YEAH.

Q.   SO EVEN IF WE IGNORE THE CD'S THAT YOU HAD TO DO SOME KIND
OF CURRENCY CONVERSION FOR, YOUR HIGH BALANCE CALCULATION WOULD
STILL BE ABOUT FOUR AND A HALF MILLION DOLLARS FOR 2007?

A.   YES, AND THAT'S AN APPROXIMATE.

Q.   SURE.  IF WE CAN LOOK AT 24-2.

A.   OKAY.

Q.   IS THIS YOUR CALCULATION OF HIGH BALANCE FOR 2008?

A.   YES.

Q.   AND BEFORE WE DO THAT, LET ME JUST ASK YOU, FOUR AND A
HALF MILLION DOLLARS, IS THAT IN EXCESS OF THE THRESHOLD FOR
WHICH THE PERSON NEEDS TO FILE AN FBAR?

A.   YES.

Q.   AND WHAT IS THAT THRESHOLD AGAIN?

A.   IT'S $10,000.

Q.   SO IF YOU GO TO 24-2, IS THIS YOUR CALCULATION OF HIGH
BALANCE FOR MR. DESAI'S HSBC INDIA ACCOUNT FOR 2008?

A.   YES, MA'AM.

Q.   AND ONCE AGAIN, ARE THERE CD'S IN SEVERAL DIFFERENT
CURRENCIES?

A.   THE SAME CURRENCIES, YEAH, THE SAME FOUR.

1   Q.   AND HOW MANY ARE IN U.S. DOLLARS?

2   A.   SIX.

3   Q.   AND SO IF WE SET ASIDE THE EXCHANGE RATE ISSUE FOR JUST A

4   MINUTE AND FOCUS ON THE U.S. DOLLARS, WHAT WOULD BE THE

5   APPROXIMATE HIGH BALANCE IN THE DEFENDANT'S ACCOUNT FOR THAT

6   YEAR?

7   A.   ABOUT 2.7 MILLION.

8   Q.   U.S. DOLLARS?

9   A.   YES.

10  Q.   IN EXCESS OF THE THRESHOLD FOR FILING AN FBAR?

11  A.   YES.

12  Q.   AND IF YOU GO TO 24-3, IS THIS YOUR CALCULATION OF HIGH

13  BALANCES FOR MR. DESAI'S ACCOUNT 3679 FOR 2009?

14  A.   YES.

15  Q.   AND HOW MANY DIFFERENT CURRENCIES ARE THESE CD'S HELD IN?

16  A.   THREE.

17  Q.   AND HOW MANY ARE IN U.S. DOLLARS?

18  A.   TWO.

19  Q.   AND IF YOU IGNORE THE CURRENCY EXCHANGE RATE ISSUE AND

20  FOCUS ON THE U.S. DOLLAR DEPOSITS, WHAT WOULD THE HIGH BALANCE

21  IN THE DEFENDANT'S ACCOUNT BE FOR 2009?

22  A.   AROUND 737,000.

23  Q.   U.S. DOLLARS?

24  A.   YES, MA'AM.

25  Q.   NOW, MR. SCHAINBAUM SHOWED YOU THE FORM SCHEDULE B THAT

1    WERE ATTACHED TO THE DEFENDANT'S 2007, '08, AND '09 TAX

2    RETURNS, DO YOU RECALL THAT?

3    A.   YES.

4    Q.   AND WELL, LET'S TAKE A LOOK AT ONE OF THEM.  GO TO

5    EXHIBIT 1, AND THE FOURTH PAGE OF THAT EXHIBIT WILL BE THE

6    SCHEDULE B.

7    A.   YOU SAID EXHIBIT 1, RIGHT?

8    Q.   YES, PLEASE.

9    A.   OKEY DOKE.

10   Q.   AND MR. SCHAINBAUM HAD YOU READ THAT NOTE THAT TALKS ABOUT

11   IF YOU GET A 1099, HERE'S WHERE YOU REPORT IT, RIGHT?

12   A.   YES.

13   Q.   AND IF A PERSON EARNS, UNDER YOUR UNDERSTANDING OF THE

14   1040 INSTRUCTIONS THAT ARE IN EVIDENCE --

15   A.   UH-HUH.

16   Q.   -- IF A PERSON EARNS INTEREST INCOME, BUT DOESN'T GET A

17   1099, DOES THAT MEAN THAT THEY DON'T HAVE TO REPORT THE INCOME

18   ON THEIR TAX RETURN?

19   A.   ACTUALLY THERE'S A LITTLE BLURB THAT I REMEMBER READING

20   THAT ADDRESSES, YOU KNOW, WHAT IF YOU DON'T GET A 1099?  AND IT

21   SAYS EVEN IF YOU DON'T GET A 1099, YOU STILL HAVE TO REPORT IT.

22   Q.   THE LAST THING I WANT YOU TO LOOK AT, PLEASE, IS

23   EXHIBIT 9, THE FBAR -- ONE OF THE BLANK FBARS.

24   A.   SORRY.  YOUR BOOK IS FALLING APART.

25   Q.   SORRY ABOUT THAT.

REDIRECT OERTEL

1    A.   THAT'S ALL RIGHT.   OKAY.

2    Q.   AND MR. SCHAINBAUM WAS ASKING YOU ABOUT THE EXCEPTIONS FOR

3    FBAR FILING ON PAGE 3, I BELIEVE.

4    A.   YEAH, PAGE 3.

5    Q.   AND CAN YOU READ THE WHOLE LAST PARAGRAPH OF THE

6    EXCEPTIONS?

7    A.   SURE.  "REPORT ANY FINANCIAL ACCOUNT (EXCEPT A MILITARY

8    BANKING FACILITY AS DEFINED IN THESE INSTRUCTIONS) THAT IS

9    LOCATED IN A FOREIGN COUNTRY, EVEN IF IT" HAS -- "EVEN IF IT IS

10   HELD AT AN AFFILIATE OF A UNITED STATES BANK OR OTHER FINANCIAL

11   INSTITUTION.  DO NOT REPORT ANY ACCOUNT MAINTAINED WITH A

12   BRANCH, AGENCY, OR OTHER OFFICE OF A FOREIGN BANK OR OTHER

13   INSTITUTION THAT IS LOCATED IN THE UNITED STATES, GUAM,

14   PUERTO RICO, AND THE VIRGIN ISLANDS."

15   Q.   NOW, IS IT FAIR TO SAY THAT BASED ON THAT INSTRUCTION, IT

16   IS THE LOCATION OF THE ACCOUNT THAT CONTROLS FBAR REPORTING?

17        MR. SCHAINBAUM:  YOUR HONOR, I OBJECT.  THAT

18   REQUIRES A LEGAL CONCLUSION.

19        THE COURT:  SUSTAINED TO THE QUESTION AS ASKED.

20   BY MS. SISKIND:

21   Q.   BASED ON THE EVIDENCE INTRODUCED AT TRIAL, DOES THIS

22   EXCEPTION APPLY TO MR. DESAI?

23        MR. SCHAINBAUM:  YOUR HONOR, THAT'S BASED ON THE

24   ULTIMATE FINDINGS AND THAT'S FOR THE JURY.

25        THE COURT:  I'LL SUSTAIN THE OBJECTION.

1    BY MS. SISKIND:

2    Q.   WHERE DID MS. KATJU SAY THAT MR. DESAI'S BANK ACCOUNT WAS

3    LOCATED?

4    A.   IN INDIA.

5    Q.   AND WHERE DID MS. KUMAR SAY THAT MR. DESAI'S BANK ACCOUNT

6    WAS LOCATED?

7    A.   INDIA.

8           MS. SISKIND:  I HAVE NO FURTHER QUESTIONS, YOUR

9    HONOR.

10          THE COURT:  RECROSS.

11                      **RECROSS-EXAMINATION**

12   BY MR. SCHAINBAUM:

13   Q.   MR. OERTEL --

14   A.   YES.

15   Q.   -- IN YOUR 27 YEARS OF BEING A REVENUE AGENT, HAVE YOU

16   EVER COME ACROSS THE INTERNAL REVENUE CODE THAT HAS PROVISIONS

17   FOR EXCEPTIONS FOR REPORTING TAXABLE INCOME?

18       LET ME PUT IT ANOTHER WAY.  ARE THERE INCOMES THAT ARE

19   EXEMPT?

20   A.   YES, THERE IS SOME INCOME -- SOME TYPES OF INCOME THAT ARE

21   EXEMPT.

22   Q.   HAVE YOU EVER HAD ANY EXPERIENCE WITH U.S. TREATIES WITH

23   OTHER COUNTRIES?

24          MS. SISKIND:  OBJECTION, YOUR HONOR.  BEYOND THE

25   SCOPE OF REDIRECT.

```
 1                THE COURT:  SUSTAINED.

 2                MR. SCHAINBAUM:  NO.  HE ASKED -- SHE ASKED HIM

 3        ABOUT --

 4                MS. SISKIND:  THERE WERE NO QUESTIONS ABOUT

 5        TREATIES.

 6                MR. SCHAINBAUM:  REPORT ALL INCOME, AND THIS IS THE

 7        OTHER SIDE OF REPORTING ALL INCOME.

 8            SURE, SHE DIDN'T ASK HIM ABOUT TREATIES, BUT THE FLIP SIDE

 9        OF REPORTING TAXABLE INCOME IS EXEMPT INCOME.

10                THE COURT:  I'M GOING TO SUSTAIN THE OBJECTION AS

11        YOU PHRASED THE QUESTION, MR. SCHAINBAUM.

12                MR. SCHAINBAUM:  ALL RIGHT.

13        Q.   LET ME REPHRASE BY ASKING ARE YOU FAMILIAR WITH ANY FORMS

14        OF EXEMPT INCOME?

15        A.   YES, THERE ARE SOME FORMS OF EXEMPT INCOME.

16        Q.   AND IS ONE SUCH FORM OF EXEMPT INCOME THE RESULT OF A

17        TREATY BETWEEN THE UNITED STATES AND ANOTHER FOREIGN COUNTRY?

18        A.   I DO NOT KNOW.

19        Q.   HAVE YOU ANY EXPERIENCE WITH TREATIES?

20        A.   I KNOW WE HAVE TREATIES.  I HAVE WORKED CASES WHERE THERE

21        ARE EXCHANGE OF INFORMATION REQUESTS THROUGH TREATIES.  THAT'S

22        ABOUT ALL I KNOW.

23        Q.   HAVE YOU, IN REVIEWING THIS CASE FOR YOUR PRESENTATION,

24        YOUR TESTIMONY HERE, LOOKED AT ANY TREATY BETWEEN THE UNITED

25        STATES AND INDIA?
```

RECROSS OERTEL

```
1              MS. SISKIND:  OBJECTION, YOUR HONOR.  BEYOND THE

2      SCOPE.

3              THE COURT:  I'LL ALLOW IT.  CAN YOU ANSWER?  DID YOU

4      LOOK AT A TREATY?

5              THE WITNESS:  NO.

6              MR. SCHAINBAUM:  NO.  OKAY.

7      Q.   DO YOU KNOW, IN CONSIDERING YOUR CALCULATIONS, WHETHER YOU

8      GAVE ANY CONSIDERATION TO EXEMPT INCOME?

9      A.   THERE -- AS FAR AS I KNOW THERE WAS NO EXEMPT INCOME.  THE

10     INTEREST THAT I CALCULATED AND THAT IS SHOWN IN THE EVIDENCE

11     WAS TAXABLE.

12     Q.   DID YOU GIVE ANY CONSIDERATION TO FOREIGN TAX CREDITS?

13             MS. SISKIND:  OBJECTION, YOUR HONOR.  THAT GOES TO A

14     TAX COMPUTATION.

15             MR. SCHAINBAUM:  WELL, THAT'S WHAT YOU ASKED HIM

16     ABOUT.

17             MS. SISKIND:  YOUR HONOR, HE WAS ASKED ABOUT

18     INTEREST INCOME AND HIGH BALANCE.

19             THE COURT:  I UNDERSTAND.  I UNDERSTAND.

20         YOU CAN ANSWER THE QUESTION.  DID YOU DO ANY CALCULATION?

21             THE WITNESS:  FOR A FOREIGN TAX CREDIT?

22     BY MR. SCHAINBAUM:

23     Q.   CORRECT.

24     A.   NO, I DID NOT.

25     Q.   DID YOU KNOW THAT THERE WAS A FOREIGN TAX CREDIT?
```

1    A.   I KNOW THAT THERE WAS SUCH A THING AS A FOREIGN TAX

2    CREDIT.

3    Q.   NO.  MY QUESTION IS, DID YOU KNOW THAT THERE WAS A FOREIGN

4    TAX CREDIT IN THIS CASE?

5             MS. SISKIND:  OBJECTION, YOUR HONOR.

6             THE COURT:  SUSTAINED.

7    BY MR. SCHAINBAUM:

8    Q.   SO WHAT FACTORS DID YOU CONSIDER IN YOUR COMPUTATION?

9    A.   I THINK I HAVE GONE OVER THAT A LOT OF TIMES.  I

10   CALCULATE -- I MEAN, THE INTEREST CALCULATIONS OR --

11   Q.   WELL, IN DETERMINING THE TAXABLE INCOME, DID YOU COME UP

12   WITH ANY CREDITS OF ANY KIND?

13   A.   NO, THAT'S -- THAT WASN'T AT ISSUE HERE.

14   Q.   EXCUSE ME?  THAT WASN'T AT ISSUE?

15   A.   NO.  I MEAN, THE -- IT WASN'T BROUGHT UP.

16   Q.   BY WHOM?

17   A.   I DON'T THINK EITHER OF YOU BROUGHT IT UP.

18   Q.   WELL, I DIDN'T PRESENT THE CASE.  WHEN YOU SAY BROUGHT UP,

19   WAS IT NOT BROUGHT UP BY THE GOVERNMENT?  DON'T LOOK OVER

20   THERE.

21             MS. SISKIND:  OBJECTION, YOUR HONOR.  WE'RE GETTING

22   INTO A SUBJECT --

23             THE COURT:  SUSTAINED, MR. SCHAINBAUM.

24             MR. SCHAINBAUM:  ALL RIGHT.

25             THE COURT:  YOU CAN MOVE ON.

1           MR. SCHAINBAUM:  IT'S JUST THAT THE WITNESS KEEPS

2    LOOKING OVER FOR SOME KIND OF CLUE.

3           THE COURT:  YOU CAN ASK YOUR QUESTION.

4    BY MR. SCHAINBAUM:

5    Q.   ALL RIGHT.  DO YOU HAVE EXHIBIT 23-1 BEFORE YOU?

6    A.   YES.

7    Q.   FOR 2008 DO YOU SEE ACCOUNT NUMBERS 256 AND 258?

8    A.   YES.

9    Q.   AND WHAT IS THE CURRENCY THAT IS CLAIMED ON THOSE

10   ACCOUNTS?

11   A.   THAT'S GREAT BRITAIN POUNDS AND EUROS.

12   Q.   ALSO.  CAN YOU JUST KEEP THAT PLACE AND GO TO EXHIBIT 137.

13           MS. SISKIND:  YOUR HONOR, THIS IS BEYOND THE SCOPE

14   OF REDIRECT.  WE DIDN'T GO OVER THESE PARTICULAR CD'S ON

15   REDIRECT.

16           MR. SCHAINBAUM:  WE DID GO OVER THE CALCULATION OF

17   THE NUMBERS, AND MAYBE NOT THESE EXACT CD'S, BUT THEY WERE

18   WITHIN THOSE NUMBERS.

19           MS. SISKIND:  YOUR HONOR, WE WENT OVER THE HIGH

20   BALANCE NUMBERS, BUT NOT THE INTEREST INCOME CALCULATION.

21           THE COURT:  MR. SCHAINBAUM, HOW FAR ARE YOU GOING

22   WITH THIS?

23           MR. SCHAINBAUM:  NOT FAR.

24           THE COURT:  THAT'S RIGHT.

25        YOU CAN ANSWER THE QUESTION.

```
 1                 MR. SCHAINBAUM:  THANK YOU.

 2                 THE WITNESS:  WHAT IS THE QUESTION?

 3      BY MR. SCHAINBAUM:

 4      Q.   THE QUESTION IS, DO YOU HAVE EXHIBIT 137 BEFORE YOU?

 5      A.   YES.

 6      Q.   DO YOU SEE ACCOUNTS NUMBERED 256 AND 258?

 7      A.   IN WHICH YEAR?

 8      Q.   2008.

 9      A.   2008 YES.

10      Q.   AND WHAT IS THE CURRENCY DENOMINATION FOR THOSE TWO

11      ACCOUNTS?

12      A.   IT SHOWS U.S.D., BUT I REMEMBER IN MY DIRECT EXAMINATION

13      THAT I THINK WE HAD ADDRESSED THAT, THAT I HAD NOTICED THAT

14      THERE WAS A DISCREPANCY THERE ALSO.

15           SO I ACCOUNTED FOR IT.

16      Q.   HOW DID YOU ACCOUNT FOR IT?

17      A.   BY USING THE CORRECT --

18      Q.   THE CORRECT?

19      A.   BY USING THE CORRECT CURRENCY.

20      Q.   AND WHICH CURRENCY WAS CORRECT?

21      A.   I BELIEVE IF I USED BRITISH POUNDS IN EUROS I WOULD HAVE

22      TO SAY THAT THAT'S THE CORRECT ONE.

23      Q.   AND WOULD THAT BE BASED ON COMMON SENSE?

24                 MS. SISKIND:  OBJECTION, YOUR HONOR.

25                 THE COURT:  SUSTAINED.
```

1          MR. SCHAINBAUM:  I HAVE NO FURTHER QUESTIONS.

2          THE COURT:  ANYTHING FURTHER?

3          MS. SISKIND:  NOTHING FURTHER.

4          THE COURT:  MAY THE WITNESS BE EXCUSED,

5     MR. SCHAINBAUM?

6          MR. SCHAINBAUM:  YES.

7          THE COURT:  THANK YOU, SIR.  YOU MAY STAND DOWN.

8          THE WITNESS:  THANK YOU.  YOUR HONOR, I DO HAVE A

9     QUESTION.  I'M A SUMMARY WITNESS AND MY TESTIMONY IS DONE.

10         WILL I BE ALLOWED TO STAY IN THE --

11         THE COURT:  YOU'VE BEEN EXCUSED.

12         MR. SCHAINBAUM:  YES.

13         THE COURT:  BOTH PARTIES HAVE EXCUSED YOU.

14         THE WITNESS:  THANK YOU.  I WANTED TO BE SURE.

15         MS. SISKIND:  YOUR HONOR, I THINK WE HAVE A

16    HOUSEKEEPING MATTER TO ATTEND TO WITH MS. GARCIA TO MAKE SURE

17    ALL OF THE EXHIBITS THAT WE BELIEVE ARE IN EVIDENCE ACTUALLY

18    ACCORDING TO THE COURT'S RECORDS ARE IN EVIDENCE.

19         THE COURT:  ALL RIGHT.

20         MR. SCHAINBAUM:  AND I HAVE A HOUSEKEEPING MATTER.

21    COULD I HAVE A SIDE-BAR?

22         THE COURT:  YES.  DO WE NEED TO HAVE THE SIDE-BAR

23    BEFORE -- I WANTED TO ASK MS. SISKIND WHETHER OR NOT THE

24    GOVERNMENT RESTS CONTINGENT ON ALL OF THE EXHIBITS OFFERED AND

25    RECEIVED OR ACTUALLY RECEIVED INTO EVIDENCE.

1          MS. SISKIND:  SUBJECT TO THAT VERIFICATION, YOUR

2    HONOR, THE UNITED STATES RESTS.

3          THE COURT:  ALL RIGHT.  THANK YOU.  LET'S HAVE A

4    SIDE-BAR.  THANK YOU.

5      (SIDE-BAR CONFERENCE ON THE RECORD.)

6          THE COURT:  WE'RE AT SIDE-BAR.

7          MR. SCHAINBAUM:  I HAVE A HOUSEKEEPING PROBLEM.

8      I DON'T LIKE TO DO THIS, BUT THE PROBLEM IS I HAVE AN

9    ATTORNEY HERE WITH HIS WITNESS AND THE WITNESS WILL NOT BE

10   AVAILABLE NEXT WEEK.  IT'S A SHORT WITNESS.  IT CAN'T BE MORE

11   THAN A HALF HOUR.

12         THE COURT:  AND YOU WANT TO PUT HIM ON?

13         MR. SCHAINBAUM:  YEAH.  BUT I REALLY -- BUT I WANT

14   TO PROTECT MY RIGHTS UNDER RULE 29.

15         THE COURT:  SURE.  OKAY.

16         MR. SCHAINBAUM:  AND A HOUSEKEEPING MATTER, SINCE HE

17   CANNOT COME BACK, HE WOULD COME BACK, BUT IT'S NOT A PRACTICAL

18   POSSIBILITY AT THIS TIME.

19         THE COURT:  SO YOU CAN MAKE YOUR RULE 29 MOTION AT

20   THE CONCLUSION OF THE GOVERNMENT'S CASE OR AT THE CONCLUSION OF

21   THE ENTIRE CASE.

22         MR. SCHAINBAUM:  OH, I'M GOING TO DO THAT THEN AS

23   WELL AS NOW.

24         THE COURT:  BOTH.

25         MR. SCHAINBAUM:  I'M DOING IT NOW, BUT I'M GOING TO

```
 1         FILL IN THE BLANKS UNDER RULE 29.

 2              THE COURT:  BUT YOU'D LIKE TO -- PRIOR TO MAKING

 3         YOUR RULE 29, YOU'D LIKE TO PUT THIS WITNESS UP?  IS THAT WHAT

 4         YOU'RE SAYING?

 5              MR. SCHAINBAUM:  NO.  I WANT TO PUT THE RULE 29 AND

 6         THEN FILL IN THE BLANKS, BUT THIS WITNESS -- TAKE HIM OUT OF

 7         TURN IN SHORT.

 8              THE COURT:  EXCUSE ME.  SO YOU WANT TO TAKE A BREAK

 9         AND MAKE YOUR RULE 29 MOTION AND THEN PUT THE WITNESS ON?

10              MR. SCHAINBAUM:  RIGHT.  CORRECT.

11              THE COURT:  WELL, I DON'T KNOW HOW MUCH TIME YOU

12         HAVE.

13              MR. SCHAINBAUM:  YOU CAN TAKE IT UNDER ADVISEMENT.

14              THE COURT:  OF COURSE, OF COURSE.  WELL, WE'LL SEE

15         HOW MUCH TIME WE HAVE FOR THIS WITNESS.  IF YOU DON'T FINISH

16         HIM, I'LL HAVE TO ORDER HIM BACK MONDAY.

17              MR. SCHAINBAUM:  WELL, YOU'RE THE JUDGE AND I'M JUST

18         A MERE ATTORNEY.

19              MS. SISKIND:  WELL, I DON'T KNOW.  I MEAN, GIVEN THE

20         PREVIOUS ARGUMENTS WE'VE HAD IN THIS COURTROOM, I IMAGINE IT'S

21         GOING TO BE QUITE A LENGTHY RULE 29 ARGUMENT.

22              MR. SCHAINBAUM:  WE CAN DEFER THE ARGUMENT FOR THE

23         WITNESS.  I CAN MAKE THE RULE 29 AND THEN ARGUE LATER.

24              MS. SISKIND:  I THINK RULE 29 SHOULD BE RULED UPON

25         AT THE CONCLUSION OF THE GOVERNMENT'S CASE.
```

```
 1                   THE COURT:  WELL, THE COURT --

 2                   MS. SISKIND:  WE SHOULD JUST ARGUE IT.

 3                   MR. SCHAINBAUM:  I AGREE.  UNDER THE CIRCUMSTANCES,

 4      IT'S A PRACTICAL PROBLEM.  HE'S A WITNESS WHO FLEW UP TODAY AND

 5      WE TOLD HIM IT WOULD BE LATE IN THE AFTERNOON AND HIS LAWYER

 6      ADVISED ME, AND I KNEW THIS AHEAD OF TIME, THAT HE WASN'T GOING

 7      TO BE AVAILABLE NEXT WEEK.

 8          SO THAT'S THE PRACTICAL PROBLEM.  I'M NOT GIVING UP ANY

 9      RIGHTS.

10                   THE COURT:  SO LET'S DO THE RULE 29 MOTION AND THEN

11      I MAY HAVE TO ORDER HIM BACK MONDAY.

12                   MS. SISKIND:  WE CAN ALSO, I MEAN, TAKE THIS WITNESS

13      OUT OF TURN NEXT WEEK.

14                   THE COURT:  HE'S NOT AVAILABLE?  IS HE AVAILABLE AT

15      ALL NEXT WEEK?

16                   MS. SISKIND:  HE TOLD ME HE'S AVAILABLE PART OF NEXT

17      WEEK.

18                   MR. SCHAINBAUM:  HE DID?

19                   MS. SISKIND:  YES.

20                   MR. SCHAINBAUM:  THEY KNOW MORE THAN I DO.

21                   THE COURT:  WELL, WHY DON'T YOU CHECK WITH HIM AND

22      SEE WHAT HIS AVAILABILITY IS?

23                   MR. SCHAINBAUM:  I MEAN, I WOULD -- IF I HAD, YOU

24      KNOW, MY DRUTHERS HERE IS TO HAVE THE ENTIRE RULE 29 ARGUED AND

25      THEN CALL THE WITNESS, AND THE ONLY REASON I'M UP HERE IS
```

```
1       AGAINST MY OWN WAY OF DOING THINGS IS TO ACCOMMODATE THE

2       WITNESS.

3                   THE COURT:  I UNDERSTAND.

4                   MR. SCHAINBAUM:  I MEAN, BECAUSE TECHNICALLY I'LL

5       JUST MAKE THE RULE 29, PROTECT THE RECORD, AND I CAN DEFER THE

6       ARGUMENT AND YOU CAN TAKE IT UNDER ADVISEMENT, OR WE CAN DO THE

7       WHOLE NINE YARDS ON RULE 29.

8                   THE COURT:  WELL, WE CAN EMBARK ON THE RULE 29

9       MOTION.  I DON'T KNOW HOW LONG THAT'S GOING TO TAKE.  IT'S NOW

10      20 MINUTES AFTER 4:00.  I DON'T KNOW HOW LONG YOU'RE GOING TO

11      TAKE ON THAT.  I'LL GIVE YOU AS MUCH TIME AS YOU WANT ON THAT,

12      OF COURSE.

13                  MR. SCHAINBAUM:  THANK YOU VERY MUCH.

14                  THE COURT:  BUT THEN WE RUN INTO WITNESS TIMES.

15                  MR. SCHAINBAUM:  WELL, LET ME GO TALK BECAUSE

16      MS. SISKIND HAS MORE POWER.

17                  MS. SISKIND:  I HAVE NO MORE POWER.  I THOUGHT HE

18      SAID HE WAS UNAVAILABLE MONDAY, TUESDAY, AND WEDNESDAY.  I MAY

19      BE MISTAKEN.

20                  THE COURT:  DO YOU WANT TO TALK TO HIM AND TELL HIM

21      WHAT'S COMING?

22                  MR. SCHAINBAUM:  I DO.

23                  THE COURT:  WHY DON'T YOU GO OVER AND ASK HIM AND

24      I'LL WAIT FOR YOUR ANSWER HERE.

25                  (PAUSE IN PROCEEDINGS.)
```

1          MR. SCHAINBAUM:  ONE OF THE CLASSIC JOYS OF

2     LITIGATING.  HE CAN'T GET BACK HERE UNTIL MAYBE THURSDAY

3     AFTERNOON.

4          THE BEST SOLUTION, WHICH IS NOT A GREAT SOLUTION, IS TO DO

5     IT NOW, TO MAKE THE RULE 29 MOTION, DEFER ARGUMENT, AND THEN

6     TAKE IT UNDER SUBMISSION AND LET US PUT HIM ON AS A SHORT

7     WITNESS.

8               THE COURT:  DEFINE "SHORT."  WHAT DOES THAT MEAN?

9               MR. SCHAINBAUM:  IT CAN'T BE MORE THAN A HALF HOUR.

10              THE COURT:  THAT'S FOR DIRECT?

11              MR. SCHAINBAUM:  NO.

12              THE COURT:  THAT'S COMPLETE AND EVERYTHING?

13              MR. SCHAINBAUM:  YEAH.  I MEAN, MAYBE 15 MINUTES.

14              THE COURT:  WELL, I WILL WANT TO PROTECT YOUR RULE

15    29 MOTION AND I'M HAPPY TO DO THAT.  WE CAN HAVE THE JURY STEP

16    OUT AND YOU CAN MAKE SOME OPENING STATEMENTS AND YOU CAN HAVE

17    SOME COMMENTS ON IT AND WE'LL PROTECT IT FOR THE RECORD AND SEE

18    WHAT WE CAN DO WITH THE WITNESS.

19         WHAT IS THE OFFER OF PROOF OF THIS WITNESS?

20              MR. SCHAINBAUM:  THE OFFER OF PROOF IS THAT HE WAS

21    PRESENT AT A MEETING IN NEWPORT BEACH AND TWO HSBC BANKERS

22    SAID, PUT YOUR DEPOSITS IN HSBC INDIA, THERE'S NO TAX

23    CONSEQUENCES IN THE U.S., THERE'S A HIGH INTEREST RATE AND

24    THERE'S NO 1099'S ISSUED.

25         AND, IN FACT, THAT'S WHAT HAPPENED.  IF YOU RECALL,

1    VANDANA KATJU AND AARTI KUMAR, WHEN I ASKED QUESTIONS ALL OVER

2    THE PLACE, THEY KEPT DENYING.

3            THE COURT:  THEY DENY THEY SAID THAT.

4            MR. SCHAINBAUM:  THEY DENIED, RIGHT.  SO THERE WAS A

5    MAN AND A WOMAN.

6            MS. SISKIND:  BASED ON THE OFFER OF PROOF, AT THIS

7    TIME WE DON'T HAVE AN OBJECTION TO THE WITNESS BEING CALLED.

8            MR. SCHAINBAUM:  OKAY.  THANK YOU.

9            THE COURT:  OKAY.  WELL, LET'S DO THIS REAL QUICK

10   AND WE'LL GET OUR JURY OUT OF HERE AT 5:00 O'CLOCK.  I ALWAYS

11   PROMISE THEN BEFORE 5:00.

12           MR. SCHAINBAUM:  I'LL DO IT.

13           THE COURT:  THANK YOU.  I'LL ASK THEM TO STEP OUT.

14       (END OF DISCUSSION AT SIDE-BAR.)

15           THE COURT:  LADIES AND GENTLEMEN, THE GOVERNMENT HAS

16   NOW RESTED, WHICH MEANS THAT THEY HAVE FINISHED THEIR CASE.

17       WHAT I'M GOING TO DO IS TO -- I NEED TO TAKE ABOUT

18   TEN MINUTES WITH THESE LAWYERS OUTSIDE OF YOUR PRESENCE, BUT

19   I'M NOT GOING TO RELEASE YOU YET TODAY.

20       I EXPECT -- MY THOUGHT IS, AFTER TALKING WITH THE LAWYERS,

21   IS THAT WE MAY BE ABLE TO PRESENT SOME DEFENSE EVIDENCE, AT

22   LEAST GET ONE WITNESS FINISHED TODAY, AND I THINK WE CAN

23   COMPLETE THAT BEFORE 5:00 O'CLOCK.

24       SO LET ME ASK YOU TO -- IF YOU WOULD, I'LL EXCUSE YOU FOR

25   JUST A MOMENT.  IF YOU COULD PLEASE GO TO THE JURY ROOM AND

```
 1        WE'LL CALL YOU BACK.  JUST A MOMENT.  THANK YOU.

 2            (JURY OUT AT 4:25 P.M.).

 3                THE COURT:  ALL RIGHT.  THE RECORD SHOULD REFLECT

 4     THAT THE JURY HAS LEFT THE COURTROOM.  THE GOVERNMENT HAS

 5     RESTED.

 6        MR. SCHAINBAUM.

 7                MR. SCHAINBAUM:  YOUR HONOR, ON BEHALF OF THE

 8     DEFENDANT WE MAKE A MOTION UNDER FEDERAL RULES OF CRIMINAL

 9     PROCEDURE RULE 29.

10                THE COURT:  ALL RIGHT.  AND YOU'RE ASKING FOR?

11                MR. SCHAINBAUM:  I WOULD ASK THAT WE DEFER THE

12     ARGUMENT BECAUSE OF THE HOUSEKEEPING PROBLEM THAT WE NEED TO

13     HAVE A WITNESS, AND THAT WE WOULD ALSO RESPECTFULLY REQUEST

14     THAT THE COURT TAKE THE MOTION UNDER ADVISEMENT AFTER BOTH

15     COUNSEL HAVE THE TIME TO ARGUE THE MOTION.

16                THE COURT:  ALL RIGHT.  MS. SISKIND.

17                MS. SISKIND:  YOUR HONOR, CERTAINLY WE OPPOSE THE

18     MOTION AND WE'LL ARGUE AT THE APPROPRIATE TIME.

19                THE COURT:  ALL RIGHT.  THANK YOU.

20        AS I UNDERSTAND IT, JUST FOR THE RECORD, MR. SCHAINBAUM,

21     YOU HAVE A WITNESS YOU WOULD LIKE TO CALL --

22                MR. SCHAINBAUM:  CORRECT.

23                THE COURT:  -- IN YOUR CASE IN CHIEF.  THAT WITNESS

24     IS HERE AND THAT WITNESS, APPARENTLY, HAS FLOWN A GREAT

25     DISTANCE AND IS UNAVAILABLE, UNAVAILABLE UNTIL LATE NEXT WEEK.
```

1          MR. SCHAINBAUM:  THAT'S CORRECT, YOUR HONOR.

2          THE COURT:  AND YOU'D LIKE -- IT'S NOW 4:25 ON

3    FRIDAY AFTERNOON.  YOU HAVE INDICATED THAT YOU WOULD LIKE TO

4    CALL THIS WITNESS FOR THE WITNESS'S CONVENIENCE TO AT LEAST GET

5    THIS TESTIMONY ON.

6          YOU HAVE TOLD ME AT SIDE-BAR THIS IS A SHORT WITNESS, A

7    BRIEF WITNESS.

8          MR. SCHAINBAUM:  THAT'S CORRECT, YOUR HONOR.

9          THE COURT:  AND BY CALLING THE WITNESS, YOU'RE

10   PRESERVING YOUR RULE 29 MOTION AND NOT INDICATING THAT YOU

11   ACQUIESCE OR WITHDRAW THAT MOTION IN ANY MANNER.

12         MR. SCHAINBAUM:  THAT'S RIGHT, YOUR HONOR.  WE DO

13   NOT IN ANY RESPECT, IN ANY MANNER WAIVE OUR RIGHTS UNDER THE

14   RULE 29 MOTION.  THIS IS SIMPLY A HOUSEKEEPING ACCOMMODATION

15   FOR WHICH THE DEFENDANT IS GRATEFUL FOR YOUR COURTESY, YOUR

16   HONOR, AND THE COURTESY OF THE GOVERNMENT.

17         THE COURT:  ALL RIGHT.  THANK YOU.  SO YOUR RULE 29

18   MOTION, IT SHOULD BE NOTED THAT YOU HAVE MADE YOUR MOTION AT

19   THE CONCLUSION OF THE GOVERNMENT'S CASE, AND I WILL PERMIT YOU

20   TO PROVIDE ADDITIONAL ARGUMENT FOR THAT MOTION AT ANOTHER TIME.

21         WE WILL TAKE THIS WITNESS, I SUPPOSE, TECHNICALLY OUT OF

22   ORDER IN THE CONTEXT OF YOUR RULE 29 MOTION, BUT WE'LL ALLOW

23   THAT TESTIMONY TO BE RECEIVED NOW AT THIS TIME.

24         MR. SCHAINBAUM:  OKAY.

25         MS. SISKIND:  AND, YOUR HONOR, COULD I JUST CLARIFY

1      FOR THE RECORD, IN THE EVENT WHEN WE GO OVER THE EXHIBITS THERE

2      IS SOMETHING THAT IS MISSING, WILL WE BE PERMITTED TO REOPEN

3      AND ADD THAT?

4                 THE COURT:  YES.

5                 MS. SISKIND:  THANK YOU, YOUR HONOR.

6                 MR. SCHAINBAUM:  I WOULD SAY THAT I AGREE WITH THAT

7      BECAUSE I THINK -- I'M UNCLEAR AS TO THE STATE OF CALIFORNIA

8      EXHIBITS WHERE THEY WERE CERTIFIED AND THE COURT QUASHED THE

9      APPEARANCE OF THE PERSON.

10                THE COURT:  WE'LL REVIEW ALL OF THOSE EXHIBITS AT

11     THE APPROPRIATE TIME.

12                MR. SCHAINBAUM:  ALL RIGHT.  THANK YOU, YOUR HONOR.

13     COULD WE HAVE A FEW MINUTE BREAK?  I WANT TO --

14                THE COURT:  WE CAN HAVE ABOUT A THREE-MINUTE BREAK.

15                MR. SCHAINBAUM:  THANK YOU.

16          (RECESS FROM 4:28 P.M. UNTIL 4:32 P.M.)

17          (JURY IN AT 4:32 P.M.)

18                THE COURT:  ALL RIGHT.  WE'RE BACK ON THE RECORD IN

19     THE DESAI MATTER.  COUNSEL IS PRESENT.  MS. SISKIND IS NOT

20     PRESENT, BUT I'M TOLD SHE WILL JOIN US IN JUST A MOMENT.

21          MR. KENNEDY, CAN WE PROCEED?

22                MR. KENNEDY:  WE CAN, YOUR HONOR.  I SPOKE TO

23     MS. SISKIND AND SHE'LL BE BACK IN A MINUTE.

24                THE COURT:  DOES THE DEFENSE WISH TO PROCEED?

25                MR. SCHAINBAUM:  YES.  WE'LL CALL ANKIL LALU.  I

1    APOLOGIZE IF I MISPRONOUNCED IT.

2            THE COURT:  OKAY.  MR. LALU, IF YOU WOULD COME

3    FORWARD, PLEASE.  IF YOU CAN STAND AND FACE OUR COURTROOM

4    DEPUTY HERE WHILE YOU RAISE YOUR RIGHT HAND.  SHE HAS A

5    QUESTION FOR YOU.

6        (DEFENDANT'S WITNESS, ANKIL LALU, WAS SWORN.)

7            THE WITNESS:  YELL.

8            THE COURT:  LET ME INVITE YOU TO HAVE A SEAT HERE,

9    SIR.  PLEASE MAKE YOURSELF COMFORTABLE.  FEEL FREE TO ADJUST

10   THE CHAIR AND THE MICROPHONE AS YOU NEED, AND I'LL ENCOURAGE

11   YOU TO SPEAK DIRECTLY INTO THAT MICROPHONE AS YOU CAN.

12       WHEN YOU'RE COMFORTABLE, WOULD YOU PLEASE STATE YOUR NAME

13   AND SPELL IT, PLEASE.

14           THE WITNESS:  SURE.  MY NAME IS ANKIL LALU, FIRST

15   NAME A-N-K-I-L, LAST NAME L-A-L-U.

16           THE COURT:  COUNSEL.

17                       **DIRECT EXAMINATION**

18   BY MR. SCHAINBAUM:

19   Q.   CAN YOU STATE FOR THE RECORD WHERE YOU RESIDE?

20   A.   TUSCAN, CALIFORNIA.

21   Q.   AND CAN YOU STATE FOR THE RECORD WHAT YOUR PROFESSIONAL OR

22   BUSINESS OCCUPATION IS?

23   A.   REAL ESTATE.

24   Q.   AND ARE YOU IN THE REAL ESTATE BUSINESS WITH ANY RELATIVE?

25   A.   IT'S A FAMILY BUSINESS.

1    Q.   AND WHO IS IN THE FAMILY BUSINESS?

2    A.   MYSELF, MY SISTER, AND MY FATHER.

3    Q.   AND DID THERE COME AN OCCASION WHEN YOU WERE PRESENT AND

4    REPRESENTATIVES OF HSBC BANK VISITED YOUR REAL ESTATE OFFICE?

5    A.   YES.

6    Q.   AND WHEN WAS THAT?

7    A.   I CAN'T REMEMBER THE EXACT DATE, BUT IT WAS EITHER LATE

8    SOMETIME IN 2006 OR LATE INTO 2007.

9    Q.   AND DO YOU RECALL WHAT THE PURPOSE WAS FOR THE VISIT BY

10   THE HSBC BANKERS?

11   A.   YEAH.  TO MY RECOLLECTION, I THINK THEY WERE OPENING UP A

12   BRANCH SOMEWHERE IN CALIFORNIA AND I THINK THEY WERE JUST OUT

13   LOOKING FOR BUSINESS.

14   Q.   AND WHEN YOU SAY "OUT LOOKING FOR BUSINESS," CAN YOU BE

15   MORE PRECISE AS TO WHAT THE SUBJECT OF THE MEETING WAS?

16   A.   YEAH, COLLECTING DEPOSITS FROM NONRESIDENT INDIANS.

17   Q.   EXCUSE ME.

18   A.   COLLECTING DEPOSITS FROM NONRESIDENT INDIANS.

19   Q.   AND ARE YOU AND YOUR FATHER NONRESIDENT INDIANS?

20   A.   YES.

21   Q.   AND WERE YOU PRESENT AT THIS MEETING?

22   A.   YES.

23   Q.   AND CAN YOU DESCRIBE THE IDENTITY OF THE HSBC BANKERS?

24   A.   THEIR NAMES?

25   Q.   YES.

DIRECT LALU

```
1    A.   YES.  IT WAS MAYUR PATNI, VANDANA KATJU, AND CHAITALI

2    KHABY.

3              THE COURT:  CAN YOU SPELL THE LAST INDIVIDUAL,

4    PLEASE.

5              THE WITNESS:  I'M GOING TO TRY.  I'M NOT SURE IF I

6    CAN.

7              THE COURT:  THANK YOU.

8              THE WITNESS:  I'M NOT SURE IF THIS IS ACCURATE, BUT

9    K-H-A-B-Y.  SOMETHING LIKE THAT.  I DON'T KNOW IF THAT'S

10   ACCURATE.

11             THE COURT:  AND THE LAST NAME, DO YOU KNOW?

12             THE WITNESS:  THAT WAS THE LAST NAME.  DO YOU NEED

13   THE FIRST NAME?

14             THE COURT:  PLEASE.

15             THE WITNESS:  C-H-A-I-T-A-L-I.

16             THE COURT:  THANK YOU.

17   BY MR. SCHAINBAUM:

18   Q.   AND WHAT WAS THE SUBJECT OF THE MEETING?  YOU INDICATED

19   THAT THE OVERALL SUBJECT WAS TO COLLECT DEPOSITS?

20   A.   RIGHT.

21   Q.   AND DID THEY MAKE ANY STATEMENTS REGARDING HOW THEY WERE

22   GOING TO COLLECT THE DEPOSITS?

23   A.   RIGHT.  SO THEY MENTIONED -- AT LEAST THE THEME WAS THAT

24   THERE WAS A TAX TREATY BETWEEN THE U.S. AND INDIA WHEREIN ANY

25   DEPOSITS IN INDIA, THE INTEREST EARNED THERE IS NOT TAXABLE IN
```

```
 1     THE UNITED STATES UNTIL THOSE FUNDS ARE BROUGHT BACK TO THE

 2     UNITED STATES.

 3     Q.   DID THEY REFER TO TAXES BEING WITHHELD AT THE SOURCE?

 4     A.   I DON'T REMEMBER.

 5     Q.   AND DID THEY REFER TO WHETHER OR NOT HSBC BANK WOULD BE

 6     ISSUING 1099'S?

 7     A.   I DON'T REMEMBER.

 8     Q.   SO WHAT YOU REMEMBER IS THAT THEY SAID IF YOU PUT U.S.

 9     DOLLAR DEPOSITS IN INDIA, THERE WAS NO TAX CONSEQUENCES IN THE

10     U.S.?

11     A.   ON THE INTEREST COMPONENT, ON THE INTEREST INCOME.

12     Q.   AND WAS THERE ANYTHING ELSE SAID?

13     A.   NO.   THAT WAS WHAT I REMEMBER.

14     Q.   OKAY.   AND, AGAIN, WHO DID YOU SAY WAS PRESENT?

15     A.   IT WAS MAYUR PATNI, VANDANA KATJU, CHAITALI KHABY.

16     Q.   AND YOU WERE THERE?

17     A.   I WAS THERE.

18     Q.   AND WHO ELSE WAS THERE?

19     A.   MY FATHER.

20          MR. SCHAINBAUM:   OKAY.   I HAVE NO FURTHER QUESTIONS.

21          THE COURT:   ANY CROSS-EXAMINATION?

22          MR. KENNEDY:   BRIEFLY, IF I MAY, YOUR HONOR.

23          THE COURT:   YES.

24                     CROSS-EXAMINATION

25     BY MR. KENNEDY:
```

1     Q.   GOOD AFTERNOON, MR. LALU.  IS IT FAIR TO SAY, IF THIS WAS

2     2006 OR 2007, WE'RE TALKING SIX OR SEVEN YEARS AGO?

3     A.   RIGHT.

4     Q.   AND IS THAT A REASON WHY YOU CAN'T REMEMBER A LOT OF THIS

5     CONVERSATION?

6     A.   WELL, THE DETAILS I COULDN'T.

7     Q.   A LOT OF TIME HAS PASSED?

8     A.   SURE.

9     Q.   AND IS IT FAIR TO SAY THAT YOU WERE ABOUT 26 AT THE TIME

10    OF THAT CONVERSATION?

11    A.   YEAH.  I'M 32 RIGHT NOW, SO, YOU KNOW.

12    Q.   AND TELL THE MEMBERS OF THE JURY AGAIN WHERE THE -- WHAT

13    TOWN, WHAT PHYSICAL PLACE THIS TOOK PLACE IN.

14    A.   IRVINE, CALIFORNIA.

15    Q.   AND CAN YOU TELL THE MEMBERS OF THE JURY WHEN THESE

16    BANKERS WERE THERE TO DISCUSS A BANK ACCOUNT, IT WAS YOUR

17    FATHER'S ACCOUNT AND NOT YOURS, RIGHT?

18    A.   MY FATHER'S ACCOUNT.

19    Q.   AND YOU JUST HAPPENED TO BE PRESENT AT THIS MEETING?

20    A.   YES.

21    Q.   AND WHEN YOU WERE TESTIFYING ON DIRECT, YOU -- AND CORRECT

22    ME IF I'M WRONG, I THINK YOU USED THE WORD, AND I WROTE IT DOWN

23    "THEY" MENTIONED THERE WAS A TAX TREATY AND SO ON AND SO FORTH.

24    YOU DIDN'T IDENTIFY WHO STATED THIS.

25    A.   YEAH, IT WAS -- I DON'T REMEMBER IF THERE WAS SPECIFICALLY

1    ONE PERSON THAT MENTIONED THE TAX TREATY, BUT I USED "THEY"

2    BECAUSE COLLECTIVELY THOSE THREE WERE THERE AT THE MEETING SO I

3    JUST CLUMPED THEM TOGETHER.

4    Q.   SO YOU JUST DON'T RECALL --

5    A.   WHO EXACTLY SAID IT.

6    Q.   YEAH?

7    A.   YES.

8    Q.   AND DO YOU REMEMBER WHAT TIME OF YEAR IT WAS?  WHAT MONTH?

9    A.   LATE 2006, '07 IS THE BEST OF MY KNOWLEDGE.

10   Q.   AND DID THEY SAY ANYTHING TO YOU ABOUT THE EFFECT THAT YOU

11   DON'T HAVE TO REPORT A FOREIGN BANK ACCOUNT ON YOUR INCOME TAX

12   RETURN?

13   A.   NOT THAT I RECALL.

14   Q.   DID THEY SAY ANYTHING TO YOU ABOUT NOT HAVING TO REPORT A

15   FOREIGN BANK ACCOUNT ON A BOX AT THE BOTTOM OF A SCHEDULE B?

16   A.   NOT THAT I RECALL.

17   Q.   YOU'RE TESTIFYING HERE TODAY AND YOU'RE AWARE, CORRECT,

18   THAT YOUR FATHER IS ACTUALLY UNDER A CRIMINAL INVESTIGATION FOR

19   FAILING TO FILE FOREIGN BANK ACCOUNT INFORMATION WITH THE U.S.

20   GOVERNMENT?

21   A.   YES.

22   Q.   AND YOU OBVIOUSLY KNOW ABOUT THAT AS YOU SIT HERE TODAY,

23   RIGHT?

24   A.   YES.

25           MR. KENNEDY:  I DON'T HAVE ANY FURTHER QUESTIONS.

```
 1                    MR. SCHAINBAUM:  NO.  THANK YOU.

 2                    THE COURT:  AND MAY THIS WITNESS BE EXCUSED?

 3                    MR. SCHAINBAUM:  YES.

 4                    MS. SISKIND:  YES, YOUR HONOR.

 5                    THE COURT:  THANK YOU, SIR.  YOU'RE EXCUSED.  THANK

 6         YOU.

 7              DOES THE DEFENSE HAVE ANY OTHER WITNESSES TO OFFER TODAY?

 8                    MR. SCHAINBAUM:  NO.

 9                    THE COURT:  ALL RIGHT.  THIS WOULD BE A GOOD TIME TO

10         TAKE OUR WEEKEND RECESS THEN, COUNSEL?

11                    MS. SISKIND:  YES, YOUR HONOR.

12                    MR. SCHAINBAUM:  YES.

13                    THE COURT:  LET'S DO THAT.  WE'LL TAKE OUR WEEKEND

14         RECESS, LADIES AND GENTLEMEN.  THANK YOU FOR YOUR PATIENCE.

15         WE'LL BE IN SESSION MONDAY, THIS COMING MONDAY AT 9:00 A.M.

16         WE'LL CALL YOU UP AT 9:00 A.M.  HAVE A GOOD WEEKEND.  THANK YOU

17         SO MUCH.

18              (JURY OUT AT 4:41 P.M.)

19                    THE COURT:  THE RECORD SHOULD REFLECT THAT THE JURY

20         HAS LEFT THE COURTROOM.

21              ANYTHING ELSE, COUNSEL?

22                    MR. SCHAINBAUM:  UNLESS YOU WANT TO HAVE A MOTION OR

23         THE RULE 29 ARGUMENT NOW, OR MAYBE MONDAY AT 8:30.

24                    MS. SISKIND:  I HAVE A SLIGHT PREFERENCE FOR NOW.  I

25         HAVE A FEELING IF WE START AT 8:30 ON MONDAY, THE JURY IS GOING
```

```
1      TO BE DELAYED STARTING AT 9:00.

2              THE COURT:  WELL, WHY DON'T WE PROCEED WITH THE

3      ARGUMENT NOW?

4          MR. SCHAINBAUM, DO YOU HAVE AN ARGUMENT FOR YOUR RULE 29

5      MOTION?

6              MR. SCHAINBAUM:  RIGHT.

7          WELL, I'D LIKE TO START WITH THE FACT THAT THIS IS AN

8      EIGHT COUNT CRIMINAL TAX FELONY COUNTS AND THE USUAL RULES IN A

9      CRIMINAL CASE PREVAIL HERE.

10         THE DEFENDANT IS PRESUMED INNOCENT AND THE GOVERNMENT MUST

11     PROVE EACH AND EVERY ELEMENT OF THE CRIME BEYOND A REASONABLE

12     DOUBT.

13         SO LOOKING -- GOING BACKWARDS FORWARD COUNTS SIX, SEVEN,

14     AND EIGHT ARE THE FBARS.  WE BELIEVE THAT THE FBARS -- THERE

15     WAS NO WILLFUL FAILURE TO FILE FBARS BECAUSE UNDER THE

16     CIRCUMSTANCES TWO THINGS:

17         THE FBARS WERE NOT REQUIRED TO FILE; AND THE EVIDENCE

18     SHOWS THERE'S A GREAT DEAL OF CONFUSION, COMPLEXITY TO NEGATE

19     THE WILLFULNESS.

20         BUT ON A LEGAL MATTER, BECAUSE HSBC HAD A REPRESENTATIVE

21     OFFICE AND BECAUSE RIGHT ON THE FBAR INSTRUCTIONS IT SAID IF

22     YOU HAVE A FOREIGN BANK THAT HAS A BRANCH, AGENCY, AGENT IN THE

23     UNITED STATES YOU DON'T NEED TO FILE AN FBAR.

24         I THINK THE LAST WITNESS TESTIFIED THAT THEY ALL SAID THAT

25     THEY WERE ALL AGENTS OF HSBC INDIA.
```

1     SO AS A MATTER OF LAW, FBARS WERE NOT REQUIRED TO BE

2     FILED.  AND -- SO ON THAT GROUND ALONE WE BELIEVE THAT WE'RE

3     ENTITLED TO A JUDGMENT OF ACQUITTAL ON RULE -- ON COUNTS SIX,

4     SEVEN, AND EIGHT.

5         THE REGULATIONS SUPPORT US 31 U.S.C. SECTION 5314 AND THE

6     C.F.R., 31 C.F.R. SECTION 1010.350.

7         SO THE REGULATION PROVIDES THAT THE REPRESENTATIVE BANK

8     BEING IN FREMONT AND NEW YORK ARE IN THE UNITED STATES AND

9     THAT'S NOT A FOREIGN BANK BY DEFINITION UNDER THE REGULATIONS.

10        THE GENERAL DEFINITION SUPPORTING THAT IS ALSO 31 C.F.R.

11    SECTION 1010.100, AND THE RELEVANT SECTION IS PARENTHESIS

12    LITTLE U.

13        SO WHEN YOU TAKE THIS ALL TOGETHER, THE INSTRUCTIONS AND

14    THE FBAR, LOOKING AT GOVERNMENT'S EXHIBITS 9 AND 10, THAT AS A

15    MATTER OF LAW NO FBAR WAS REQUIRED TO BE FILED AND THE

16    DEFINITION OF THE FOREIGN BANK EXCLUDES THE TERM DOES NOT

17    INCLUDE AN AGENT, AGENCY, BRANCH, OR OFFICE WITHIN THE UNITED

18    STATES OF A BANK ORGANIZED UNDER FEDERAL LAW, AND THAT'S RIGHT

19    OUT OF THE LAW.

20        SO THE GOVERNMENT IN THAT REGARD HAS FAILED TO SUSTAIN ITS

21    BURDEN OF PROOF BEYOND A REASONABLE DOUBT, AND IT'S REALLY A

22    PRETTY CLEAR MATTER OF LAW ON SIX, SEVEN, EIGHT -- COUNTS SIX,

23    SEVEN, AND EIGHT.

24        NOW, THE EVIDENCE HERE ALSO, IF YOU WANT TO LOOK FURTHER,

25    WHICH I DON'T THINK YOU HAVE TO BECAUSE I THINK THE LAW IS

1    PRETTY CLEAR, THAT THE TESTIMONY OF VANDANA KATJU SAYING THAT

2    SHE WAS A LIAISON ON PAGE 366, LINE 5, THE SEPTEMBER OF

3    SEPTEMBER 11; AND PAGE 370, LINE 3; PAGE 370, LINE 16; PAGE

4    498, LINE 1; PAGE 631, LINE 13; PAGE 631, LINE 16; PAGE 633,

5    LINE 10; PAGE 633, LINE 10; AND PAGE -- WELL, IT'S THE SAME

6    CITATION OVER AND OVER AGAIN.

7         NOW, IF YOU GO TO THE TESTIMONY OF AARTI KUMAR, SHE SAID I

8    WAS EMPLOYED BY HSBC REPRESENTATIVE OFFICE IN FREMONT, PAGE

9    990, LINE 7; AND AS AN EMPLOYEE THERE, WE WERE ALSO CONNECTED

10   TO HSBC UNITED STATES.  MY CONTRACT LETTER DID MENTION THAT I

11   WAS AN EMPLOYEE OF HSBC U.S. AND EXPLAINED THAT CONNECTION WITH

12   HSBC U.S.

13        SO I WOULD LOOK TO -- AND THEN HER ANSWER -- AND HER

14   LINKEDIN PAGE SAID, "IF MY UNDERSTANDING IS CORRECT, I THINK IT

15   SAID, IT WAS SAID THAT THAT WHICH ALLOWED US TO WORK IN THE

16   UNITED STATES, EVEN THOUGH WE WERE PART OR EVEN THOUGH WE HAD

17   DIRECT REPORTING TO HSBC INDIA" SUPPORTS ALL OF THE FACTUAL

18   FOUNDATION FOR THE LAW FOR THE REG UNDER WHY THE BRANCH IS NOT

19   A BRANCH -- IT'S A BRANCH OF A FOREIGN BANK AND THEREFORE

20   EXCLUDES THE REQUIREMENT OF FILING AN FBAR.

21        ALSO, YOUR HONOR, IF YOU LOOK AT PAGE 1176, LINE 3, HER

22   ANSWER TO THE QUESTION "AND REPRESENTED WHICH BANK?

23        "I HAD DIRECT REPORTING TO MY MANAGERS AND MY MANAGERS

24   WERE DIRECTLY REPORTING TO HSBC INDIA.  SO I WAS AN HSBC

25   INDIA," WHICH FITS THE DEFINITION OF REPRESENTATIVE AND AGENT

1     AND WHICH FITS THE DEFINITION OF THE REG THAT I CITED, WHICH IS

2     PART OF 31 C.F.R. 1010.100, SUBPARAGRAPH U, PARENTHESIS LITTLE

3     U.

4         NOW, AS TO COUNTS FOUR AND FIVE, THAT'S THE COUNTS WHERE

5     MR. DESAI IS CHARGED WITH AIDING AND ABETTING FILING A FALSE

6     TAX RETURN FOR HIS ADULT CHILDREN, NEAL AND AMI.

7         AND IT'S OUR CONTENTION, EVEN THOUGH THERE SEEMS TO BE

8     SOME AMBIGUITY IN THE RECORD THAT THERE ARE ONLY TWO BANK

9     ACCOUNTS, THERE MAY BE MORE LISTED OUT, BUT THEY'RE SUBACCOUNTS

10    OF MR. DESAI AND MRS. DESAI'S BANK ACCOUNTS AND IT'S CLEAR THAT

11    ALL OF THE MONEY, ALL OF THE SOURCES OF THE MONEY COME FROM

12    MR. DESAI.

13        SO IN SUBSTANCE, IF THAT'S THE CRITERIA, AND IT SHOULD BE,

14    THE ECONOMIC SUBSTANCE, EVERYTHING IS MR. DESAI AND MRS. DESAI.

15    IT'S SUBSTANCE.  THERE'S AN ADAGE IN THE TAX WORLD, SUBSTANCE

16    OVER FORM.

17        AND IF YOU APPLY THAT CRITERIA HERE, IT'S CLEAR THAT THE

18    BANK ACCOUNTS, ANY WAY YOU LOOK AT THEM, BELONG TO MR. AND

19    MRS. DESAI AND THEY ADDED THEIR ADULT CHILDREN TO THOSE

20    ACCOUNTS.

21        AND THEY WERE MANAGED OUT OF THE REPRESENTATIVE OFFICE IN

22    FREMONT.

23        SO IT'S OUR POSITION THAT IF ANYTHING HAD TO BE REPORTED,

24    I SAY "IF," IT SHOULD HAVE BEEN ON MR. AND MRS. DESAI'S TAX

25    RETURNS.

1    IF THERE WAS TO BE A FILING OF AN FBAR, IT SHOULD HAVE

2    COME OUT OF MR. AND MRS. DESAI'S TAX RETURNS.  SO IT CAN'T BE A

3    FALSE TAX RETURN BECAUSE THEY WERE NOT THE ULTIMATE ECONOMIC

4    BENEFICIARY.  AND JUST BECAUSE THEY HAD THEIR NAMES ON THERE

5    DOESN'T MEAN THAT THEY HAD CONTROL OF THOSE ACCOUNTS BECAUSE

6    THERE'S NO EVIDENCE THAT THEY DID.

7    AND SO IF THEY DID NOT REALLY OWN THE ACCOUNTS

8    ECONOMICALLY, IF IN SUBSTANCE THE ACCOUNTS ECONOMICALLY BELONG

9    TO MR. AND MRS. DESAI, IF EVERYTHING IT'S ON COUNTS ONE, TWO

10   AND THREE.  COUNTS FOUR AND FIVE ARE KIND OF MOOT IN THIS WHOLE

11   UNIVERSE.

12   AND I SAY THAT THE REAL PROBLEM HERE IS COUNTS ONE AND TWO

13   AND THREE.  THERE'S WHERE YOU COME DOWN TO.

14   COUNTS FOUR AND FIVE SHOULD GO AWAY BECAUSE IT ALL BELONGS

15   TO MR. AND MRS. DESAI, AND THEN YOU WOULD HAVE TO DEAL WITH

16   COUNTS ONE, AND TWO, AND THREE.

17   I MEAN, BEING A CRIMINAL CASE, THE ESSENCE OF THE CRIMINAL

18   CONDUCT IS WILLFULNESS.

19   NOW, WILLFULNESS CAN BE PROVEN BY DIRECT EVIDENCE OR

20   INDIRECT EVIDENCE OR CIRCUMSTANTIAL EVIDENCE.

21   SO WHAT DO WE HAVE ON COUNTS ONE, TWO, AND THREE?  IF THE

22   COURT IS IMPRESSED WITH THE NUMBERS, YOU CAN'T GET OVER THAT.

23   THIS IS BIG NUMBERS.

24   MR. OERTEL, WHETHER HIS COMPUTATIONS ARE CORRECT OR NOT,

25   THEY'RE STILL BIG NUMBERS.

1              BUT THAT'S NOT THE POINT.  THE POINT IS THAT LEGALLY WHAT

2       DOES IT ALL MEAN?

3              IF, IN FACT, AS YOU JUST HEARD THIS TESTIMONY FROM THIS

4       WITNESS, THERE WAS THE SCHEME AND THE SCHEME WAS TO ENTICE

5       VICTIMS TO PUT THEIR MONEY IN HSBC INDIA.

6              THE COURT:  I CAN'T CONSIDER THIS WITNESS'S

7       TESTIMONY.

8              MR. SCHAINBAUM:  NO, THAT'S RIGHT.  THANK YOU FOR

9       THAT.

10             OKAY.  DON'T CONSIDER IT.  I'LL JUST ARGUE FROM WHAT I

11      KNOW.

12             AND FROM WHAT I KNOW IS THAT THE CIRCUMSTANTIAL EVIDENCE

13      OF WHAT HAS HAPPENED THROUGH THE TESTIMONY, IF YOU BELIEVE THE

14      TESTIMONY OF VANDANA KATJU AND IF YOU BELIEVE THE TESTIMONY OF

15      AARTI KUMAR, THEY WERE HERE BASICALLY DOING NOTHING EXCEPT

16      TELEPHONING, MARKETING, OR HAVING SOCIAL EVENTS.

17             BUT THE ESSENCE OF THE ONE, TWO, THREE COUNT OF FILING

18      FALSE TAX RETURNS, IT'S CLEAR FROM SCHEDULE B THAT, ANY WAY YOU

19      LOOK AT IT, MR. DESAI REPORTS LOTS OF INTEREST INCOME AND LOTS

20      OF -- A COUPLE OF THOSE BANKS ARE FOREIGN BANKS.  AND THEN HE

21      CHECKS THE BOX NO.

22             IT CREATES REASONABLE DOUBT AS TO WILLFULNESS.

23             ANOTHER REASONABLE DOUBT AS TO WILLFULNESS IS THE

24      CONTINUOUS SET OF DOCUMENTS THAT THE GOVERNMENT CLAIMS SHOWS

25      WILLFULNESS, THOSE CP NOTICES.  THE CP NOTICES REALLY SHOW,

1    TOGETHER WITH THE TRANSCRIPTS, THAT MR. DESAI IS OBEDIENT.  HE

2    GETS A NOTICE, HE DEALS WITH IT, AND HE PAYS.

3        NOW, THE I.R.S. KNEW FROM THE VERY BEGINNING THAT THERE

4    WAS A FOREIGN BANK ACCOUNT.  THEY DID NOTHING.  YEAR AFTER YEAR

5    THEY DIDN'T SAY, LOOK, IN ANY KIND OF NOTICE, YOU HAVE A

6    FOREIGN BANK ACCOUNT, FILE AN FBAR.  THEY DIDN'T DO THAT.

7        YEAR AFTER YEAR THEY SENT HIM A NOTICE AND HE RESOLVES IT.

8    THE TRANSCRIPTS ARE PRIMA FACIE EVIDENCE OF MR. DESAI'S LACK OF

9    WILLFULNESS WHEN TAKEN TOGETHER WITH THE CP NOTICES.  IT'S NOT

10   THE OTHER WAY.  IT'S THE LACK OF WILLFULNESS.

11       SO THE PROBLEM IS THAT THE NUMBERS ARE LARGE, BUT THAT

12   DOESN'T REALLY LEGALLY MEAN ANYTHING.  IT'S IRRELEVANT.

13       SO THE CHARGE HERE IS AS IN COUNTS FOUR AND FIVE, THAT THE

14   RETURNS ARE FALSE FOR TWO REASONS:  ONE, THERE IS SUBSTANTIAL

15   OMISSION OF INCOME; TWO, THE BOX IS CHECKED "NO" WHEN IT SHOULD

16   HAVE BEEN CHECKED YES.

17       BUT THAT DOESN'T DO IT.  YOU HAVE GOT TO HAVE THE ELEMENT

18   OF WILLFULNESS.  YOU HAVE TO SHOW THE ELEMENT OF WILLFULNESS

19   AND THE GOVERNMENT IS TRYING TO SHOW THAT THROUGH THE LARGE

20   NUMBERS.

21       ON THE OTHER HAND, THE CLEAR EVIDENCE IS THAT MR. DESAI

22   KEEPS REPORTING NUMBERS THAT ARE NOT REALLY ALL OF THE TIME

23   CORRECT.  IT DOESN'T SHOW YOU -- I MEAN, IF IT YOU WERE

24   INTENTIONALLY TRYING TO BE WILLFULNESS, YOU WOULD GO OUT OF

25   YOUR WAY TO CONCEAL, HIDE, AND DO WHATEVER IT IS.  THERE'S NO

```
 1        EVIDENCE THAT THAT IS HAPPENING.

 2             THERE'S EVIDENCE IN THE RECORD, WHETHER IT'S CONFLICTING

 3        OR NOT, THAT MR. DESAI RELIED ON SOMETHING BECAUSE WHY WOULD --

 4        AND THIS IS, OF COURSE, TO SHOW WHETHER, TAKING THE CASE IN THE

 5        MOST FAVORABLE LIGHT TO THE GOVERNMENT, WHICH IS THE STANDING

 6        FOR THIS RULE, WHY WOULD A REASONABLE JURY SAY TO THEMSELVES,

 7        YEAR AFTER YEAR HE GETS THESE NOTICES AND YET HE HAS THESE

 8        ACCOUNTS AND HE DOESN'T DO ANYTHING?  IS THE MAN CRAZY OR HAS

 9        HE REASONABLY BEEN TOLD SOMETHING?  OR SOMETHING HAS INTERCEDED

10        TO SAY THAT HE DOESN'T HAVE TO REPORT IT?

11             BECAUSE THE PATTERN HERE FROM THE TAX RETURNS, THE CP

12        NOTICES, AND WHAT WAS HAPPENING SHOWS THAT THE GOVERNMENT

13        CANNOT --

14                  THE COURT:  IT APPEARS, FOR THE RECORD, IT APPEARS A

15        JUROR OPENED THE DOOR, POKED HER HEAD IN, AND CLOSED THE DOOR.

16        MS. GARCIA IS GOING TO --

17                  MR. SCHAINBAUM:  DO YOU WANT ME TO WAIT?

18                  THE COURT:  YEAH, WHY DON'T YOU JUST FOR A SECOND.

19        (PAUSE IN PROCEEDINGS.)

20                  THE COURT:  WHY DON'T YOU CONTINUE, MR. SCHAINBAUM?

21                  MR. SCHAINBAUM:  OKAY.  SO COMING DOWN TO

22        COUNTS ONE, TWO, AND THREE, AS WELL AS FOUR AND FIVE, BUT JUST

23        FOR THE PURPOSES OF WHAT THE GOVERNMENT ALLEGED MAKES THE

24        RETURNS FALSE, THE OMISSION OF THE INCOME, INTEREST INCOME, AND

25        THE CHECKING OF THE BOX "NO."
```

1          THERE'S NO EVIDENCE HERE TO SHOW THAT THE AMOUNT OF

2     INTEREST ALLEGED EARNED IN THE FOREIGN BANK ACCOUNTS ARE

3     ACCURATE, THAT HE WOULD KNOW BECAUSE THERE WERE NO FORM 1099'S.

4          AND WE KNOW THAT FROM THE TESTIMONY OF MR. OERTEL, WHICH

5     CREATES REASONABLE DOUBT THAT HE EVEN COULD CALCULATE IT

6     INCORRECTLY.  SO YOU CAN INFER THAT THE TAXPAYER COULD NOT

7     CORRECTLY DETERMINE INCOME, BUT THAT'S NOT ENOUGH.

8          THE REST OF IT IS WHY WASN'T THERE ANYTHING ON THERE, AND

9     THE QUESTION IS THE GOVERNMENT HASN'T SUPPLIED ANY DIRECT

10    EVIDENCE OR ANY EVIDENCE THAT HE DIDN'T KNOW AND HE WENT OUT OF

11    HIS WAY AND IN SOME OF THE CASES WHERE YOU SET UP A FOUNDATION,

12    YOU SET UP A TRUST, YOU SET UP A DOUBLE WHATEVER, NONE OF THAT

13    IS HERE.

14         HE WENT AND DEALT WITH BANKERS IN THE U.S. WHO DID A LOT

15    OF THINGS, INCLUDING COLLECTING DEPOSITS AND MOVING THEM

16    AROUND.

17         AND SO A JUROR COULD SAY, LOOKING AT THE MOST FAVORABLE

18    WAY, THE GOVERNMENT HAS NOT PROVEN BEYOND A REASONABLE DOUBT

19    THAT HE WAS WILLFUL.  HE HAD A SPECIFIC INTENTION TO DECEIVE

20    THE GOVERNMENT AND IN MAKING A FALSE RETURN BY OMITTING THIS

21    INCOME BECAUSE THIS EVIDENCE SHOWS TO THE CONTRARY.  HE'S

22    PUTTING ON THE RETURN INCOME FROM ALL OF THE 1099'S THAT HE'S

23    GETTING.

24         AND IT'S CLEAR BEYOND A REASONABLE DOUBT HE DID NOT GET AN

25    INTEREST INCOME FORM 1099 FROM THE HSBC BANK.

1          AND SO YOU CAN -- FROM THE E-MAILS THAT ARE IN EVIDENCE

2     AND THE COLLECTION OF ACTIVITIES, YOU CAN INFER THAT HE HAD A

3     GOOD FAITH BELIEF THAT HE DID NOT HAVE TO REPORT IT.

4          AND THERE'S NO CONTRARY EVIDENCE OTHER THAN AN INFERENCE

5     THAT -- WHICH YOU CAN TAKE INTO CONSIDERATION EVEN THOUGH WE

6     DON'T HAVE DIRECTLY IN EVIDENCE WHY THE BANK CLOSED, BUT WE DO

7     KNOW INDIRECTLY THAT THEY WERE INVOLVED IN KIND OF AN ACTIVITY

8     THAT WAS NOT LEGALLY SANCTIONED AND ULTIMATELY BECAUSE THEY

9     PROMPTLY CLOSED THE BANK THREE YEARS AFTER THEY STARTED.

10         SO I THINK SUMMARIZING, SIX, SEVEN, AND EIGHT, FBARS WERE

11    NEVER REQUIRED UNDER THE FACTS AND CIRCUMSTANCES.  THOSE COUNTS

12    SHOULD GO.

13         COUNTS FOUR AND FIVE DEPEND REALLY ON THE WILLFULNESS TO A

14    FURTHER EXTENT, BUT THE REAL POINT IS THAT ALL OF THE INTEREST

15    IN THE BANK BELONGS TO MR. AND MRS. DESAI.

16         SO EVERYTHING REALLY COMES DOWN TO THE CORE, WHAT ABOUT

17    COUNTS ONE, TWO, AND THREE, AND YOU HAVE TO LOOK AT THE

18    TOTALITY OF THE RECORD, AND I DON'T BELIEVE GIVEN LOOKING AT

19    THE EVIDENCE IN THE MOST FAVORABLE LIGHT TO THE GOVERNMENT WHAT

20    A REASONABLE JURY COULD CONCLUDE, THAT THEY COULD CONCLUDE THAT

21    MR. DESAI IS GUILTY BEYOND A REASONABLE DOUBT OF COUNTS ONE,

22    TWO, AND THREE, FOUR, FIVE, SIX, SEVEN, AND EIGHT.

23         THANK YOU, YOUR HONOR.

24              THE COURT:  THANK YOU, MR. SCHAINBAUM.

25         MS. SISKIND, DO YOU HAVE A RESPONSE?

1          MS. SISKIND:  YES, YOUR HONOR.

2          YOUR HONOR, MR. SCHAINBAUM ACCURATELY CITED THE STANDARD

3     THAT THE COURT IS GUIDED BY AND THAT'S TO REVIEW THE EVIDENCE

4     IN THE LIGHT MOST FAVORABLE TO THE GOVERNMENT AND ASK WHETHER

5     ANY RATIONALE TRIER OF FACT COULD FIND THE DEFENDANT GUILTY

6     BEYOND A REASONABLE DOUBT.

7          COUNTS ONE, TWO, AND THREE ARE THE FALSE TAX RETURNS FOR

8     ASHVIN AND NILA DESAI FOR 2007 THROUGH 2009.

9          SEVERAL ELEMENTS OF THIS OFFENSE I DON'T THINK ARE IN

10    DISPUTE THAT THESE ARE THE DEFENDANT'S TAX RETURNS AND THAT

11    THEY WERE SIGNED UNDER PENALTIES OF PERJURY.

12         ANOTHER ELEMENT IS THAT THE TAX RETURNS WERE MATERIALLY

13    FALSE AND THERE ARE TWO MATERIAL FALSITIES ALLEGED IN THE

14    INDICTMENT THAT HAVE BEEN ESTABLISHED BY THE GOVERNMENT'S CASE

15    IN CHIEF.  ONE IS THE FAILURE TO REPORT INTEREST INCOME, AND

16    THE SECOND IS THE FAILURE TO RESPOND "YES" TO THE FOREIGN BANK

17    ACCOUNT QUESTION, QUESTION 7A ON THE SCHEDULE B.

18         THE INTEREST INCOME WAS ESTABLISHED BY THE TESTIMONY OF

19    REVENUE AGENT OERTEL.  HE TESTIFIED TO HIS CALCULATIONS AND

20    THAT THERE WAS A SUBSTANTIAL AMOUNT OF MONEY GENERATED BY THE

21    ACCOUNTS HELD IN THE NAME OF THE DEFENDANT AND HIS WIFE, NONE

22    OF WHICH APPEARED ON THE TAX RETURN.

23         HE ALSO TESTIFIED THAT THE BALANCE IN THE DEFENDANT'S

24    ACCOUNT EXCEEDED $10,000, WHICH MEANS THAT HE WAS REQUIRED TO

25    CHECK "YES" IN RESPONSE TO QUESTION 7(A).

1          THOSE ARE TWO FALSITIES, BOTH OF WHICH WERE ESTABLISHED BY

2     THE GOVERNMENT'S CASE.

3          IN TERMS OF WILLFULNESS, THE QUESTION IS WHETHER THE

4     DEFENDANT WAS AWARE OF HIS LEGAL DUTY TO REPORT INTEREST INCOME

5     FROM HSBC INDIA ON THE TAX RETURN AND TO RESPOND AFFIRMATIVELY

6     TO THE FOREIGN BANK ACCOUNT QUESTION.

7          THE EVIDENCE ESTABLISHED THAT THE DEFENDANTS SELF-PREPARED

8     HIS 2007 THROUGH 2009 TAX RETURNS AND THAT HE REPORTED INTEREST

9     INCOME FROM OTHER SOURCES, INCLUDING SMALL AMOUNTS OF INTEREST

10    INCOME FROM OTHER PLACES, SUGGESTING THAT HE WAS METICULOUS

11    ABOUT THE PREPARATION OF HIS RETURNS.

12         THE EVIDENCE ESTABLISHED THAT THE DEFENDANT KNEW THAT HE

13    HAD FOREIGN BANK ACCOUNTS IN INDIA AND THAT THOSE MANY ACCOUNTS

14    GENERATED INTEREST INCOME.  THE E-MAILS AND THE LETTERS AND THE

15    OTHER DOCUMENTS THAT CAME INTO EVIDENCE SHOW THAT THIS WAS A

16    DEFENDANT -- THIS WAS A BANK CUSTOMER WHO ACTIVELY MANAGED HIS

17    ACCOUNTS, WHO STAYED ON TOP OF HIS INVESTMENTS.

18         THERE WAS AN E-MAIL WHERE HE WAS EVEN COMPLAINING ABOUT A

19    $60 WIRE TRANSFER FEE THAT HE WAS ASSESSED.  THIS WAS SOMEONE

20    WHO KNEW WHAT WAS GOING ON WITH HIS MONEY, WHICH MAKES SENSE

21    GIVEN THE AMOUNT OF MONEY THAT HE HAD ON DEPOSIT WITH THE BANK.

22         HE ALSO HAD SUBSTANTIAL CONVERSATIONS -- THE CONVERSATIONS

23    OVER E-MAIL WITH BANKERS ABOUT INTEREST RATES THAT SHOW HIM IN

24    ONE E-MAIL CALLING HIS CONTACT WITH THE STATE BANK OF INDIA AND

25    TRYING TO PLAY ONE BANK OFF OF THE OTHER TO GET A HIGHER RATE

1573

1    OF RETURN ON HIS MONEY.

2         AND THERE WAS TESTIMONY THAT THE DEFENDANT HAD ACCESS TO

3    THE MEANS, EVEN IF HE DIDN'T GET A 1099, HE HAD ACCESS TO

4    INFORMATION TO USE TO REPORT INTEREST INCOME TO THE I.R.S.

5         MS. KATJU TESTIFIED ABOUT THE SIGNIFICANCE OF AN E-MAIL

6    THAT REFERENCED AN INTERNET BANKING I.D. AND A PIN AND A TOKEN

7    I THINK SHE TALKED ABOUT, AND SHE DESCRIBED TO THE JURY WHAT A

8    PERSON COULD ACCESS IN INTERNET BANKING AND SHE SAID ONE OF THE

9    THINGS YOU COULD ACCESS WERE YOUR ACCOUNT STATEMENTS THAT HAD

10   INFORMATION ABOUT YOUR DEPOSITS.

11        THERE WERE ALSO TWO E-MAILS INTRODUCED THROUGH THE

12   TESTIMONY OF MS. KUMAR THAT SHOW SCREEN SHOTS BEING MAILED

13   DIRECTLY TO THE DEFENDANT.

14        SO EVEN IN THE ABSENCE OF 1099'S, THERE WAS A MEANS BY

15   WHICH THE DEFENDANT COULD DETERMINE HOW MUCH INCOME HE HAD IN

16   HIS ACCOUNTS, AND GIVEN THE OTHER EVIDENCE OF HOW HE STAYED ON

17   TOP OF HIS INVESTMENTS, THERE'S SIGNIFICANT EVIDENCE THAT HE

18   WOULD BE ON TOP OF HOW MUCH INTEREST INCOME HE WAS EARNING.

19        THE EVIDENCE ALSO ESTABLISHED THAT THE DEFENDANT WAS

20   FAMILIAR WITH THE FORM 1040 INSTRUCTIONS, AND SPECIFICALLY THE

21   ONE PAGE OF THOSE INSTRUCTIONS THAT TELL TAXPAYERS HOW TO FILL

22   OUT SCHEDULE B, HOW TO REPORT THEIR INTEREST INCOME, HOW TO

23   DETERMINE WHETHER OR NOT THEY HAVE TO CHECK THE BOX, AND WE

24   KNOW THIS BECAUSE EACH OF THE TAX RETURNS IN EXHIBITS 1 THROUGH

25   3, THE PAGE RIGHT AFTER SCHEDULE B IS A COPY OF THE SCHEDULE B

1    INSTRUCTIONS AND THERE'S TESTIMONY THAT THAT PAGE TELLS

2    TAXPAYERS HOW TO FILL OUT THAT FORM ACCURATELY.

3         THE CUSTOMER DECLARATION THE DEFENDANT SIGNED WHEN HE

4    ADDED HIS SON TO HIS ACCOUNT ALSO PROVIDES ADDITIONAL EVIDENCE

5    OF WILLFULNESS BECAUSE IT CONTAINS THE STATEMENT, UNDER CURRENT

6    U.S. TAX LAW, U.S. CITIZENS AND RESIDENTS ARE SUBJECT TO TAX ON

7    THEIR WORLDWIDE INCOME, AND THAT PUT THE DEFENDANT ON NOTICE,

8    IF HE HADN'T BEEN BEFORE, OF HIS LEGAL OBLIGATION TO REPORT

9    INCOME FROM HIS FOREIGN BANK ACCOUNT TO THE GOVERNMENT.

10        AND FINALLY, THE EVIDENCE THAT THE COURT HEARD THIS

11   MORNING ESTABLISHES THAT BETWEEN 2005 AND 2010, THE DEFENDANT

12   RECEIVED MULTIPLE NOTICES FROM THE I.R.S. AS PART OF

13   CORRESPONDENCE AUDITS, ALL OF WHICH RELATED TO UNREPORTED

14   INTEREST INCOME.  THOSE NOTICES STARTED BEFORE THE DEFENDANT

15   REACTIVATED ACCOUNT 3679.  THEY CONTINUED THROUGH THE ENTIRE

16   TIME PERIOD AT ISSUE IN THIS CASE.  SOME OF THEM CLOSELY

17   COINCIDE WITH THE DATES ON WHICH TAX RETURNS WERE FILED.

18        AND THESE AUDITS WERE -- EACH TIME THAT THE I.R.S. CAME TO

19   THE DEFENDANT AND SAID YOU LEFT INTEREST INCOME OFF OF YOUR TAX

20   RETURN, THIS WAS ANOTHER REMINDER TO THE DEFENDANT TO REPORT

21   ALL OF HIS INCOME AND EACH TIME IT WAS ANOTHER OPPORTUNITY TO

22   COME CLEAN AND TO REPORT HIS INCOME TO THE GOVERNMENT, BUT HE

23   DID NOT.

24        AND THAT'S PART OF THE EVIDENCE THAT THERE WAS CONCEALMENT

25   IN THIS CASE BECAUSE EACH AUDIT WAS AN OPPORTUNITY FOR THE

1    DEFENDANT TO COME CLEAN AND SAY THAT IN ADDITION TO THE

2    INTEREST INCOME, I.R.S., THAT YOU FIGURED OUT ON YOUR OWN FOR

3    THESE 1099'S, I HAVE MORE I NEED TO REPORT, AND HE NEVER DID

4    SO.

5         AND THERE'S ADDITIONAL EVIDENCE OF CONCEALMENT,

6    PARTICULARLY THERE'S TWO E-MAILS IN WHICH THE DEFENDANT IS

7    ASKING THAT BANK STATEMENTS FOR ACCOUNT AND FOR HIS DAUGHTER'S

8    ACCOUNT NOT BE MAILED TO HIS HOUSE BUT BE MAILED ELSEWHERE.

9         SO THAT'S THE EVIDENCE OF WILLFULNESS AS TO COUNTS ONE

10   THROUGH THREE.

11        COUNTS FOUR AND FIVE RELATE TO TAX RETURNS FOR THE

12   CHILDREN.  THE SAME WILLFULNESS AS FOR THE TAX RETURNS APPLY TO

13   THESE COUNTS AS WELL.  HE MANAGED HIS CHILDREN'S ACCOUNTS.  HE

14   KNEW ABOUT HIS OBLIGATIONS OF REPORTING.

15        MR. SCHAINBAUM'S ARGUMENT ABOUT THE ECONOMIC SUBSTANCE OF

16   THESE ACCOUNTS IS CONTRARY TO WHAT THE TAX RETURN INSTRUCTIONS

17   SAY ABOUT FOREIGN BANK ACCOUNT REPORTING.  THE SCHEDULE B

18   INSTRUCTIONS SAY THAT A PERSON IS REQUIRED TO CHECK THE YES BOX

19   IF THEY HAVE A FINANCIAL INTEREST IN OR SIGNATURE OR OTHER

20   AUTHORITY OVER AN ACCOUNT.

21        SIGNATURE AUTHORITY WAS CERTAINLY ESTABLISHED WITH THE

22   FACTS OF THIS CASE THAT PARTICULARLY NEAL DESAI AND AMI DESAI

23   HAD SIGNATURE AUTHORITY OVER THEIR PARENTS' ACCOUNTS.  AND THAT

24   ALONE, NO MATTER WHAT THE SOURCE OF THE FUNDS IN THAT ACCOUNT

25   MIGHT BE, IT WAS ENOUGH TO TRIGGER THE REQUIREMENT TO CHECK THE

1      "YES" BOX IN RESPONSE TO QUESTION 7(A).

2          BUT EVEN MORE THAN THAT, THE COURT CAN SEE ON EXHIBIT 136

3      THAT THE EVIDENCE IN THIS CASE IS NOT LIMITED JUST TO THAT

4      ACCOUNT IN THE NAME OF ASHVIN DESAI JOINTLY WITH NEAL AND NILA

5      DESAI JOINTLY WITH AMI.  THERE WERE TWO OTHER ACCOUNT NUMBERS.

6          AND DESPITE MR. SCHAINBAUM REFERRING TO THESE AS

7      SUBACCOUNTS, THERE WAS NO TESTIMONY FROM ANY WITNESS THAT THESE

8      WERE SOMEHOW SUBACCOUNTS OF THE PARENTS' MAIN ACCOUNTS.

9          THEY APPEAR ON 136 AS FOUR SEPARATE ACCOUNT NUMBERS UNDER

10     FOUR SEPARATE NAMES, AND THAT'S HOW THEY SHOULD BE TREATED WHEN

11     VIEWING THE EVIDENCE FOR PURPOSES OF THIS RULE 29 MOTION.

12         COUNTS SIX THROUGH EIGHT, THE DEFENSE IS ARGUING THAT AS A

13     MATTER OF LAW, MR. DESAI WASN'T LEGALLY REQUIRED TO FILE AN

14     FBAR.

15         BUT WE -- I THINK WE HAVE READ THAT PARAGRAPH IN THE FBAR

16     INSTRUCTIONS SEVERAL TIMES THROUGH SEVERAL DIFFERENT WITNESSES

17     NOW, AND WHAT IS CLEAR BY LOOKING AT THE FBAR INSTRUCTIONS IN

18     EXHIBITS 9 AND 10 IS THAT THE LOCATION OF THE ACCOUNT, THE

19     COUNTRY IN WHICH THE ACCOUNT WAS MAINTAINED IS WHAT CONTROLS

20     FOR THE FBAR FILING REQUIREMENT.

21         AND DESPITE THE PRESENCE OF BANKERS HERE IN THE U.S.,

22     DESPITE THE EXISTENCE OF REPRESENTATIVE OFFICES IN NEW YORK AND

23     FREMONT, THESE WERE INDIAN BANK ACCOUNTS AND THERE WAS NO

24     TESTIMONY TO THE CONTRARY.

25         MS. KATJU AND MS. KUMAR TESTIFIED THAT THE ACCOUNTS WERE

1        IN INDIA.  IT DOESN'T MATTER WHO THEY WERE EMPLOYED BY OR WHERE

2        THEY WERE SITTING PHYSICALLY WHEN THEY WERE SERVICING THESE

3        ACCOUNTS.  THE MONEY WAS INDIA.  THEY TESTIFIED THEY DIDN'T

4        EVEN HAVE THE FACILITIES IN THEIR OFFICES IN NEW YORK AND

5        FREMONT TO PROCESS DEPOSITS OR ACCESS ACCOUNT STATEMENTS.  ALL

6        OF THAT WAS OVER IN INDIA AND THAT'S WHY THEY COULDN'T PROCESS

7        A DEPOSIT AND WHY IT HAD TO GO THROUGH THE LOCK BOX AND BE SENT

8        TO INDIA.

9        ALL OF THE ACCOUNTS IN THIS CASE WERE MAINTAINED IN A

10       FOREIGN COUNTRY.  THEY'RE FOREIGN BANK ACCOUNTS,

11       NOTWITHSTANDING THE EXISTENCE OF REPRESENTATIVE OFFICE, AND FOR

12       THAT REASON THE DEFENDANT WAS LEGALLY REQUIRED TO FILE AN FBAR.

13       AND THE OTHER ELEMENTS OF THE FBAR CHARGE ARE MET AS WELL.

14       THE DEFENDANT WAS A U.S. CITIZEN; HE HAD A FINANCIAL INTEREST

15       IN A FOREIGN FINANCIAL ACCOUNT; AND THERE WAS MORE THAN $10,000

16       IN THE ACCOUNTS, AND AGENT OERTEL'S TESTIMONY, EVEN WHEN THE

17       NUMBERS CAME DOWN WHEN HE TOOK OUT THOSE FOREIGN DEPOSITS

18       TODAY, WE WERE STILL WELL IN EXCESS OF $10,000.

19       AND FINALLY, FOR THE ELEMENT OF WILLFULNESS FOR THE MENTAL

20       STATE ON THE FBAR CHARGES, THE DEFENDANT SELF-PREPARED HIS 2007

21       THROUGH 2009 TAX RETURNS.

22       WE KNOW THAT HE HAD TO LOOK AT THE SCHEDULE B, LOOK AT THE

23       FOREIGN BANK ACCOUNT QUESTION BECAUSE HE ANSWERED THAT

24       QUESTION, AND RIGHT BELOW THE QUESTION IS A REFERENCE TO THE

25       FBAR INSTRUCTIONS.

1          THERE'S ALSO A REFERENCE TO THE FBAR ON THE 2009 SCHEDULE

2     B INSTRUCTIONS WHICH WAS INCLUDED WITH HIS RETURN.

3          SO THOSE TWO PIECES OF EVIDENCE, TAKEN TOGETHER, ESTABLISH

4     THAT THE DEFENDANT WAS AWARE OF THE FBAR FILING REQUIREMENT AND

5     THAT HE WAS WILLFUL WITH RESPECT TO THOSE CHARGES.

6          THE COURT:  THANK YOU.  MR. SCHAINBAUM, DO YOU HAVE

7     A BRIEF REBUTTAL?

8          MR. SCHAINBAUM:  YES.  FIRST OF ALL, WITH REGARD TO

9     COUNTS SIX, SEVEN, AND EIGHT, WHAT THE I.R.S. INSTRUCTION HAS

10    ADDED I.R.S. LANGUAGE DOES NOT APPEAR IN THE STATUTE.

11    31 C.F.R. 1010.100, SUBPARAGRAPH PARENTHESIS U, FOREIGN

12    BANK:  "A BANK ORGANIZED UNDER FOREIGN LAW, OR AN AGENCY,

13    BRANCH, OR OFFICE LOCATED OUTSIDE OF THE UNITED STATES OF A

14    BANK.  THE TERM DOES NOT INCLUDE AN AGENT, AGENCY, BRANCH, OR

15    OFFICE WITHIN THE UNITED STATES OF A BANK ORGANIZED UNDER

16    FOREIGN LAW."

17         THERE'S NO REFERENCE TO WHERE THE ACCOUNT IS LOCATED.  THE

18    REFERENCE IS TO THE INSTITUTION BECAUSE WHAT HSBC SHOULD HAVE

19    DONE, LIKE CITIBANK DID AND BANK OF AMERICA, ISSUED 1099'S

20    BECAUSE WHEN THEY WERE HERE IN THE U.S. AS A REPRESENTATIVE

21    BANK, THEY WERE UNDER FEDERAL LAW AND THE FEDERAL LAW REQUIRED

22    ANYBODY OVER $10 TO GET A NOTICE, AN INFORMATION PIECE.

23         SO THE I.R.S., IF YOU LOOK AT THE HISTORY, SORT OF EVOLVED

24    THE DEFINITION IN ITS -- OR THE FINCEN EVOLVED THE DEFINITION.

25    BUT THAT'S -- ACTUALLY IT'S THE I.R.S. ON THE SCHEDULE B.  THEY

```
 1        ADDED THE LANGUAGE THAT THERE'S NO SUPPORT FOR.

 2            AS TO THE INFORMATION ON COUNTS FOUR AND FIVE, THEY

 3        BELONG -- ALL OF THOSE ACCOUNTS BELONG TO MR. AND MRS. DESAI.

 4        ANY WAY YOU LOOK AT IT, THEY BELONG TO MR. AND MRS. DESAI.  AS

 5        TO COUNTS ONE, TWO, AND THREE, THEY'RE CLEARLY MR. AND

 6        MRS. DESAI.

 7            BUT WHAT IS IT?  IT'S WILLFULNESS.  AND THE GOVERNMENT

 8        SAYS THAT THEY DETERMINE WILLFULNESS BEYOND A REASONABLE DOUBT.

 9            WELL, AARTI KUMAR SAID THAT MR. DESAI WAS A NICE PERSON, A

10        NICE MAN.

11            VANDANA KATJU FINALLY STATED, WHEN I ASKED HER, DID YOU

12        MAKE THE STATEMENT THAT HE WAS A SCATTERBRAIN?  SHE ANSWERED

13        THAT, IN EFFECT, THAT -- AND WHAT WAS THE WORD THAT SHE USED?

14        HE, IN EFFECT, WAS A SCATTERBRAIN.  HE DIDN'T HAVE ANYTHING --

15        BECAUSE I SAID TO HER, IS HE A SOPHISTICATED INVESTOR?  AND SHE

16        SAID HE WAS NOT.

17            BUT SHE ANSWERED -- WHAT WAS THAT WORD?

18                MR. ALLEN:  ABSENTMINDED.

19                MR. SCHAINBAUM:  ABSENTMINDED.  THANK YOU.

20            SHE SAID HE WAS ABSENTMINDED.

21            AND I SAID, WHAT DOES THAT MEAN?

22            AND SHE SAID SCATTERBRAIN.

23            SO THERE'S A DIRECT OBSERVATION OF HIS MENTAL STATE FROM

24        SOMEBODY WHO WAS DOING BUSINESS WITH MR. DESAI.

25            AND SO IT HAS TO COME DOWN TO WILLFULNESS AND I DON'T
```

1    THINK THE GOVERNMENT HAS SHOWN BEYOND A REASONABLE DOUBT,

2    TAKING THE CRITERIA MOST FAVORABLE TO THEM, THAT A REASONABLE

3    JURY COULD FIND THAT MR. DESAI WAS WILLFUL.

4        MIGHT FIND THAT HE WAS CARELESS, MIGHT FIND HE WAS

5    NEGLIGENT, MIGHT FIND THAT HE WAS ABSENTMINDED, AND MIGHT FIND

6    THAT HE WAS, LIKE I SAY, GOOFY, BUT NOT WILLFUL.

7        THANK YOU.

8            THE COURT:  THANK YOU VERY MUCH.  THE COURT WILL

9    DEFER RULING ON RULE 29 MOTION AND TAKE IT UNDER ADVISEMENT.

10           MR. SCHAINBAUM:  THANK YOU.

11           THE COURT:  AND WE'LL BE IN RECESS AT THIS TIME AND

12   WE'LL SEE YOU MONDAY AT 9:00 O'CLOCK.

13       REMEMBER MONDAY IS A HALF DAY.

14           MS. SISKIND:  YOUR HONOR, COULD I RAISE ONE ISSUE?

15           THE COURT:  SURE.

16           MS. SISKIND:  AND FIRST IF WE CAN CONFIRM WHO THE

17   NEXT WITNESS IS GOING TO BE MONDAY MORNING?

18           MR. SCHAINBAUM:  LET'S SEE.  MR. ALLEN IS THE KEEPER

19   OF THE WITNESS INVENTORY.  RAVI GONDIPALLI.  WHAT IS HIS LAST

20   NAME?  GONDIPALLI.  WITNESS X.

21           THE COURT:  RAVI GONDIPALLI YOU'LL BE CALLING MONDAY

22   MORNING?

23           MR. SCHAINBAUM:  RIGHT.  WHO ELSE?

24           MR. ALLEN:  IT'S ONLY THE MORNING SESSION.

25           MR. SCHAINBAUM:  THEN WE HAVE TO ROUND UP THE

```
1        OTHERS, ASSUMING --

2                THE COURT:  WELL, DO YOU HAVE AN ANTICIPATED SECOND

3        WITNESS TO CALL?

4                MR. SCHAINBAUM:  WE HAVE RAVI GONDIPALLI AND WITNESS

5        X, WHICH WILL BE A WHILE.  AND BASANT KEDIA, DOMINIC O'HAGAN.

6                THE COURT:  OKAY.

7                MR. SCHAINBAUM:  I THINK THEY SHOULD BE BACK FROM

8        THEIR TRAVELS.

9                THE COURT:  OKAY.  ALL RIGHT.

10               MR. SCHAINBAUM:  I MIGHT EVEN -- SOUGATA BANERJEE.

11               THE COURT:  OKAY.

12               MR. SCHAINBAUM:  I HAVE A HOUSEKEEPING PROBLEM.

13               MS. SISKIND:  I WAS ABOUT TO RAISE AN ISSUE WITH THE

14       COURT.

15               THE COURT:  ABOUT THE WITNESSES?

16               MS. SISKIND:  YES.

17               THE COURT:  LET'S TALK ABOUT THE WITNESSES FIRST.

18               MR. SCHAINBAUM:  OKAY.  BUT I HAVE A HOUSEKEEPING

19       MATTER.

20               THE COURT:  REGARDING THE WITNESSES?

21               MR. SCHAINBAUM:  NO.

22               MS. SISKIND:  SO MR. GONDIPALLI, THE GOVERNMENT IS

23       GOING TO BE OBJECTING TO HIS TESTIMONY IN ITS ENTIRETY ON THE

24       BASIS THAT IT CONSTITUTES IMPROPER IMPEACHMENT ON A COLLATERAL

25       MATTER BY INTRINSIC EVIDENCE.
```

1     I DON'T EXPECT TO BE HEARD ON THIS TODAY.  I HAVE A CASE

2  I'M GOING TO HAND UP TO THE COURT AND THE DEFENSE AND WE CAN

3  DISCUSS IT BEFORE HE TAKES THE STAND.

4          MR. SCHAINBAUM:  CAN WE HAVE THE CASE?

5          THE COURT:  I THINK SHE GAVE YOU THE CASE.

6          MS. SISKIND:  I DON'T THINK WE NEED TO GO INTO IT

7  NOW, BUT THIS IS, I THINK, THE LEADING NINTH CIRCUIT CASE ON

8  IMPEACHMENT BY EXTRINSIC EVIDENCE ON A COLLATERAL MATTER, WHICH

9  IS OUR OBJECTION TO THE ENTIRETY OF MR. GONDIPALLI'S TESTIMONY.

10     IN TERMS OF THE TESTIMONY OF WITNESS X, WHO I THINK WE

11  NEED TO IDENTIFY AT THIS POINT ON THE RECORD IF THAT'S OKAY

12  WITH THE COURT BECAUSE HE'S ABOUT TO BE CALLED AS A WITNESS.

13     BUT IN ANY EVENT, WITNESS X AND BASANT KEDIA THE

14  GOVERNMENT WILL BE OBJECTING TO THEIR TESTIMONY, AS WE HAVE

15  PREVIOUSLY, ON SEVERAL GROUNDS.

16     I THINK WE WILL CERTAINLY NEED PROFFERS AS TO WHAT THE

17  SUBSTANCES OF THEIR TESTIMONY WILL BE.

18     BUT GIVEN WHAT I KNOW ABOUT THESE TWO WITNESSES, THERE'S

19  GOING TO BE MULTIPLE HEARSAY OBJECTIONS, RELEVANCE OBJECTIONS,

20  AND ALSO I THINK THE DEFENSE IS GOING TO ATTEMPT TO ELICIT SOME

21  SCHEME EVIDENCE FROM THESE INDIVIDUALS WHICH THE COURT HAS

22  PREVIOUSLY RULED THERE NEEDS TO BE FOUNDATION FOR, PRIMARILY A

23  NEXUS BETWEEN AN ALLEGED SCHEME AND A DEFENDANT.

24     AND GIVEN THAT THERE'S -- I KNOW THERE'S ONLY BEEN ONE

25  DEFENSE WITNESS CALLED SO FAR, BUT GIVEN THAT THERE'S NO

1       CONNECTION YET MADE BETWEEN ANY SCHEME AND THIS DEFENDANT'S

2       STATE OF MIND, THE GOVERNMENT WILL BE MAKING A FOUNDATIONAL

3       OBJECTION TO THEIR TESTIMONY AS WELL.

4               THE COURT:  OKAY.

5               MR. SCHAINBAUM:  WELL, I JUST WANT TO BE CLEAR, WE

6       HAVE HAD SEVERAL WITNESSES, VANDANA KATJU AND AARTI KUMAR,

7       STATE THAT THERE WAS NO SCHEME, THERE WAS NO STRATEGY AND AT

8       THE MINIMUM THESE WITNESSES ARE GOING TO IMPEACH THAT POSITION

9       OF THOSE TWO WITNESSES.

10              THE COURT:  OKAY.  WE'LL HAVE A -- WE COULD HAVE A

11      HEARING AS TO FURTHER OFFERS OF PROOF AS WE GET CLOSER TO THAT.

12          LET'S TAKE UP YOUR HOUSEKEEPING ISSUE.

13              MR. SCHAINBAUM:  OKAY.  MR. LAFFER HAS A TRIAL

14      COMMITMENT TO BE A WITNESS IN SOUTHERN CALIFORNIA.  AM I

15      CORRECT?

16              MR. LAFFER:  YES.

17              MR. SCHAINBAUM:  SO HE NEEDS -- I HAVE BEEN

18      JOCKEYING THE SCHEDULE AND SINCE THE COURT SAID MONDAY MORNING

19      WAS THE ONLY SESSION, THE PLAN IS FOR HIM TO GO RIGHT AFTER

20      THAT SESSION TO THE LOS ANGELES AREA, TESTIFY TO WHATEVER HE'S

21      GOING TO TESTIFY TO, AND THEN RETURN.

22          WHEN ARE YOU GOING TO RETURN?

23              MR. LAFFER:  MONDAY EVENING.

24              MR. SCHAINBAUM:  MONDAY EVENING.

25          SO WE MIGHT NEED A LITTLE WIGGLE ROOM MONDAY MORNING TO

1584

1    GET HIM TO THE AIRPORT SO HE CAN GET TO SOUTHERN CALIFORNIA.

2              THE COURT:  WHAT DOES THAT MEAN?  YOU NEED TO BREAK

3    BEFORE NOON?

4              MR. SCHAINBAUM:  PROBABLY.  IS THAT -- WHAT'S

5    YOUR --

6              MR. LAFFER:  I THINK I HAVE A 1:00 O'CLOCK FLIGHT.

7              MR. SCHAINBAUM:  OUT OF WHERE?

8              MR. LAFFER:  OUT OF HERE, SAN JOSE.

9              THE COURT:  ALL RIGHT.

10             MR. SCHAINBAUM:  SO IT MIGHT BE 11:30.

11             THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.

12             MR. SCHAINBAUM:  HAVE A NICE WEEKEND, YOUR HONOR.

13             THE COURT:  THANK YOU.

14         (COURT CONCLUDED AT 5:21 P.M.)

15

16

17

18

19

20

21

22

23

24

25

1

2

3                        <u>CERTIFICATE OF REPORTER</u>

4

5

6

7          I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED

8    STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

9    280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

10   CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15                                  _____

16                                  IRENE RODRIGUEZ, CSR, CRR
                                    CERTIFICATE NUMBER 8076
17

18                                  DATED:  SEPTEMBER 20, 2013

19

20

21

22

23

24

25